**Exhibit 1**

**FERC, Order Denying Stay (Jan. 24, 2024)**

186 FERC ¶ 61,021
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
Allison Clements and Mark C. Christie.

| | |
|---|---|
| Rio Grande LNG, LLC | Docket Nos. CP16-454-000 |
| Rio Bravo Pipeline Company, LLC | CP16-454-003 |
| | CP16-455-000 |
| | CP16-455-002 |
| | CP20-481-000 |

ORDER DENYING STAY

(Issued January 24, 2024)

1.      On November 8, 2023, Commission staff issued a notice granting Rio Grande LNG, LLC (Rio Grande) authorization to proceed (Notice to Proceed) with construction of the Storm Protection Perimeter Levee (Levee) and the Material Offloading Facility of the Rio Grande Liquified Natural Gas Terminal (Rio Grande LNG Terminal).  On November 24, 2023, the City of Port Isabel, the Carrizo Comecrudo Tribe of Texas, Sierra Club, and Vecinos para el Bienestar de la Comunidad Costera (together, Sierra Club) filed a joint motion for stay of the Commission's orders authorizing construction of the Rio Grande LNG Terminal and Rio Bravo Pipeline.[1]  This order denies the requested stay.

I.      **Background**

2.      On November 22, 2019, the Commission authorized Rio Grande to construct and operate the Rio Grande LNG terminal, designed to produce up to 27 million metric tonnes per annum of LNG for export pursuant to section 3 of the Natural Gas Act (NGA).[2]  In the same order, the Commission also issued a certificate of public

---

[1] The motion cited the Notice to Proceed as well as orders authorizing the construction and operation of the Rio Grande LNG Terminal and on remand.  *See* notes 2, 5, *infra*.

[2] *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131, at P 5 (2019) (Authorization Order). *See* 15 U.S.C. § 717b.

convenience and necessity, under NGA section 7,[3] to Rio Bravo Pipeline Company, LLC (Rio Bravo) to construct and operate a new interstate natural gas pipeline system (Rio Bravo Pipeline) designed to provide up to 4.5 billion cubic feet per day (Bcf/d)[4] of firm natural gas transportation capacity from several interconnects in the vicinity of the Agua Dulce Hub in Nueces County, Texas, to Rio Grande's LNG export terminal.

3.        On December 23, 2019, Sierra Club and several other parties jointly requested rehearing of the Authorization Order.  On January 23, 2020, the Commission denied rehearing.[5]  Sierra Club petitioned for review of the Authorization and Rehearing Orders in the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit).

4.        While Sierra Club's petition for review was pending before the court, Rio Bravo filed an application on June 16, 2020, under section 7, to amend its certificate for the Rio Bravo Pipeline Project (Amendment Project).[6]

5.        On August 3, 2021, the D.C. Circuit remanded the Authorization and Rehearing Orders, holding that the Commission's National Environmental Policy Act (NEPA) analyses of the project's impacts on climate change regarding the use of the social cost of carbon and environmental justice communities were deficient.[7]  On April 21, 2023, the Commission addressed both Rio Bravo's Amendment Project and the issues remanded to the Commission (Remand Order).[8]  The Remand Order supplemented the environmental analysis of both the Rio Grande LNG Terminal and the Rio Bravo Pipeline Project, by: (1) addressing the argument regarding the social cost of carbon and (2) updating the analysis of the projects' environmental justice impacts, consistent with the Commission's current practice.  In the Remand Order, the Commission determined that the Rio Grande LNG Terminal, as conditioned in the Authorization Order and in the Remand Order, is

---

[3] 15 U.S.C. § 717f.

[4] 4.5 billion cubic feet per day is the equivalent of 4,500,000 dekatherms per day assuming that one dekatherm equals one thousand cubic feet of gas.

[5] *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 (2020) (Rehearing Order).

[6] Rio Bravo, Application to Amend Certificate of Public Convenience and Necessity, Docket No CP20-481-000 (filed June 16, 2020) (Pipeline Amendment Application).

[7] *Vecinos Para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021) (*Vecinos*).

[8] *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (2023) (Remand Order).

not inconsistent with the public interest (the standard set forth in NGA section 3).[9]
Additionally, the Commission determined that the Rio Bravo Pipeline Project, as
conditioned in the Authorization Order and as amended and modified in the Remand
Order, is required by the public convenience and necessity (the standard established by
NGA section 7).[10]

6.      On May 22, 2023, Sierra Club sought rehearing of the Remand Order.

7.      On July 24 and 25, 2023, Rio Grande requested that the Director of the Office of
Energy Projects issue a notice allowing it to proceed with construction of the Levee[11] and
the Material Offloading Facility[12] for the Rio Grande LNG Terminal.

8.      On August 17, 2023, Sierra Club petitioned for judicial review of the Remand
Order in the D.C. Circuit.

9.      On October 27, 2023, the Commission issued an order addressing Sierra Club's
arguments raised on rehearing and sustaining the result of the Remand Order.[13]

10.     On November 8, 2023, Commission staff issued the Notice to Proceed with
construction of the Levee and the Material Offloading Facility.[14]  The notice clarified that

---

[9] Remand Order, 183 FERC ¶ 61,046 at P 208.

[10] *Id.*

[11] The Levee would be constructed surrounding the LNG Terminal site to protect
the site from storm surge and to manage stormwater flows.  Apr. 26, 2019 Final
Environmental Impact Statement (Final EIS) at 4-44 to 4-45.

[12] Rio Grande would construct the Material Offloading Facility along the western
extent of the LNG Terminal site, adjacent to the Brownsville Ship Channel.  The Material
Offloading Facility would primarily be used during construction for marine delivery of
bulk materials and larger or pre-fabricated equipment as an alternative to road
transportation.  It would be maintained for the life of the project for periodic delivery of
bulk materials.  *Id.* at 2-11.

[13] *Rio Grande LNG, LLC*, 185 FERC ¶ 61,080 (2023) (Rehearing Order II).

[14] Notice to Proceed at 1.

Docket No. CP16-454-000, et al.                                    - 4 -

this approval did not grant Rio Grande the authority to commence construction of any other project facilities at the LNG Terminal.[15]

11.     On November 24, 2023, Sierra Club filed the instant motion for stay, requesting that the Commission stay the Commission's orders pending the outcome of judicial review.[16]  On December 11, 2023, Rio Grande and Rio Bravo filed separate answers in opposition to Sierra Club's motion for stay.

12.     On December 21, 2023, Sierra Club filed an answer in response to Rio Grande's and Rio Bravo's December 11 answers.  On January 3, 2024, Rio Bravo filed an answer in response to Sierra Club's December 21 answer.  The Commission's Rules of Practice and Procedure prohibit answers to answers.[17]  Accordingly, we reject Sierra Club's December 21 answer and Rio Bravo's January 3 answer.

## II.     **Discussion**

13.     The Commission reviews requests for stay under the standard established by the Administrative Procedure Act (APA):  a stay will be granted if the Commission finds that "justice so requires."[18]  Under this standard, the Commission considers such factors as: (1) whether the moving party will suffer irreparable injury without a stay, (2) whether a stay would substantially harm other parties, and (3) whether the stay is in the public interest.[19]  If the party requesting the stay is unable to demonstrate that it will suffer irreparable harm absent a stay, we need not examine other factors.[20]

14.     A stay is an extraordinary remedy,[21] especially where, as here, the Commission already considered the type of claimed irreparable harms that are the foundation of the

---

[15] *Id.*  Construction of the Rio Bravo Pipeline has not commenced.

[16] Sierra Club Motion for Stay at 1-2.

[17] 18 C.F.R. § 385.213(a)(2)(2022).

[18] 5 U.S.C. § 705.

[19] *See Const. Pipeline Co., L.L.C.*, 154 FERC ¶ 61,092, at P 9 (2016); *Transcon. Gas Pipe Line Co., L.L.C.,* 150 FERC ¶ 61,183, at P 9 (2015); *Millennium Pipeline Co., L.L.C.*, 141 FERC ¶ 61,022, at P 14 (2012).

[20] *See, e.g., Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,236, at P 8 (2016); *Transcon. Gas Pipe Line Co.*, 150 FERC ¶ 61,183 at P 9; *Millennium Pipeline Co.*, 141 FERC ¶ 61,022 at P 14.

[21] *See Munaf v. Geren*, 553 U.S. 674, 691 (2008) ("A preliminary injunction is an

stay request as part of the public interest determination it conducted in granting the underlying authorizations.  Indeed, in making its determinations that the Rio Grande LNG Terminal was not inconsistent with the public interest and that the Rio Bravo Pipeline is required by the public convenience and necessity, the Commission carefully considered and balanced the alleged harms of the project against its benefits.[22]  Moreover, a stay of construction would potentially delay the eventual export of LNG authorized under DOE's separate application of the public interest.[23]  Accordingly, for authorizations under NGA sections 3 and 7, the Commission's longstanding policy has been to disfavor requests for stay.[24]

---

extraordinary and drastic remedy; it is never awarded as of right.") (internal citations omitted).

[22] *See* Remand Order, 183 FERC ¶ 61,046 at PP 139-142 (discussing the projects' effects on air quality); Authorization Order, 169 FERC ¶ 61,131 at PP 85, 91, 118 (discussing the projects' impacts on ocelots).

[23] In August 2016, Rio Grande received authorization from the Department of Energy, Office of Fossil Energy (DOE) to export the project's full capacity to countries with which the United States has a Free Trade Agreement (FTA).  *Rio Grande LNG, LLC*, DOE/FE Docket No. 15-190-LNG, Order No. 3869 (2016).  Congress deems the export of natural gas to FTA countries to be in the public interest.  *See* 15 U.S.C. § 717b(c) (exportation of gas to FTA nations "shall be deemed to be consistent with the public interest").  On February 10, 2020, DOE issued an order authorizing Rio Grande to export LNG to non-FTA nations, but with which the U.S. still permits such trade.  *Rio Grande LNG, LLC*, DOE/FE Docket No. 15-190-LNG, Order No. 4492 (2020).

[24] *See*, *e.g*., *SFPP, L.P*., 166 FERC ¶ 61,211 at P 7 (2019) ("When considering requests for a stay of Commission action, the Commission's general policy is to refrain from granting stays in order to assure definitiveness and finality in Commission proceedings."); *Transcontinental Gas Pipe Line Co., LLC*, 150 FERC ¶ 61,183 at P 9 (2015) ("Our general policy is to refrain from granting stays in order to ensure definiteness and finality in our proceedings."); *Boston Edison Co*., 81 FERC ¶ 61,102 at 61,377 (1997) ("the Commission follows a general policy of denying motions for stay based on a need for finality in administrative proceedings.")  We note that this long-standing practice differs from the presumptive stays issued by the Commission under Order 871-B.  In that proceeding, the Commission reexamined its stay policy in Order No. 871-B and provided for presumptive stays while the Commission considers requests for rehearing of orders authorizing new natural gas and LNG facilities under NGA section 7.  *Limiting Authorizations to Proceed with Constr. Activities Pending Rehearing*, Order No. 871-B, 175 FERC ¶ 61,098 (2021).  The Commission found that this action appropriately addressed the competing interests at stake, including those of project

15.     In order to support a stay, the movant must substantiate that irreparable injury is "likely" to occur.[25] Here, the appeal is ongoing and, as discussed below, Sierra Club has not shown it will experience irreparable harm to justify granting the extraordinary remedy of a stay. To constitute irreparable harm, the injury must be both certain and great, and actual, not theoretical.  Bare allegations of what is likely to occur do not suffice.[26]  The movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof that the harm is certain to occur in the near future.[27]  Further, the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin.[28]  A stay generally "will not be granted against something merely feared as liable to occur at some indefinite time" in the future.[29]  Moreover, the injury "must be beyond remediation" and "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough."[30]

16.     In support of Sierra Club's claim that a stay is necessary to prevent irreparable harm, Sierra Club states that the construction and operation of the projects would impact wildlife and wildlife habitat, endangered species, recreation, visual resources, tourism, air quality, and wetlands, citing to the conclusions in Commission staff's final Environmental Impact Statement (final EIS).[31]  Sierra Club cites *Amoco Production Co. v. Village of Gambell* for the proposition that where environmental harm can be established, irreparable harm is almost always present because compensation is not a

---

opponents in being able to challenge the Commission's ultimate decision before alleged harm to affected landowners may occur, and the project developer's interest in proceeding with construction when it has obtained all necessary permits.

[25] *See Transcon. Gas Pipe Line Co.*, 150 FERC ¶ 61,183 at P 10 (citing *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Wis. Gas Co.*, 758 F.2d at 674 (quoting *Conn. v. Mass.*, 282 U.S. 660, 674 (1931)).

[30] *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 287 (D.D.C. 2017) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)) (denying motions for preliminary injunction for failure to establish irreparable harm).

[31] Sierra Club Motion for Stay at 2-4.

Docket No. CP16-454-000, et al.                                                      - 7 -

sufficient remedy.[32]  Sierra Club attaches the declaration of Juan Mancias, a member of the Carrizo Comecrudo Tribe of Texas and a member of the Sierra Club, which describes his activities near the project area, to support its argument.[33]

17.     Sierra Club's claims regarding environmental impacts do not constitute evidence of irreparable harm sufficient to support a stay.  Sierra Club has recast its opposition to the projects, raising generalized claims of harm and summarizing conclusions made in the final EIS, rather than identifying specific, imminent injuries.  The Commission's orders explain that the projects are environmentally acceptable[34] and that both Rio Grande and Rio Bravo would minimize project impacts by adhering to the mitigation

---

[32] *Id.* at 4 (citing 480 U.S. 531, 545 (1987)).

[33] *Id.* at Declaration of Juan Mancias.

[34] Remand Order, 183 FERC ¶ 61,046 at PP 7, 208.

measures for all impacted resources, including impacts to aquatic resources,[35] wildlife,[36] endangered species,[37] recreation,[38] and tourism.[39]

---

[35] Authorization Order, 169 FERC ¶ 61,131, at P 81 (explaining that the construction of the projects would have temporary and minor impacts on aquatic resources); Remand Order, 183 FERC ¶ 61,046 at P 55 (explaining that Rio Bravo's proposed amendment would not impact aquatic resources); Final EIS at 4-108 (all dredging would be conducted using equipment designed to meet the Texas state water quality standards and in accordance with applicable U.S. Army Corps of Engineers permit requirements), *id.* at 4-109 (stating that Rio Grande will use vibratory hammers to drive the sheet pilings at the material offloading facility), *id.* at 5-9 (recommending that Rio Bravo must ensure that all waterbodies with perceptible flow be crossed between November 1 and January 31).

[36] Authorization Order, 169 FERC ¶ 61,131 at PP 79-80, 82 (explaining that the construction of the projects would not result in significant impacts to wildlife not considered threatened, endangered or having other special status and, by implementing mitigation measures, the projects would have temporary and minor impacts on fisheries); Remand Order, 183 FERC ¶ 61,046 at P 75 (stating that the Amendment Project would have a "de minimis" impact on wildlife resources); Final EIS at 4-156 (Rio Grande will conduct pre-construction surveys and hazing to flush wildlife from the site), 5-8 (explaining that Rio Grande and Rio Bravo would implement measures from their Migratory Bird Conservation Plans).

[37] Authorization Order, 169 FERC ¶ 61,131 at PP 85, 91 (describing the U.S. Fish and Wildlife Service's (FWS) Biological Opinion requiring applicants to: (1) implement the conservation measures in the FWS's biological opinion; (2) notify FWS of any unauthorized take or if any endangered cat is found dead or injured during project implementation; (3) provide information and training on ocelot habitat requirements and avoidance measures to all project employees and contractors; and (4) monitor take of the ocelot and jaguarundi and provide periodic monitoring reports to FWS).

[38] Authorization Order, 169 FERC ¶ 61,131 at PP 94, 97 (explaining that the projects would not have significant impacts on recreation); Remand Order, 183 FERC ¶ 61,046 at PP 122-23 (explaining that the cumulative recreational impacts on environmental justice communities would be less than significant); Final EIS at 4-100 (stating that Rio Bravo has minimized impacts on the Lower Rio Grande Valley National Wildlife Refuge by adopting a route variation, reconfiguring horizontal directional drill (HDD) workspaces, and decreasing the construction footprint), 4-101 (noting that Rio Bravo would implement its *Upland Erosion Control, Revegetation, and Maintenance*

18.       Sierra Club has the burden to show that the extraordinary remedy of a stay is appropriate.[40]  Although the dissent faults the Commission for failing to issue data requests or otherwise to develop record evidence identifying potential harms and benefits relevant to the stay analysis,[41] where the record submitted by the stay applicant is inadequate to justify a stay, such additional process is not required under the law and is not consistent with Commission practice.

19.       Sierra Club states that its member, Mr. Mancias, will be harmed by air emissions from construction and operation because he is a recreational user in the area and is reliant on supplemental oxygen.[42]  The Commission has considered these potential harms to the health of people residing or recreating in the vicinity of the project, such as Mr. Mancias. In the Remand Order, the Commission explained that because portions of the projects will enter service before construction is entirely completed, there is the potential that those overlapping activities could contribute, in connection with other background emissions, to an exceedance of the National Ambient Air Quality Standards (NAAQS) for particulate matter and nitrogen oxide.[43]  The NAAQS are designed to ensure public safety by setting acceptable concentration limits that minimize health risks and that are designed to protect sensitive populations, such as at-risk populations of older adults, children, and people with asthma.[44]  To ensure that the projects do not exceed these

---

*Plan* (Plan), *Wetland and Waterbody Construction and Mitigation Procedures* (Procedures), and Spill Prevention, Control, and Countermeasure Plan (SPCC) Plan)).

   [39] Final EIS at 4-216, 4-229 (stating that Rio Grande will implement several measures to mitigate impacts to traffic on State Highway-48, including adding additional left-turn lanes, optimizing traffic signal timing, scheduling deliveries to avoid the expected arrival and departure of the workforce, and staggering shifts to avoid workers arriving and leaving at the same time).

   [40] *See Nken v. Holder*, 556 U.S. 418, 433-34 (2009) (collecting cases); *Munaf v. Geren*, 553 U.S. at 691 (stay pending appeal "is an extraordinary and drastic remedy; it is never awarded as of right"); *Reynolds Metals Co. v. FERC*, 777 F.2d 760, 763 (D.C. Cir. 1985) (motion for stay pending review is "seeking extraordinary relief").

   [41] *See* Clements Dissent at PP 4, 14.

   [42] Sierra Club Motion for Stay at 3.

   [43] *See* Remand Order, 183 FERC ¶ 61,046 at PP 141-42.

   [44] *Port Arthur LNG Phase II, LLC*, 184 FERC ¶ 61,184, at P 47 (2023) (citing Review of the Primary National Ambient Air Quality Standards for Oxides of Nitrogen, 83 Fed. Reg. 17226, 17230-17274 (Apr. 18, 2018) (codified at 40 C.F.R. §§ 50 *et seq.* (2022))).  The cases cited in the dissent acknowledge the U.S. Environmental

Docket No. CP16-454-000, et al.                                                      - 10 -

levels, the Commission required Rio Grande to file with the Commission a Project Ambient Air Quality Mitigation and Monitoring Plan for particulate matter and nitrogen oxide for periods when construction, commissioning and start-up, and operation of the project occur simultaneously.[45]  The projects will not result in NAAQS exceedances during periods of construction alone,[46] and specifically not the portion of stage 1 construction that has been authorized at this time.  Sierra Club has not established that temporary construction emissions will have irreparable health impacts.[47]  Additionally, as previously explained in this proceeding, there are other recreation sites nearby.  Sierra Club has not demonstrated that Mr. Mancias is unable to access these other sites for similar recreational opportunities during the temporary construction period or during pendency of appeal.[48]

20.      In its motion, Sierra Club states that the projects are "likely to adversely affect" endangered ocelots, resulting in a significant cumulative environmental impact.[49]  Sierra Club fails to explain how ocelot impacts harm movants or how such harm is imminent, and also does not recognize that the Commission has required mitigation to reduce

---

Protection Agency's comment regarding the NAAQS, but the Commission ultimately determined that it was appropriate to rely on the NAAQS to determine impacts on all communities.  *See Port Arthur LNG Phase II, LLC*, 184 FERC ¶ 61,184, at P 47 (2023); *Gas Transmission Nw., LLC*, 185 FERC ¶ 61,035, at P 87 (2023); *see also Texas Eastern Transmission, LP*, 184 FERC ¶ 61,187, at P 59 (2023); *Colum. Gulf Transmission, LLC*, 178 FERC ¶ 61,198, at P 65 (2022).

[45] Remand Order, 183 FERC ¶ 61,046 at P 142.

[46] *See id.* at P 139.

[47] Sierra Club Motion for Stay at 3.

[48] Cameron County offers a variety of parks and recreation areas providing ample sites that are removed from the area of potential impacts from the proposed LNG Terminal site.  Final EIS at 4-454.  *See Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 289-90 (D.D.C. 2017) (finding no irreparable harm as any individual who may be deterred from recreating in the area may return after active construction).

[49] Sierra Club Motion for Stay at 3.  We note that project impacts on the ocelot themselves, as well as other environmental issues discussed in the stay request, were not raised on appeal of the Authorization Order and were not the subject of the remand, although they were considered in the initial authorization order.  Authorization Order, 169 FERC ¶ 61,131 at PP 85, 91, 118.

Docket No. CP16-454-000, et al.                                    - 11 -

impacts to ocelot habitat.[50]  In its October 2, 2019 Final Biological Opinion, the FWS authorized the incidental take of one endangered cat (ocelot or jaguarundi) over the life of the projects (i.e., 30 years)[51] and concluded that the Rio Grande LNG Project is not likely to jeopardize the continued existence of the ocelot.[52]  "[N]o court has held that as a matter of law, the taking of a single animal [], no matter the circumstance, constitutes irreparable harm."[53]  Sierra Club has not shown that an irreparable injury is *likely* to

---

[50] *See, e.g., Mountain Valley Pipeline, LLC*, 174 FERC ¶ 61,192, at P 23 (2021) (concluding that "unsupported assumptions that mitigation measures will either be ignored or will fail" are insufficient to show irreparable harm).

[51] Authorization Order, 169 FERC ¶ 61,131 at P 85.  *See Strahan v. Secretary, Mass. Exec. Office of Energy and Envtl. Affairs*, 458 F.Supp.3d 76, 79 (D. Mass. 2020) ("Congress has set forth a permitting process through appropriate expert agencies that allows for the incidental taking of endangered species *if* the agency is satisfied that such incidental takes will, among other things, not threaten the survival of the species.  The determination to allow such takings, however, is for the expert agency, and not the court, to make"); *see also* Rehearing Order, 170 FERC ¶ 61,046 at PP 86-87.

[52] Authorization Order, 169 FERC ¶ 61,131 at P 85.  *See Pac. Coast Fed'n of Fisherman's Ass'n v. Gutierrez*, 606 F.Supp.2d 1195, 1207 (E.D. Cal. 2008) (considering whether the action sought to be enjoined "will reduce appreciably [the species'] likelihood of survival or recovery or appreciably diminish the value of their critical habitat").

[53] *Wild Equity Inst. v. City & Cnty. of S. Fran.*, No. C 11-00958 SI, 2011 WL 5975029, at *7 (N.D. Cal. Nov. 29, 2011)(rejecting the assertion that the death of a listed animal is an irreparable harm absent a showing that action sought to be enjoined will cause an appreciable reduction in the likelihood of survival or recovery of the species) (citing *Animal Welfare Inst. v. Martin*, 588 F.Supp.2d 70, 109 (D. Me. 2008); *Ala. v. U.S. Army Corps of Engineers*, 441 F.Supp.2d 1123, 1135–36 (N.D. Ala. 2006) (collecting opinions); *Defenders of Wildlife v. Salazar,* 812 F.Supp.2d 1205, 1209 (D. Mt. 2009) ("[T]o consider any taking of a listed species as irreparable harm would produce an irrational result" because the [Endangered Species Act] allows for incidental take permits)); *see also Water Keeper All. v. U.S. Dept. of Def.*, 271 F.3d 21, 34 (1st Cir. 2001) (finding the court did not abuse its discretion when it determined that Water Keeper's assertions concerning irreparable harm stemming from the "death of even a single member of an endangered species" were insufficient to justify granting injunctive relief).

occur.[54]  Rio Bravo has committed to following the FWS's[55] best management practices and Commission staff concluded in an Environmental Assessment (EA) that the Amendment Project is not likely to adversely affect the ocelot.[56]  With the implementation of the best management practices, Commission staff ultimately concluded that impacts from the Amendment Project on ocelots would be sufficiently minimized and not significant.[57]  Sierra Club has not shown that the implementation of best management practices and the mitigation measures are insufficient to prevent irreparable harm sufficient to support a stay of the Authorization Order.[58]

21.    Contrary to the dissent, harm to movants' potential wildlife viewing in the Laguna Atacosa National Wildlife Refuge does not amount to an injury "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm"[59]

---

[54] *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (U.S. 2008) (clarifying that to meet the irreparable injury requirement a movant must "demonstrate that irreparable injury is *likely* in the absence of an injunction").  *Compare Ctr. for Biological Diversity v. Ross*, 480 F.Supp.3d 236, at 252 (D.D.C. 2020) (movant provided evidence of seven whales found dead and several more actively entangled over the last three years) *and Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (U.S. 1978) (concluding that completion of the project would have destroyed the critical habitat of the snail darter, resulting in the complete extinction of the endangered species).

[55] The Authorization Order found that the projects, with the imposition of the Environmental Conditions and measures required by the 2019 Biological Opinion, would be an environmentally acceptable action.  Authorization Order, 169 FERC ¶ 61,131 at PP 85 & 91; Rehearing Order, 170 FERC ¶ 61,046 at PP 31-33.  Pursuant to the 2019 Biological Opinion and the Authorization Order, Rio Bravo filed an amendment application with the Commission on July 20, 2023, to adjust its pipeline route to reduce direct impacts to ocelot habitat.  On August 23, 2023, FWS concurred with Rio Bravo's determination that the proposed pipeline route adjustment may affect, but is not likely to adversely affect the ocelot and included a list of best management practices.  FWS Aug. 23, 2023 Letter at 4.

[56] Nov. 14, 2023 EA, Docket No. CP23-519-000, at 30.

[57] *Id.* at 30-31.

[58] *See Duke Energy Carolinas, LLC*, 124 FERC ¶ 61,254 (2008) (finding no irreparable harm where reasonable and prudent measures to avoid or minimize the incidental take of an endangered species were developed pursuant to the requirements of FWS and the movant pointed to no deficiencies in the plan).

[59] *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Docket No. CP16-454-000, et al.                                                                - 13 -

Because, as discussed below, there is neither a certainty of irreparable injury to the ocelot nor a showing that the primarily nocturnal species[60] may not be viewed in alternative locations.  Further, while the dissent focuses on potential adverse impacts to ocelots from clearing the LNG Terminal site, site preparation began in 2022 in accordance with required mitigation and the site has been cleared and prepared for construction,[61] such that the ocelot habitat is no longer present.[62]  Therefore, a stay would not impact ocelot habitat in the way the dissent contemplates.  The dissent also points to potential noise impacts from pile driving, but ignores both Commission and FWS requirements that implement mitigation measures to reduce noise impacts.[63]  FWS also required mitigation to reduce vehicular impacts associated with the project by requiring all project traffic to remain on established roads and reduce speeds.[64]  Again, these measures and the information in the dissent were accounted for by FWS when it issued its Final Biological Opinion.[65]  While the EIS acknowledges that the loss of one ocelot would result in a

---

[60] Oct. 2, 2019 FWS Final Biological Opinion at 6.

[61] *See* Mar. 6, 2020 Notice to Proceed with Implementation Plan and Site Preparation/Mobilization (granting Rio Grande LNG's request to commence full site preparation including site clearing and balancing, placement of imported material, and rough grading of the LNG Terminal); Oct. 31, 2022 Monthly Report 35 at 3, (describing initial site preparation and wildlife relocation efforts); Jan 2, 2024 Monthly Report 49 at 3-6 (describing building and improvement of the site).  We note there were no ocelots observed during site clearing.  *See* Oct. 31, 2022 Monthly Report 35 at 3.

[62] Nov. 2023 Monthly Report at 3.  Contrary to the dissent's claim that mesquite-thorn shrub habitat at the LNG Terminal site is the preferred ocelot habitat, Dissent at P 9, the ocelot's preferred habitat also includes chaparral thickets and live oak mottes in the area. Final EIS at 4-157; 4-447.

[63] Authorization Order, 169 FERC ¶ 61,131, at P 105 (Environmental Condition 34 requires Rio Grande to monitor pile-driving activities, file weekly noise data once pile-driving activities have begun, and implement mitigation measures if noise impacts exceed 10 decibels over ambient levels at nearby noise-sensitive areas); Aug. 23, 2023 FWS Letter, Docket No. CP23-519-000, at 5 ("Noise levels should be minimized and all generators should be in baffle boxes, have an attached muffler, or use other noise-abatement methods in accordance with industry standard").

[64] *Id.* at 30; Aug. 23, 2023 FWS Letter, Docket No. CP23-519-000, at 5.

[65] "After reviewing the current status of the ocelot, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the [FWS's] biological opinion that the proposed [Rio Grande LNG Terminal Project] and, the [Rio Bravo Pipeline Project] as proposed is not likely to jeopardize the continued

Docket No. CP16-454-000, et al.                                                                - 14 -

significant impact, FWS subsequently issued its Biological Opinion allowing the incidental take of one endangered cat because it would not jeopardize the species.  The Commission considered this information when it authorized the projects.[66]

22.      Similarly, Sierra Club states only that "the projects would have a permanent impact on tourism,"[67] but fails to explain how these generalized impacts imminently harm any of its members or movants, particularly when the Commission has determined that these impacts will not result in significant impacts.[68]

23.      Sierra Club next states that off-site mitigation associated with wetlands restoration will result in an irreparable injury to its members who recreate at the nearby Laguna Atascosa National Wildlife Refuge because it will not restore the loss of site-specific recreation and wildlife-viewing opportunities associated with the project site.  We find that Sierra Club's alleged harms are speculative and it has not shown that irreparable injury is "likely" to occur.[69]  Sierra Club did not assert that movants could not continue to recreate at the refuge or that they could not instead recreate or fish at other locations nearby.  Fishing opportunities would still exist nearby and construction at the Rio Grande LNG Terminal site would not restrict fishing access to bays in the project area or the Gulf of Mexico.[70]  The off-site mitigation Rio Grande and Rio Bravo will carry out, pursuant

---

existence of the listed ocelot…There is no critical habitat listed for these species within the action area, therefore none will be affected."  Oct. 2, 2019 FWS Final Biological Opinion.

   [66] Authorization Order, 169 FERC ¶ 61,131, at P 85.

   [67] Sierra Club Motion for Stay at 3.

   [68] Authorization Order, 169 FERC ¶ 61,131 at P 98; Remand Order, 183 FERC ¶ 61,046 at PP 124-25.

   [69] *See Millennium Pipeline Co., L.L.C.*, 162 FERC ¶ 61,241, at P 6 (2018) (finding that Riverkeeper's claims that members would "suffer from the loss of forest land, wetlands, and streams 'in and around where they live, work, and recreate,'" did not constitute sufficient evidence of irreparable harm); *see also Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,148, at P 15 (2023) (movant did not show that the mitigation measures were insufficient to prevent irreparable harm).

   [70] Final EIS at 4-219, 4-237 (These areas include the remainder of the undeveloped channel shoreline, as well as nearby public areas, including the Zapata boat launch, the pier over San Martin Lake, and the south end of Bahia Grande).

to the requirements in their U.S. Army Corps of Engineers permit,[71] will take place in the same watershed as the projects, which will result in "no net loss" of wetlands in the United States.[72]  Moreover, the Commission's orders found that there would not be significant impacts to recreation and wildlife as a result of the loss of wetlands at the project sites.[73]

24.     Sierra Club contends that significant visual impacts will harm Mr. Mancias, who recreates in the Bahia Grande unit of the Laguna Atascosa National Wildlife Refuge. Sierra Club again fails to explain why the harm to Mr. Mancias is either irreparable or imminent.  Although the Remand Order found cumulative impacts on visual resources would be potentially significant due to the physical facilities of the Rio Grande LNG Terminal,[74] the impacts associated with construction activities (e.g., cranes) are temporary, and the permanent impacts associated with the Rio Grande LNG Terminal facilities will be realized incrementally, over the course of the anticipated 7-year construction period.[75]  Moreover, for an injury to qualify as irreparable it must be "beyond remediation."[76]  Here, visual impacts from construction are temporary,[77] and otherwise permanent visual impacts could be reversed.[78]

---

[71] Rio Bravo Oct. 6, 2021 Supplemental Information at 4 – 9.

[72] Final EIS at 4-68, 4-69.

[73] Remand Order, 183 FERC ¶ 61,046 at PP 75, 164, 184, 206; Authorization Order, 169 FERC ¶ 61,131 at PP 79, 97.

[74] Remand Order, 183 FERC ¶ 61,046 at P 163.

[75] Final EIS at 2-31.

[76] See Nat'l Parks Conservation Ass'n v. Semonite, 282 F. Supp. 3d 284, 289 (D.D.C. 2017).

[77] See Id. at 289–90 (concluding aesthetic injuries to recreational users during construction of electric transmission lines does not constitute irreparable harm as "any individuals who may be deterred from recreating in the area may return after active construction project"); Transco. Gas Pipe Line Co. LLC, 160 FERC ¶ 61,042, at P 10 (2017) (Because the impacts of operational emissions would not occur until construction was completed, the Commission found the impacts were not sufficiently imminent to support a stay).

[78] Transco. Gas Pipe Line Co., LLC, 161 FERC ¶ 61,250, at P 100 (2017) ("[t]o the extent that [the project sponsor] elects to proceed with construction, it bears the risk

25.     As noted above, where, as here, a movant has not established that it will suffer irreparable harm absent a stay, the Commission need not examine other factors.[79]  Sierra Club raises generalized claims of harm that are neither imminent nor irreparable to support a stay.[80]  As discussed above, cumulative visual and ocelot impacts, while significant, are not imminent, especially given the narrow scope of construction authorized in the Notice to Proceed.  Even if impacts were imminent, significance alone is not sufficient to establish an irreparable injury when Sierra Club fails to articulate how its members and movants will be specifically harmed.  Moreover, the Commission, as noted above, has required mitigation to minimize project impacts and has found the projects are environmentally acceptable.[81]  For these reasons, we conclude that Sierra Club has not demonstrated that absent a stay there will be irreparable harm.

26.     We appreciate and respect the concerns expressed by those opposing proposed projects.  Once we have decided that a project is in the public interest, however, we cannot lightly stay the authorizations that permit project development in the absence of a showing of irreparable harm.  While individuals may be inconvenienced, even substantially, by a project or may not be able to use lands impacted by a project in the

───────────────────

that ... our orders will be overturned on appeal" and it could be required to remove the new facilities or undertake further remediation).

[79]  *Tenn. Gas Pipeline Co.*, 160 FERC ¶ 61,062, at P 4 (2017).

[80]  *See Nat'l Fuel Gas Supply Corp.*, 160 FERC ¶ 61,043, at P 9 (2017) ("These generalized claims of environmental harm do not constitute sufficient evidence of irreparable harm that would justify a stay."); *Tenn. Gas Pipeline Co.*, *L.L.C.*, 155 FERC ¶ 61,087, at P 5 (2016) (finding that a "generalized claim [of environmental harm] does not constitute evidence of irreparable harm that would justify a stay"); *Fla. Se. Connection, LLC*, 154 FERC ¶ 61,264, at P 8 (2016) (denying stay premised upon "generalized environmental harm without identifying specifics"); *Empire Pipeline, Inc.*, 153 FERC ¶ 61,379, at P 11 (2015) (denying stay where movant "provided only unsupported, generalized allegations about environmental harm resulting from the project"); *Transcon. Gas Pipe Line Co.*, 150 FERC ¶ 61,183 at P 19 (denying stay request where movant "only assert[ed] generalized environmental harm to its members without identifying specifics"); *Tenn. Gas Pipeline Co.*, 96 FERC ¶ 61,116, at 61,446 (2001) ("[G]eneral allegations do not constitute evidence of irreparable harm that would justify staying the orders in this proceeding").

[81]  *Columbia Gas Transmission, LLC*, 162 FERC ¶ 61,260 at P 7 (2018) (the Commission did not believe that denying the request for stay would put the environment at risk because the Commission has previously determined that the projects would be an environmentally acceptable action).

Document Accession #: 20240124-3078          Filed Date: 01/24/2024

manner to which they have been accustomed, such impacts do not necessarily constitute irreparable harm, particularly in the absence of a showing that affected resources are unique and that other, similar opportunities are not available.

27.     Because Sierra Club has not proved irreparable injury absent a stay, we need not examine whether issuing a stay may substantially harm other parties or whether a stay is in the public interest.  Nonetheless, in the balance of this order, we consider those factors and conclude that neither supports issuance of a stay.

28.     Sierra Clubs asserts that granting a stay will not substantially harm other parties because Rio Grande and Rio Bravo have failed to expeditiously move the projects forward.[82]  We find that granting a stay of the projects' authorizations, thereby halting any and all project construction for an undefined period of time would cause delay and therefore harm to Rio Grande, Rio Bravo, and their customers who are relying on the projects to provide needed transportation capacity and export of natural gas—exports that, as noted, have been approved following DOE's application of the public interest standard under NGA section 3.[83]

29.     Finally, we also conclude that the public interest cuts against granting a stay.  As noted, in conducting the necessary public interest determinations when authorizing the project, the Commission considered the type of harms raised by Sierra Club and determined  that the Rio Grande LNG terminal and the Rio Bravo Pipeline met the relevant statutory standards.[84]  That is not to say, as the dissent suggests, that it can never

---

[82] Sierra Club Motion for Stay at 5.

[83] *See supra* note 22; Rio Grande Answer at n.39 (citing Press Release, NextDecade Co., *NextDecade Announces Positive Final Investment Decision on Rio Grande LNG Phase 1* (July 12, 2023), https://investors.next-decade.com/news-releases/news-release-details/nextdecade-announces-positive-final-investment-decision-rio). *See also e.g.*, Rio Grande Jan. 2, 2024 Monthly Status Report No. 49 for Dec. 2023 at 3-9 (describing ongoing construction activities, including building and improving laydown yards and work pads; arrangement of temporary facilities; temporary drainage improvements; buildout and improvement of onsite construction roads; and reclamation, stabilization and restoration of the shoreline, general site activities, and completed test pile program).

[84] Authorization Order, 169 FERC ¶ 61,131, at P 133; Remand Order, 183 FERC ¶ 61,046 at P 208.  The dissent claims that errors in the Commission's Remand Order weigh in favor of granting the request for stay.  We do not agree that the Commission erred.  The same claims were addressed by the Commission on rehearing and will be addressed by the D.C. Circuit on appeal.  For purposes of Sierra Club's motion for stay,

be in the public interest to stay an action which the Commission has found to be in the public interest.  But here we considered the very factors put forth by Sierra Club in support of its stay request in authorizing the projects and nothing in its motion meets the high bar needed to justify a stay.  Given the harm that could be caused by staying the approved facilities, including the delay to exports of LNG,[85] we do not believe that the harms alleged by Sierra Club, even if irreparable, support a conclusion that stay is in the public interest.

30.      We are cognizant that the construction and operation of necessary infrastructure often entail environmental impacts.  We take seriously our obligation to balance project need with those impacts and make every effort to impose reasonable environmental mitigation measures to reduce them.  As discussed in the Authorization Order and the Remand Order, Rio Grande and Rio Bravo have taken sufficient steps to minimize adverse impacts, including those required by FWS, and Rio Grande has obtained all of the federal permits it needs to proceed with applicable construction.  Here, we do not find that granting a stay is in the public interest.

31.      Given that Sierra Club has not demonstrated the likelihood of irreparable injury in the absence of a stay or that justice otherwise requires issuance of a stay, we conclude that a stay is not required here, and we therefore deny Sierra Club's motion.

The Commission orders:

      Sierra Club's motion for stay is hereby denied, as discussed in the body of this order.

By the Commission.  Commissioner Clements is dissenting with a separate statement attached.

( S E A L )


                                        Debbie-Anne A. Reese,
                                        Acting Secretary.

--------------------------------------------------------

the likelihood of success on the merits is not a factor weighed by an administrative agency.

      [85] Rio Grande holds long-term LNG sales and purchase agreements to export natural gas supplies with:  TotalEnergies, Shell, ENGIE, Galp, Itochu, ExxonMobil, ENN, China Gas and Guangdong Energy.  Rio Grande Dec. 11, 2023 Answer at 12.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Rio Grande LNG, LLC                               Docket Nos.  CP16-454-000
Rio Bravo Pipeline Company, LLC                                CP16-454-003
                                                               CP16-455-000
                                                               CP16-455-002
                                                               CP20-481-000

(Issued January 24, 2024)

CLEMENTS, Commissioner, *dissenting*:

1.      I dissent from today's Order.**1**  Through rigid application of the Commission's stay precedents, the Order perpetuates and magnifies the injury the Commission inflicted on environmental justice (EJ) communities by failing to meet its legal obligations following the D.C. Circuit's remand in the *Vecinos* case.**2**  With this Order, the Commission heightens the almost impossibly steep barrier its stay precedents erect to ever finding alleged harms to human health or the environment to be irreparable.  In doing so, the Commission ignores the difficulties that affected environmental justice (EJ) communities, tribes, non-governmental organizations (NGOs), and individuals face in proving harm is "certain," "great," "actual," "imminent," and "beyond remediation."**3**  As explained below, Sierra Club's case for irreparable harm is much stronger than the Order portrays.  Moreover, the Commission's failure to meet its legal obligations to fully assess, consider, and explain the projects' environmental impacts weighs heavily in favor of a stay because the public has a strong interest in assuring that federal agencies follow the law.**4**

2.      At the outset, it is important to recognize that this case is fundamentally about environmental justice.  The stay movants include parties who prevailed in *Vecinos* on two

---

**1** *Rio Grande LNG, LLC*, 186 FERC ¶ 61,021 (2024) (Order).

**2** *Vecinos Para el Bienstar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021) (*Vecinos*).

**3** *See* Order, 186 FERC ¶ 61,021 at P 15.

**4** In determining whether to grant a stay, the Commission generally considers whether the moving party will suffer irreparable injury without a stay, whether a stay would substantially harm other parties, and whether the stay is in the public interest.  *Id.* at P 13.

Document Accession #: 20240124-3078          Filed Date: 01/24/2024

issues: (1) the Commission's deficient analyses of the projects' impacts on EJ communities and climate change, and (2) the Commission's insufficient explanation of its public interest determinations under sections 3 and 7 of the Natural Gas Act (NGA) in light of those deficiencies.[5]  The movants here are the City of Port Isabel, an EJ community; Vecinos para el Bienstar de la Comunidad Costera, an EJ community organization; the Carrizo Comecrudo Tribe of Texas, a Native American tribal organization; and Sierra Club, an environmental NGO advocating on its own behalf and that of the other movants.  As explained below, neither these movants – nor any other potentially affected EJ communities or representatives – had any meaningful opportunity to participate in, or comment on, the Commission's new analyses of the projects' environmental impacts on remand.  Today's Order compounds that injury to them.

3.      The Administrative Procedure Act (APA) establishes a broad and flexible standard for agencies to determine whether to stay their own actions: "[w]hen … justice so requires."[6]  Although nothing in the APA compels it to do so, the Commission has taken a particularly restrictive approach to stay requests – at least those predicated on alleged harm to the environment or human health.  Indeed, courts have been more willing than

---

[5] *See Vecinos*, 6 F.4th 1321, at 1329-1331.

[6] 5 U.S.C. § 705.

Document Accession #: 20240124-3078        Filed Date: 01/24/2024

Docket No. CP16-454-000, et al.                                                          - 3 -

the Commission to grant stays when environmental harms[7] or human health impacts[8] are at stake. I am aware of *no* case in which the Commission has granted a stay based on allegations of harm to the environment or human health. However, there *are* examples of the Commission granting stays when purely economic interests were at stake, even

---

[7] *See, e.g.*, *Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("[E]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.") (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)); *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 201 (4th Cir. 2005) (quoting *Gambell* and noting that there are also often irreparable harms when there are disputes regarding NEPA analysis as moving construction forward would render consideration of environmental impacts a "meaningless formality."); *City of Green v. Nexus Gas Transmission, LLC*, 2017 U.S. App. LEXIS 23725, *5 (6th Cir. 2017) (unpublished) (quoting *Gambell* and finding construction of a pipeline "would cause long-term environmental harms" and constitute an irreparable injury); *Davis v. Mineta*, 302 F.3d 1104, 1115 (10th Cir. 2002) (quoting *Gambell*). Some courts have adopted "a less demanding standard" to show irreparable harm "requiring only a likelihood, not a certainty, of future irreparable harm" when it comes to harms impacting endangered species listed under the Endangered Species Act (ESA). *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 251 (D.D.C. 2020); *see also Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 221-222 (D.D.C. 2003) (holding that there can be "aesthetic injury based on the mere *contemplation* of a particular treatment of the animals in question," even if the plaintiff was unlikely to see the particular animal harmed (emphasis in original)). The harm need not rise to an extinction-level threat to a listed species to constitute irreparable harm. *See Am. Rivers v. United States Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 258-259 (D.D.C. 2003) (finding an irreparable harm to an endangered species despite it being "undisputed that high flow this summer will not lead to extinction of the species this year.").

[8] *Majid Abdulla Al-Joudi v. Bush,* 406 F. Supp. 2d 13, 20 (D.D.C. 2005) ("courts often find a showing of irreparable harm where the movant's health is in imminent danger."); *Coronel v. Decker*, 449 F. Supp. 3d 274, 281 (S.D.N.Y. 2020) ("[I]rreparable harm exists where, as here, petitioners face imminent risk to their health, safety, and lives.") (internal citations omitted); *see also Knight v. Richardson Bay Reg'l Agency*, 637 F. Supp. 3d 789, 800 (N.D. Cal. 2022) (finding that seizing plaintiff's boat would cause irreparable harm to his health and safety because he lived on it); *Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45, 58-59 (D.D.C. 2020) (finding irreparable harm to deaf individuals denied "information about their health and safety" because of a lack of American Sign Language interpreters at COVID briefings).

Docket No. CP16-454-000, et al.                                                          - 4 -

though by definition irreparable harm was absent.[9]  That inconsistency alone should
cause the majority to reconsider its rigid approach in this case.

4.      Consistent with its commitment to better integrate EJ concerns in its decision-
making,[10] the Commission should recognize the practical impediments that EJ
communities and their representatives face in producing the type of specific evidence of
harm that the Commission demands.  Most lack the resources to hire environmental,
medical, epidemiological, and other experts who could provide the proof the Commission
apparently seeks.  Moreover, it is generally the project developer that has the detailed
information about the specific impacts its project will have; the Commission provides no
opportunity for discovery and cross-examination in certificate cases that would bring all
the relevant information to light.  Here, the Commission easily could have issued data
requests to Rio Grande and Rio Bravo to determine and substantiate the harms a stay
could cause the companies and their customers, and what specific public benefits would
be affected by a stay.  Instead, as explained below, the Order relies on pure conjecture for
its findings that the project sponsors, their customers, and the public will be harmed by a
stay.[11]  It seems that the Commission demands hard evidence from the movants while
crediting bare allegations from the project developers.  I cannot countenance that double
standard.

5.      Notwithstanding these impediments, movants make a much stronger case for
irreparable injury than the Order acknowledges.  The Order discounts many of Sierra
Club's allegations by unfairly labeling them as "generalized," when they are actually
quite specific.  For example, Mr. Mancias, a member of the Sierra Club, alleges he would

---

[9] *See, e.g.*, *Calif. Indep. Sys. Operator Corp.*, 114 FERC ¶ 61,339, at P 21 (2006)
(granting stay to CAISO to avoid economic harm to market participants from
Commission order removing Permitted Netting for non-Qualifying Facility suppliers);
*Mont. Power Co., Confederated Salish and Kootenai Tribes of the Flathead Reservation*,
85 FERC ¶ 61,400, at 62,535 (1998) (finding justice required a stay despite purely
monetary harms because a hydroelectric project would otherwise be required to make a
payment to a Fish and Wildlife Implementation Fund before parties were able to obtain
judicial review of the condition mandating the payment); *Pinnacle W. Capital Corp.*, 115
FERC ¶ 61,064, at P 9 (2006) (finding justice required a stay despite purely economic
consequences because Pinnacle sought a stay of only two weeks and there would be no
adverse impacts to other parties).

[10] FERC, *Equity Action Plan* at 2 (Apr. 15, 2022), https://www.ferc.gov/equity
(explaining Commission's goal to "better integrate environmental justice and equity
considerations in its decision-making processes").

[11] *See* discussion *infra* at PP 13-14.

face an irreparable injury in the absence of a stay due to the air quality impacts of construction in an area where he regularly recreates.[12]  Mr. Mancias "uses supplemental oxygen, and he is concerned that he would be particularly susceptible to harm from this pollution."[13]  His concern is based on the fact that his "respiratory symptoms are worse when the air quality where [he is] is worse."[14]  The environmental impact statement (EIS) for the project found "that construction of the Project would impact local air quality,"[15] including by the release of particulate matter and ozone precursors both during construction[16] and operation[17] of the project.  Moreover, it concluded that the combined emissions from simultaneous construction, commissioning, start-up and operational activities at the LNG terminal could result in an exceedance of the National Ambient Air Quality Standards (NAAQS).[18]  In its Remand Order, the Commission imposed a new air pollution and monitoring condition that it intended to prevent or reduce NAAQS violations.  However, as I demonstrated in my dissents from the Remand Order and Rehearing Order, the condition is too vague and undeveloped to pass muster as effective mitigation under the National Environmental Policy Act (NEPA).[19]  Thus, to the extent the Order relies on compliance with the NAAQS to reject Mr. Mancias's claim that

---

[12] Sierra Club Motion for Stay at 3.

[13] *Id.*

[14] Declaration of Juan Mancias at P 8.  *See also* EPA, *Health and Environmental Effects of Particulate Matter (PM)*, https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm (explaining that "Exposure to [particulate matter] can affect both your lungs and your heart.  Numerous scientific studies have linked particle pollution exposure to a variety of problems."); EPA, *Health Effects of Ozone Pollution*, https://www.epa.gov/ground-level-ozone-pollution/health-effects-ozone-pollution (describing how ground level ozone can "[m]ake it more difficult to breathe deeply and vigorously and cause pain when taking a deep breath," [i]nflame and damage the airways," and "[m]ake the lungs more susceptible to infection.").

[15] EIS at 4-259.

[16] *Id.* at 4-257.

[17] *Id.* at 4-261, 4-262.

[18] *See Rio Grande LNG, LLC*, 183 FERC ¶ 61,046, at P 141 (2023) (Remand Order).

[19] Remand Order, 183 FERC ¶ 61,046 (Clements, Comm'r, dissenting at P 4); *Rio Grande LNG, LLC*, 185 FERC ¶ 61,080 (2023) (Rehearing Order) (Clements, Comm'r, dissenting at PP 6-8).

project-related air pollution will harm his health, it lacks the legal or factual justification to do so.[20]

6.      Sierra Club also explains how the project construction will destroy "recreation and wildlife-viewing opportunities" its members, including Mr. Mancias, enjoy.[21]  The Order suggests Sierra Club did not show that irreparable injury was *likely*.[22]  But Sierra Club

---

[20] *See* Order, 186 FERC ¶ 61,021 at P 19.  Even if there were a legitimate basis to conclude there would be no NAAQS violation, project related air pollution could still cause irreparable harm.  The Commission has repeatedly recognized the United States Environmental Protection Agency's (EPA) determination that emissions below NAAQS thresholds *can* cause serious health impacts, especially for individuals with preexisting respiratory conditions like Mr. Mancias.  *See Port Arthur LNG Phase II, LLC*, 184 FERC ¶ 61,184, at P 47 (2023) ("We acknowledge that EPA public rulemakings on the NAAQS have indicated that [health] effects may occur at levels below the NAAQS."); *Gas Transmission Nw., LLC*, 185 FERC ¶ 61,035, at P 87 (2023) ("NAAQS attainment alone may not assure there is no localized harm to such populations due to project emissions of volatile organic compounds, hazardous air pollutants as well as issues, such as the presence of non-project related pollution sources, local health risk factors, disease prevalence, and access (or lack thereof) to adequate care."); *see also Texas Eastern Transmission, LP*, 184 FERC ¶ 61,187, at P 59 (2023); *Colum. Gulf Transmission, LLC*, 178 FERC ¶ 61,198, at P 65 (2022).  EPA is currently reconsidering the NAAQS standards for PM2.5, in part because "recent epidemiologic studies strengthen support for health effect associations at lower PM2.5 concentrations [than the current NAAQS]." Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 88 Fed. Reg. 5561 (Jan. 27, 2023).  "The available evidence in the 2019 ISA continues to provide support for factors that may contribute to increased risk of PM2.5-related health effects including … pre-existing diseases (cardiovascular disease and respiratory disease), race/ethnicity, and socioeconomic status." *Id.*  The proposed rulemaking also noted that "[i]n its advice to the Administrator, the [Clean Air Scientific Advisory Committee (CASAC)] concurred … that the currently available health effects evidence calls into question the adequacy of the primary annual PM2.5 standard." *Id.*  While the Commission has determined that it is appropriate to rely on the NAAQS, it has only done so "*in the absence of any other guidance or thresholds for criteria pollutants*." *Port Arthur LNG Phase II, LLC*, 184 FERC ¶ 61,184, at P 47 (2023) (emphasis added). EPA's reconsideration of the NAAQS for PM2.5, supported by CASAC's expert analysis, underscores that there can be significant health impacts at emissions levels below the NAAQS.

[21] Sierra Club Motion for Stay at 3.

[22] Order, 186 FERC ¶ 61,021 at P 20.

did allege that the EIS found that 182.4 acres of wetlands at the terminal site "*will*" be permanently destroyed which will impact "wildlife-viewing opportunities available at [the terminal site]."[23]  Mr. Mancias goes bird watching and otherwise recreates at a location where he can "see the Rio Grande LNG export facility site" and expresses concern about the projects' impacts on species in the project area.[24]  Construction would eliminate wetland species on the project site, causing the exact impact Mr. Mancias explains will harm him.[25]

7.      The Order also faults Sierra Club for not showing that "movants could not continue to recreate at the refuge or that they could not instead recreate or fish at other locations nearby."[26]  However, the Order cites no support for its suggestion that movants bear the burden of proving the inability to recreate in some alternative area to show an irreparable harm.  In this respect, the Order appears to erect yet another obstacle to ever finding irreparable environmental harm.  Furthermore, the Order ignores caselaw recognizing that injury to a *specific* resource or aesthetic interest may constitute irreparable harm notwithstanding the existence of alternative similar resources or recreational opportunities.[27]

---

[23] Sierra Club Motion for Stay at 3 (citing EIS at ES-6) (emphasis added).  The EIS's finding that the wetlands will be destroyed makes this not just a likely impact, but a *certain* impact.

[24] Declaration of Juan Mancias at P 10.

[25] This area includes mangroves, shoregrass, sea ox-eye daisy, sea blite, glassworts, and saltwort.  EIS at 4-57.

[26] Order, 186 FERC ¶ 61,021 at P 23.

[27] *See City of Green,* 2017 U.S. App. LEXIS 23725, at *5 (noting that a pipeline would cause long-term environmental harm and finding that "[a]lthough Nexus has agreed to establish wetlands elsewhere to compensate for these environmental injuries, such actions appear relevant to the public interest prong of the stay test, not to the prong that considers irreparable harm to Green."); *Fund for Animals*, 281 F. Supp. 2d at 221 (finding irreparable harm to plaintiff's despite presence of mute swans in many other locations because "[p]laintiffs in this case claim, for the purposes of their request for injunctive relief… to have developed relationships with and aesthetic interests in particular swans located in Maryland, not with all swans in the Atlantic Flyway.").  *See also* Sierra Club Motion for Stay at 4 ("[E]ven if FERC is correct that off-site mitigation will mean that the net impact to the environment is insignificant, wetland restoration does not mitigate or repair the injury to these movants, who recreate at the Bahia Grande site, rather than at these other locations. Injury to these specific sites is irreparable.")

8.    Sierra Club also makes specific allegations of irreparable injury due to harms to local ocelots, an endangered species under the ESA.  Mr. Mancias indicated that about twice a month he visits the Laguna Atascosa National Wildlife refuge to enjoy viewing wildlife, specifically including ocelots.[28]  He is "concerned about the projects' impact on these species and other species in the project area."[29]  The EIS reflects that these fears are well-founded.  The EIS determined that there are three main causes of adverse impacts to ocelots: "increase in ambient sound levels," which could drive ocelots out of limited suitable habitat,[30] loss of habitat "within the LNG Terminal site boundaries,"[31] and direct kills of ocelots through vehicular strikes during construction of the projects.[32]  Although the Fish and Wildlife Service (FWS) Final Biological Opinion found that the projects are not likely to jeopardize the continued existence of the listed ocelot, movants are not required to show jeopardy to prove irreparable harm.  As one court put it, "[r]equiring Plaintiffs to show jeopardy to the existence of a species in order to secure injunctive relief would stand the ESA on its head."[33]  Notwithstanding FWS's finding of no

_____

(emphasis omitted).

[28] Declaration of Juan Mancias at P 10.  While the Order seems to imply that Mr. Mancias alleges a harm of not being able to see the ocelots at a specific location, see Order, 186 FERC ¶ 61,021 at P 23, the harm he alleges is broader.  Mr. Mancias "is concerned about the projects' impact on [ocelot and osprey] species and other species in the project *area*."  Declaration of Juan Mancias at P 10 (emphasis added).  As explained above, courts recognize that injury to a local population of species can constitute irreparable harm, notwithstanding the species' presence in other locations.  *See, e.g., Fund for Animals,* 281 F. Supp. 2d at 221.

[29] Declaration of Juan Mancias at P 10.

[30] EIS at ES-8.

[31] *Id*.

[32] EIS at 1 ("[T]he Rio Grande LNG Project, combined with other projects within the geographic scope, including the Texas LNG and Annova LNG Projects, would contribute to potential significant cumulative impacts … on the federally listed ocelot and jaguarundi from habitat loss and potential for increased vehicular strikes during construction."); *see also* EIS at 4-156 (finding that "ocelots struck by vehicles would most likely be one of the 17 members of the Laguna Atascosa NWR population, and that as a result of their small numbers, each strike would be a significant impact on the population.).

[33] *Humane Soc'y of the U.S. v. Kempthorne*, 481 F. Supp. 2d 53, 69 (D.D.C. 2006), *judgment vacated on other grounds*, 527 F.3d 181 (D.C. Cir. 2008) (vacated as

jeopardy, the projects still have "the potential to result in significant impacts on ocelots and ocelot recovery."[34]  Moreover, as explained below, these impacts appear imminent.

9.      First, the EIS found construction of the LNG Terminal would generate a level of noise that could cause a "change in ocelot behavior, including temporary or permanent displacement away from noisy areas, [and] may increase intra-species competition for home ranges and resources" and that this noise would affect "suitable habitat in the southern portion of the Laguna Atascosa NWR [and] could affect individual ocelots using the area."[35]  The construction authorized by the Commission's recent notice to proceed likely would meet or exceed that level of noise given that "pile-driving, which would be required for the installation of the marine facilities and foundations would be louder than typical construction noise."[36]  While the Commission has imposed an environmental condition designed to mitigate the impacts of noise to nearby residents, the EIS found that this condition will "not result in significant changes in noise attenuation identified."[37]

_____

moot because the grey wolf was delisted during the course of litigation).

   [34] EIS at ES-8.  *See also Ctr. For Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 252 (D.D.C. 2020) (finding irreparable harm occurs in an ESA context when actions are "likely to make the task of preserving the species more difficult." (cleaned up)).

   [35] EIS at 4-159; *see also id*. at 4-158 ("Construction-related noise could affect ocelot behavior, foraging, or breeding patterns, as they may move away from the noise or relocate in order to avoid the disturbance.").

   [36] *Id.* at 4-197.  Construction of the MOF would require pile driving.  *Id.* at 2-11 to 2-12.

   [37] *Id.* at 4-159 ("Since conducting the noise impact analysis, RG LNG has adopted certain mitigation (see section 4.11.2.3); however, these modifications did not result in significant changes in noise attenuation identified above.").  The mitigation identified in EIS section 4.11.2.3 was required pursuant to Environmental Condition 34. *Compare* EIS at 4-290 *with* the Commission's order authorizing the terminal, Rio Grande LNG, LLC, 169 FERC ¶ 61,131, at Appendix P 34 (2019) (Authorization Order).  The condition only requires noise mitigation if noise impacts exceed 10 decibels (dB) over ambient levels at nearby Noise Sensitive Areas (NSAs), which are miles further from the construction site than the Laguna Atascosa NWR.  *See* EIS at 4-284.  Project-related noise levels have already reached a maximum of 56.6 dBA at NSA 1.  Weekly Noise Data Report for Week 5 at 1.  Sound propagation studies in the EIS indicate that if NSA 1 were experiencing 45 dBA of noise, areas of the Laguna Atascosa NWR could expect to experience 70 dBA of noise.  EIS at 4-294.  Moreover, the EIS found that there could be changes to ocelot behavior at 60 dBA.  *Id.* at 4-159.  Since NSA 1 has already experienced noise levels above the level that would produce 70 dBA of noise at the

The noise impacts that the EIS associated with the threats to ocelots are starting with the very phase of construction Sierra Club hopes to stay.

10.      Second, loss of habitat is already underway. "[T]he proposed Project would result in the loss (conversion to developed land) of 189.1 acres of upland shrub habitat at the LNG Terminal site, of which 138.3 acres include mesquite-thorn scrub vegetation."[38] This vegetation is one of the preferred habitats for the ocelot.[39]  The EIS found that "a 63.9-acre loma that currently exists on the LNG Terminal site would also be lost during development of the property; loma habitat is important feeding habitat for ocelots."[40] Pre-construction activities have already disturbed this habitat.[41]

11.      Third and finally, traffic impacts to ocelots also appear imminent.  The EIS explains that "about 45 percent of the tracked [ocelot] deaths in south Texas have been due to vehicular incidents."[42]  During peak construction,[43] transit of workers to and from

Laguna Atascosa NWR, and ocelot impacts would occur at only 60 dBA, the obvious conclusion is that significant noise impacts have already occurred to ocelots and will do so again if the Commission allows further construction.  The Order's discussion of noise mitigation resulting from the Rio Bravo Pipeline route amendment is irrelevant to this analysis, which focuses on pile driving associated with construction of the Rio Grande LNG Terminal.  *See* Order, 186 FERC ¶ 61,021 at P 21 n.66.

[38] EIS at 4-158.

[39] *Id.* at 4-155 (noting that "[p]referred [ocelot] habitat … may include chaparral thickets, mesquite-thorn scrub, and live oak mottes").  *See also* Oct. 2, 2019 FWS Final Biological Opinion at 12 ("The Project would result in the permanent loss of 262.4 acres of dense loma evergreen shrubland, and loma grassland/shrubland, and upland shrub thornscrub habitat for the proposed RGLNG terminal and pipeline system, which are considered preferred ocelot habitat.").

[40] EIS at 4-158.  "Lomas are clay dunes that developed through wind-driven depositional processes and support specific vegetation communities."  *Id.* at 3-27.

[41] Order, 186 FERC ¶ 61,021 at P 21; *see also* Oct. 2023 Monthly Status Report No. 47 at 8.  The area pictured, Train 1's footprint, is within the Loma del Rincon Chiquito.  *See* EIS at 4-72 (map showing the location of the loma); *id.* at 2-4 (map showing the facility layout).

[42] *Id.* at 4-156.

[43] At this phase of construction, about one-third of the total construction work force will be present.  *See* Resource Report 5 at 14.

the project site will "represent a considerable increase in the traffic currently experienced on SH-48 (about 12,000 transits per day), and other local roadways," increasing the chance of an ocelot strike.[44]  "[O]celots injured along SH-48 would most likely belong to the Laguna Atascosa NWR population, which is estimated to include 17 cats, [and] each direct mortality would result in a 6 percent reduction in the local population."[45]  Thus, "the loss of one cat would result in a significant impact on ocelots."[46]

12.     The Order mischaracterizes my dissent in claiming it "focuses on" habitat destruction at the LNG Terminal site, which the Order says has already occurred and therefore would not be impacted by a stay.[47]  To be sure, habitat destruction at the LNG Terminal site alone poses a serious danger to the ocelot population, but that is not my sole focus.  Rather, my focus is on the effects of several types of adverse impacts – of which habitat loss is one – that combine to imperil the ocelot population.[48]  That one of those impacts has already occurred likely makes the consequences of the other ongoing and imminent threats all the worse for the ocelots.

---

[44] EIS at 4-156

[45] *Id.*

[46] *Id.* The EIS found these impacts even when "reduced speed limits would be enforced within, to, and from construction workspaces for the entire Project."  *Id.*  The mitigation measures imposed by FWS to "reduce speeds to the maximum extent practicable" therefore do not change the EIS analysis.  Aug. 23, 2023 FWS Letter, Docket No. CP23-519-000, at 5.

[47] Order, 186 FERC ¶ 61,021 at P 21.

[48] The EIS finds that "the loss of suitable habitat, through either direct or indirect pathways, has the potential to result in significant impacts on ocelots and ocelot recovery."  EIS at 4-160.  The impacts of habitat loss are cumulative and, as discussed above, noise has the potential to further limit suitable ocelot habitat.  *See supra* P 9.  The FWS's Biological Opinion supports my conclusion that multiple stressors likely will have synergistic, adverse effects.  For example, the Biological Opinion explains that habitat fragmentation caused by clearing and fencing the terminal site can result in inbreeding, which in turn may "reduce the fitness of individuals[,] … reduce the ability of an animal to adapt to a changing environment[,] and increase population-level disease susceptibility."  Oct. 2, 2019 FWS Final Biological Opinion at 27 (internal citations omitted).  The Biological Opinion also notes that "[d]ue to the large home ranges of ocelots and the importance of corridor habitat, even incremental habitat loss could be significant."  *Id.* at 32.

13.     Once irreparable harm has been established, harm to other parties is considered in
the stay determination.  The Order's finding that granting a temporary stay would cause
delay and therefore harm to Rio Grande, Rio Bravo, and their customers is speculative.[49]
The Order does not explain or substantiate what the purported harm is because it lacks
the record evidence to do so.  As the Authorization Order explains, the Department of
Energy (DOE) has sole authority to consider the effects of the LNG exports themselves,
including economic impacts.[50]  For that reason, the Commission developed no record on
the project's specific benefits.  Instead, the Commission relied solely on the fact of
DOE's export authorization and its own perfunctory analysis of environmental impacts in
concluding the project is not inconsistent with the public interest.[51]  Contrary to the
Order's suggestion, there was no "balancing" of the project's harms against its benefits in
the Authorization Order.[52]

14.     In the stay proceeding, the Commission has made no effort to ascertain the
specific harms a temporary stay could cause to the project sponsors and their customers.
Sierra Club offers solid evidence in the form of the Commission's own EIS and a sworn
affidavit from one of its members to substantiate the environmental and human health
injuries movants will suffer.  For its part, the Commission simply assumes, with no
explanation, that a stay will delay completion of the project and the assumed delay will
automatically harm the project sponsors and their customers.[53]  There are many relevant
questions the Commission could have and should have considered before jumping to this
conclusion.  For example, according to Rio Grande LNG's parent company's last
quarterly report to the Securities and Exchange Commission, the first commercial
shipment of LNG from the Rio Grande LNG terminal will not occur until late 2027.[54]
There is no indication that the Commission considered whether the project sponsors
could accelerate construction later in the project's remaining four-year construction
schedule to make up any time lost due to issuance of a temporary stay.  Nor did it seek
out any projections of what the market demand for LNG four years from now will be and
whether Rio Grande could sell its LNG at a profit.[55]  The Commission did not even ask

---

[49] *See* Order, 186 FERC ¶ 61,021 at P 28.

[50] Authorization Order, 169 FERC ¶ 61,131 at P 20.

[51] *See id*. at P 25.

[52] *See* Order, 186 FERC ¶ 61,021 at P 14.

[53] *Id*. at P 28.

[54] NextDecade Corp., Form 10-Q for the Quarter Ended September 30, 2023 at 23
(Nov. 13, 2023).

[55] The Order references NextDecade's July 12, 2023, announcement that it reached

the project sponsors to substantiate the harms they claim they and their customers will suffer. On this record, it appears that the balance of harms factor tilts in Sierra Club's favor.

15.     Finally, the "public interest" factor also weighs in favor of a stay. Courts have long recognized that "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."[56] That includes compliance with NEPA.[57] As I demonstrated in my dissents to the Remand Order and Rehearing Order, the Commission violated NEPA by failing to prepare a supplemental EIS following the *Vecinos* court's remand.[58] On remand, the Commission conducted an expanded review of EJ impacts that identified *367* additional EJ communities that could be adversely affected by the Rio Grande LNG Terminal and the Rio Bravo Pipeline. Instead of preparing a supplemental EIS and giving these and other affected communities, organizations, and individuals an opportunity to comment it, the

---

a Final Investment Decision (FID) for Phase I of the Rio Grande LNG terminal. Order, 186 FERC ¶ 61,021 at P 28 n.88. That fact does not guarantee that Rio Grande will actually produce and sell LNG four years from now. After it reached FID, NextDecade reported that it has incurred operating losses since its inception and there is "substantial doubt" about the company's ability to continue as a going concern. NextDecade Corp., Form 10-Q for the Quarter Ended September 30, 2023 at 8, 23 (Nov. 13, 2023).

[56] *NAACP v. United States Postal Serv.*, 496 F. Supp. 3d 1, 20 (D.D.C 2020) (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). The Order seemingly implies that my focus is on success on the merits. *See* Order, 186 FERC ¶ 61,021 at P 29 n.89. That is incorrect. Failure to follow the law is a separate and distinct matter that bears on the public interest prong.

[57] *See, e.g., Friends of the Capital Crescent Trail v. Fed. Transit Admin.*, 263 F. Supp. 3d 144, 151 (D.D.C. 2017) (finding it was not in the public interest to allow Maryland to begin construction of a transit project pending appeal "while critical NEPA analysis remains incomplete."); *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 26 (D.D.C. 2009) (holding that "[t]here is no question that the public has an interest in having Congress' mandates in NEPA carried out accurately and completely," and that "[t]he public also has an interest in ensuring that the Final Rule promulgated by the DOI does not give way to unintended environmental consequences that have not (but should have) been evaluated."); *Fund for Animals,* 281 F. Supp. 2d at 237 (finding plaintiffs likely to succeed on claims agency violated NEPA and enjoining culling of mute swans).

[58] *See* Remand Order, 183 FERC ¶ 61,046 (Clements, Comm'r, dissenting at PP 2-4); Rehearing Order, 185 FERC ¶ 61,080 (Clements, Comm'r, dissenting at PP 4-8).

Commission included its new analyses in the Remand Order itself. Of course, there is no opportunity for public comment on Commission orders. The Commission's procedural shortcuts left it with a fundamentally flawed record that could not support a public interest determination under the NGA for either the Rio Grande LNG Terminal or the Rio Bravo Pipeline project.[59] Moreover, in violation of the APA, the Commission failed to provide a reasoned explanation of whether or how it revisited its public interest determinations under sections 3 and 7 of the NGA, as the *Vecinos* court instructed it to do.[60] Indeed, the Commission left vague whether it had considered its own post-remand environmental analyses *at all* in its public interest determinations. Failure to fully consider the projects' environmental justice and other adverse impacts violates the NGA, NEPA, and the APA, a perfect trifecta of errors.[61]

16.     The majority's determination that a stay is not in the public interest is both conclusory and unpersuasive.[62] The question before us is whether the *stay itself* is in the public interest, not what the Commission or DOE found in their authorizing orders.[63] To answer that question, the Commission must understand what potential harms a temporary stay would cause to the public and balance them against the harms the public would suffer if construction continues. As demonstrated above, Sierra Club has offered evidence of specific harms to human health and the environment if the Commission denies a stay. In contrast, the Order neither explains why a temporary delay would harm the public interest nor substantiates its conclusion with record evidence.[64] If the Order

---

[59] Remand Order, 183 FERC ¶ 61,046 (Clements, Comm'r, dissenting at P 1). The fundamentally deficient administrative record similarly cannot support the Commission's conclusion that the projects are "environmentally acceptable." The Order repeatedly invokes that finding to support its conclusion that Sierra Club failed to demonstrate irreparable harm. Beyond lacking record support, the Order's reasoning is flawed. Even if the projects overall were "environmentally acceptable," they nevertheless could impose irreparable injury on particular communities or individuals, as Sierra Club alleges the Rio Grande Terminal and Rio Bravo Pipeline will.

[60] Rehearing Order, 185 FERC ¶ 61,080 (Clements, Comm'r, dissenting at PP 12-15).

[61] *See id.* (Clements, Comm'r, dissenting at PP 15-18).

[62] *See* Order, 186 FERC ¶ 61,021 at P 29.

[63] *See Philipp v. Fed. Republic of Germany.*, 436 F. Supp. 3d 61, 69 (D.D.C. 2020) (weighing the public interest of "prompt resolution of claims stemming from Holocaust-era crimes" against "the importance of issues of sovereign immunity" in deciding whether to stay an order allowing an action against Germany to proceed).

[64] *See* Sierra Club Motion for Stay at 6 (arguing that "if the courts reject Port

were correct in suggesting that the public interest finding in the Authorization Order *ipso facto* determines that a stay is not in the public interest,[65] the public interest prong of the stay standard would be a nullity and no stay of an NGA section 3 or section 7 order could ever be granted.  The Commission's circular reasoning on the public interest prong is not the reasoned decision-making the APA demands.[66]  Moreover, even if the Order's reasoning somehow made sense, the Commission's NGA public interest determinations in authorizing the projects deserve no weight in determining whether the public interest favors a stay because they rest on a series of fundamental legal errors.[67]

17.     The Commission's failure to meaningfully engage with the EJ communities, tribes, and NGOs affected by the Rio Grande LNG Terminal and Rio Bravo Pipeline has left us with an incomplete understanding of the impacts these projects will have on the most marginalized among us and how to mitigate them.  The Commission's rigid application of its stay precedents is particularly troubling in this of all cases, where the D.C. Circuit found our original consideration of EJ impacts deficient, our second try on remand was legally flawed, and members and representatives of EJ communities now fear imminent, irreparable injury.  At the very least, today's decision highlights the importance of promptly completing the work the Commission has started to improve its engagement with EJ communities so it does not repeat these errors.

---

Isabel's challenge, and the project moves forward, this would merely incrementally delay benefits that would not be realized for years in any event, given the long production timetable. And while FERC found that it could not determine that the project was contrary to the public interest, neither FERC nor the Department of Energy have found that there is any *urgent* need for the exports this project would enable.") (emphasis added).

[65] *See* Order, 186 FERC ¶ 61,021 at P 14 (in reaching its public interest determination in the Authorization Order, "the Commission carefully considered and balanced the alleged harms of the project against its benefits.").  In reality, as explained above, because DOE makes the determination whether to approve LNG exports the Commission has no actual record of what the benefits of LNG exports will be and, as a consequence, performs no real "balancing" of harms against benefits.  In any event, the Authorizing Order certainly did not balance the benefits and harms of a *temporary stay,* which is the issue before us today.

[66] *See, e.g., Petro Star Inc. v. FERC*, 835 F.3d 97, 108 (D.C. Cir. 2016) (Commission's "circular rationale" does not satisfy APA requirement of reasoned decision-making).

[67] *See* discussion *supra* at P 15.

For these reasons, I respectfully dissent.


_____
Allison Clements
Commissioner

Document Content(s)

CP16-454-000.docx.......................................................1