**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

# In the United States Court of Appeals for the District of Columbia Circuit

**Nos. 23-1174 and 23-1221 (consolidated)**

———————

CITY OF PORT ISABEL, *ET AL.*,

*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

———————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

———————

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

———————

Matthew R. Christiansen
  General Counsel

Robert H. Solomon
  Solicitor

Robert M. Kennedy
  Senior Attorney
  robert.kennedy@ferc.gov

For Respondent
Federal Energy Regulatory
  Commission
Washington, D.C. 20426

February 5, 2024

## CIRCUIT RULE 28(A)(1) CERTIFICATE

### A.    Parties and Amici

The parties who have appeared before the Court are listed in

Petitioners' Circuit Rule 28(a)(1) certificate.

### B.    Rulings Under Review

1.    *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (April 21, 2023),

R. 3011, JA ___; and

2.    *Rio Grande LNG, LLC*, 185 FERC ¶ 61,080 (October 27,

2023), R. 3080, JA ___.

### C.    Related Cases

The Commission orders challenged in this case concern the Rio

Grande LNG project and were issued in response to this Court's remand

in *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th

1321 (D.C. Cir. 2021).

The *Vecinos* court also remanded Commission orders authorizing

the Texas LNG project, which is proposed to be constructed in the same

geographic region as the Rio Grande LNG project.  Petitioners have

challenged the Commission's Texas LNG remand orders in *City of Port

Isabel, et al. v. FERC*, Nos. 23-1175, *et al*.  The Court has ordered that

this case (No. 23-1174, *et al*.) and No. 23-1175, *et al*. be scheduled for

oral argument on the same day and before the same panel. *See* Nov. 15,

2023 Order, ECF No. 2027253.

*/s/ Robert M. Kennedy*
Robert M. Kennedy
Senior Attorney

## <u>TABLE OF CONTENTS</u>

Introduction .............................................................................. 1

Statement Of The Issues............................................................ 5

Statutory And Regulatory Provisions........................................ 6

Statement Of Facts…................................................................ 6

I.     Statutory And Regulatory Background...................................... 6

     A.    Natural Gas Act ................................................................ 6

     B.    National Environmental Policy Act .................................. 9

     C.    Environmental Justice....................................................... 9

II.    The Commission's Review......................................................... 10

     A.    An Overview Of Liquefied Natural Gas............................ 10

     B.    The Rio Grande Project...................................................... 11

     C.    The Commission's Environmental Review ....................... 13

     D.    Project Approval................................................................. 14

          1.    The Department of Energy...................................... 14

          2.    The Commission...................................................... 15

     E.    Subsequent Design Changes ............................................. 16

          1.    The Terminal........................................................... 16

          2.    The Pipeline ........................................................... 16

3.    The carbon capture system ...................................... 17

III.   The *Vecinos* Decisions ................................................. 18

A.    *Vecinos I* ...................................................... 18

B.    *Vecinos II* ..................................................... 19

IV.   The Remand Orders ...................................................... 19

A.    Approval Of The Revised Pipeline Proposal .................... 19

B.    Addressing The Remand ...........................................20

1.    Environmental justice ............................................ 21

a.    Geographic scope .......................................... 21

i.    Terminal ................................................. 22

ii.    Pipeline ................................................. 23

b.    Conclusions .................................................... 25

2.    Social cost of carbon protocol................................. 26

3.    Natural Gas Act analysis ....................................... 27

Summary of Argument...................................................... 28

Argument..................................................................... 30

I.    Standard Of Review ..................................................... 30

II.   The Commission Reasonably Responded To
The Court's Remand..................................................... 32

A.  The Commission Reasonably Analyzed
    Environmental Justice Impacts ...................................... 33

    1.  The Commission reasonably expanded the
        geographic scope of its analysis.............................. 33

    2.  The Commission reasonably explained
        its conclusions ........................................................ 35

    3.  Sierra Club's objections lack merit ........................ 36

        a.  Air pollution impacts ...................................... 36

            i.  No National Ambient Air Quality
                Standards violations.............................. 38

            ii. Reliance on National Ambient
                Air Quality Standards.......................... 38

        b.  Geographic scope ........................................... 40

        c.  The Isla Blanca air monitor ........................... 42

        d.  Ozone............................................................... 43

B.  The Commission Reasonably Addressed
    40 C.F.R. § 1502.21(c) ..................................................... 45

    1.  Section 1502.21(c) does not compel use of
        the social cost of carbon protocol............................ 45

        a.  Project-level review ........................................ 45

        b.  Significance threshold ................................... 48

    2.  The Commission addressed the significance
        of the Project's potential climate impacts............... 51

iii

C.  The Commission Reasonably Reassessed
Its Public Interest Determinations ................................. 53

1.  The Commission reaffirmed its
Natural Gas Act findings......................................... 53

2.  Sierra Club's complaint lacks merit....................... 54

a.  The Pipeline .................................................. 55

b.  The Terminal ................................................. 56

III.  The Commission Reasonably Prepared Its Updated
Environmental Justice Analysis................................................ 57

A.  A Supplemental EIS Was Not Required
By 40 C.F.R. § 1502.9(d)(1) ................................. 58

B.  The Commission Reasonably Presented
Its Analysis In The Remand Order ................................. 61

C.  The Commission's Process Fostered
Public Participation .......................................... 63

IV.  The Commission Reasonably Determined That
The Proposed Carbon Capture System Is
Amenable To A Separate NEPA Process ................................. 67

A.  The Projects Are Not "Connected Actions" ...................... 68

1.  Temporal overlap ..................................... 68

2.  Independent utility .................................. 70

B.  The Commission Is Not Required To Analyze Carbon
Capture As An Alternative ................................. 72

Conclusion.................................................................. 74

iv

# TABLE OF AUTHORITIES

## COURT CASES:

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison,*
    67 F.3d 723 (9th Cir. 1995) ............................................ 72-73, 73

*Appalachian Voices v. FERC,*
    No. 17-1271, 2019 WL 847199
    (D.C. Cir. Feb. 19, 2019)............................................................ 49

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
    462 U.S. 87 (1983) .................................................................. 9, 31

*Chamber of Com. v. SEC,*
    443 F.3d 890 (D.C. Cir. 2006) ...................................................... 67

*City of Boston Delegation v. FERC,*
    897 F.3d 241 (D.C. Cir. 2018) ............................ 31-32, 68, 69, 70

*City of Columbia v. Omni Outdoor Advert., Inc.,*
    499 U.S. 365 (1991) ............................................................... 54-55

*Cmtys. Against Runway Expansion, Inc. v. FAA,*
    355 F.3d 678 (D.C. Cir. 2004) .............................. 33-34, 34-35, 41

*Coal. on Sensible Transp., Inc. v. Dole,*
    826 F.2d 60 (D.C. Cir. 1987) ....................................................... 71

*Constellation Energy Commodities Grp. v. FERC,*
    457 F.3d 14 (D.C. Cir. 2006) .......................................... 51-52, 61

*Ctr. for Biological Diversity v. FERC,*
    67 F.4th 1176 (D.C. Cir. 2023)............... 31-32, 43, 47, 49, 53, 57

*Del. Riverkeeper Network v. FERC,*
    753 F.3d 1304 (D.C. Cir. 2014) ........................................... 69, 71

v

*Del. Riverkeeper Network v. FERC,*
    45 F.4th 104 (D.C. Cir. 2022) ............................................... 47-48

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004) ...................................................................... 9

*Dominion Transmission, Inc. v. Summers,*
    723 F.3d 238 (D.C. Cir. 2013) ................................................... 8

*EarthReports, Inc. v. FERC,*
    828 F.3d 949 (D.C. Cir. 2016) ............................................ 47, 49

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) .................................................................. 30

*FERC v. Elec. Power Supply Ass'n,*
    577 U.S. 260 (2016) .................................................................. 30

*Food & Water Watch v. FERC,*
    28 F.4th 277 (D.C. Cir. 2022) ................................................... 40

*FPC v. Transcon. Gas Pipe Line Corp.,*
    365 U.S. 1 (1961) ................................................................. 54-55

*FPC v. Transcon. Gas Pipe Line Corp.,*
    423 U.S. 326 (1976) .................................................................. 67

*Friends of Cap. Crescent Trail v. Fed. Transit Admin.,*
    877 F.3d 1051 (D.C. Cir. 2017) ................................. 32, 58-59, 73

*Friends of the River v. FERC,*
    720 F.2d 93 (D.C. Cir. 1983) ................................................ 62-63

*Hudson River Sloop Clearwater, Inc. v. Dep't of Navy,*
    836 F.2d 760 (2d Cir. 1988) ...................................................... 71

*Idaho Sporting Cong. v. Alexander,*
    222 F.3d 562 (9th Cir. 2000) ............................................... 61, 62

*Johnston v. SEC,*
    49 F.4th 578 (D.C. Cir. 2022) ...................................................... 66

*Marsh v. Oregon Nat. Res. Council,*
    490 U.S. 360 (1989) ................................................. 32, 58-59, 63

*Minisink Residents for Env't Pres. and Safety v. FERC,*
    762 F.3d 97 (D.C. Cir. 2014) ...................................................... 66

*Murray Energy Corp. v. EPA,*
    936 F.3d 597 (D.C. Cir. 2019) .................................................... 39

*Myersville Citizens for a Rural Cmty., Inc. v. FERC,*
    783 F.3d 1301 (D.C. Cir. 2015) ..................................... 31, 54, 66

*NAACP v. FPC,*
    425 U.S. 662 (1976) ...................................................................... 7

*Nat'l Comm. for the New River, Inc. v. FERC,*
    373 F.3d 1323 (D.C. Cir. 2004) ............................................ 31, 60

*Nat. Res. Def. Council v. NRC,*
    879 F.3d 1202 (D.C. Cir. 2018) ............................................ 62-63

*Nev. v. Dep't of Energy,*
    457 F.3d 78 (D.C. Cir. 2006) ...................................................... 31

*Oglala Sioux Tribe v. NRC,*
    45 F.4th 291 (D.C. Cir. 2022) .................................................... 62

*Process Gas Consumers Grp. v. FERC,*
    292 F.3d 831 (D.C. Cir. 2002) .................................................... 32

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ...................................................................... 9

*Sierra Club v. FERC,*
    672 F. App'x 38 (D.C. Cir. 2016) ............................................... 49

*Sierra Club v. FERC,*
    867 F.3d 1357 (D.C. Cir. 2017) ........................................... 36, 39

*Stand Up for California! v. Dep't of Interior,*
    994 F.3d 616 (D.C. Cir. 2021) .................................................... 59

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
    6 F.4th 1321 (D.C. Cir. 2021) ........................ 1, 2, 3, 8, 18, 19, 33
                                             33-34, 35, 40, 53, 72

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
    No. 20-1045, 2021 WL 3716769
    (D.C. Cir. Aug. 3, 2021) ............................ 2, 19, 39, 44, 58-59, 72

*W. Va. Pub. Servs. Comm'n v. Dep't of Energy,*
    681 F.2d 847 (D.C. Cir. 1982) ...................................................... 8

*W. Va. Pub. Serv. Comm'n v. Dep't of Energy,*
    777 F.2d 31 (D.C. Cir. 1985) ...................................................... 31

*WildEarth Guardians v. Jewell,*
    738 F.3d 298 (D.C. Cir. 2013) .................................................... 53

## ADMINISTRATIVE CASES:

*Driftwood Pipeline LLC,*
    183 FERC ¶ 61,049 (2023) ......................................................... 51

*Fla. Se. Connection, LLC,*
    164 FERC ¶ 61,099 (2018) ................................................... 46, 47

*Fla. Se. Connection, LLC,*
    162 FERC ¶ 61,233 (2018) .................................................. 46-47

*LA Storage, LLC,*
    182 FERC ¶ 61,026 (2023) ......................................................... 48

*N. Nat. Gas Co.*,
    174 FERC ¶ 61,189 (2021) ......................................................... 50

*Rio Grande LNG, LLC*,
    169 FERC ¶ 61,131 (R. 1314) (2019) ...... 11, 12, 13, 13-14, 15 52,
                                  54, 55, 56, 59-60, 60-61, 69

*Rio Grande LNG, LLC*,
    170 FERC ¶ 61,046 (R. 1349) (2020) ........... 15, 39, 39-40, 40, 43,
                                  53-54, 55-56, 59-60, 60

*Rio Grande LNG, LLC,*
    Letter Order (R. 1453) (Aug. 13, 2020).......... ........................16

*Rio Grande LNG, LLC,*
    174 FERC ¶ 61,048 (R. 2384) (2021) .............................. 16, 43-44

*Rio Grande LNG, LLC,*
    183 FERC ¶ 61,046 (R. 3011) (2023) ................. 10, 19-20, 20, 21,
                            22, 23, 24, 25, 26, 27, 34, 35, 36, 37,
                      37, 37-38, 38, 41, 43 44, 45, 46, 48, 50, 51,
            52, 53, 54, 55, 56, 57, 57-58, 60, 61, 62, 63-64, 65

*Rio Grande LNG, LLC,*
    185 FERC ¶ 61,080 (R. 3080) (2023) ................. 28, 37, 39, 41, 42
                        43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 54,
                    56, 59, 61, 65, 66, 67, 68, 69, 70, 72, 73

*Rio Grande LNG, LLC,*
    186 FERC ¶ 61,021 (2024) ......................................................... 70

*Rio Grande LNG, LLC*, DOE/FE Docket No. 15-190-LNG
    Order No. 3869 (2016) ................................................................. 14

*Rio Grande LNG, LLC*, DOE/FE Docket No. 15-190-LNG
    Order No. 4492 (2020) ........................................................... 14, 15

**STATUTES:**

Administrative Procedure Act

    5 U.S.C. § 706(2)(A) ..................................................................... 30

Natural Gas Act

    15 U.S.C. § 717 ............................................................................... 7

    15 U.S.C. § 717b .................................................. 2, 7, 8, 15, 31, 57

    15 U.S.C. § 717f ........................................................ 2, 8-9, 15, 31

    15 U.S.C. § 717r........................................................ 40, 45, 51, 61, 66

National Environmental Policy Act

    42 U.S.C. § 4321 ........................................................................... 5

Department of Energy Organization Act

    42 U.S.C. § 7151(b) ....................................................................... 7

**REGULATIONS:**

    18 C.F.R. § 380.7(a) ..................................................................... 52

    40 C.F.R. § 1501.9(a) .............................................................. 69-70

    40 C.F.R. § 1501.9(e) ................................................... 68, 69, 70

    40 C.F.R. § 1501.12 ..................................................................... 45

    40 C.F.R. § 1502.9(d) ..................................................... 58, 61, 72

    40 C.F.R. § 1502.16(a) ................................................................. 52

    40 C.F.R. § 1502.21(c).............. 2, 3, 18, 26, 28, 32, 45, 49, 51, 72

    40 C.F.R. § 1502.22 ..................................................................... 46

## <u>OTHER AUTHORITIES</u>:

Executive Order 12,898,
    59 Fed. Reg. 7,629 (Feb. 11, 1994)................................. 9-10

*NEPA Guidance on Consideration of*
    *Greenhouse Gas Emissions and Climate Change,*
    88 Fed. Reg. 1196 (Jan. 9, 2023)................................. 48-49

# GLOSSARY

| | |
|---|---|
| Br. | Petitioners' Opening Brief |
| Authorization Order | *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131 (2019) (R. 1314), JA ___ |
| Authorization Rehearing Order | *Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 (2020) (R. 1349), JA ___ |
| Commission or FERC | Federal Energy Regulatory Commission |
| EA | Rio Bravo Pipeline Project Amendment Environmental Assessment (Dec. 2020) (R. 2374), JA ___ |
| EIS | in text, environmental impact statement; in citations, Final Environmental Impact Statement, Rio Grande LNG Project (Apr. 2019) (R. 1277), JA ___ |
| LNG | Liquefied natural gas |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* |
| Pipeline | the pipeline system authorized in *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131 (2019) |
| Project | the proposed liquefied natural gas terminal and associated pipeline system at issue |
| Remand Order | *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (April 21, 2023) (R. 3011), JA ___ |

| | |
|---|---|
| Remand Rehearing Order | *Rio Grande LNG, LLC*, 185 FERC ¶ 61,080 (October 27, 2023) (R. 3080), JA ___ |
| Rio Grande | Rio Grande LNG, LLC |
| Rio Bravo | Rio Bravo Pipeline Company, LLC |
| Sierra Club | collectively, petitioners Vecinos para el Bienestar de la Comunidad Costera, Sierra Club, City of Port Isabel, and the Carrizo Comecrudo Tribe of Texas |
| Terminal | the LNG Terminal authorized in *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131 (2019) |

# In the United States Court of Appeals for the District of Columbia Circuit

### Nos. 23-1174 and 23-1221 (consolidated)

————————

CITY OF PORT ISABEL, *ET AL.*,

*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

————————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

————————

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

————————

## INTRODUCTION

This case returns to the Court after a 2021 remand to the Federal

Energy Regulatory Commission.  *See Vecinos para el Bienestar de la*

*Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021) (*Vecinos I*).

The Court directed the Commission to address three discrete issues in

connection with its authorization of Rio Grande LNG, LLC (Rio Grande)

and Rio Bravo Pipeline Company, LLC (Rio Bravo) to construct and

operate a liquefied natural gas (LNG) export terminal and associated

pipeline system pursuant to sections 3 and 7 of the Natural Gas Act, 15 U.S.C. §§ 717b, 717f (collectively, the Project).  (The Court did not vacate the Commission's prior authorization, finding it "reasonably likely that on remand the Commission can redress its failure of explanation." *Id*. at 1332.  And in a companion unpublished opinion, the Court denied all other challenges to the Commission's authorization.  *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, No. 20-1045, 2021 WL 3716769 (D.C. Cir. Aug. 3, 2021) (per curiam) (*Vecinos II*).)

First, the Court asked the Commission to reconsider the geographic scope of its environmental justice analysis.  The Court questioned why the Commission "chose to analyze the projects' impacts only on [environmental justice] communities … within two miles" of the Project, given that air quality impacts could affect a broader radius of communities.  *Vecinos I*, 6 F.4th at 1331.

Second, the Court directed the Commission to address whether 40 C.F.R. § 1502.21(c) – which concerns the use of generally accepted scientific methodologies – requires the use of the social cost of carbon

protocol or some other method to evaluate the Project's contribution to climate change.  *See id.* at 1329-30.

Third, the Court instructed the Commission to consider whether its response to either issue necessitated any change to the Commission's public interest conclusion that the Project is properly authorized under the Natural Gas Act.  *Id.* at 1331.

The Commission addressed each issue on remand.  The Commission expanded the geographic scope of its environmental justice analysis to include those communities within a 50-kilometer radius of either the terminal or the pipeline's compressor station – boundaries that are coextensive with the farthest possible extent of air quality impacts.  The Commission concluded that Project impacts would be disproportionately borne by environmental justice communities.  But apart from visual impacts near the terminal site, none would be substantial.

The Commission also explained that 40 C.F.R. § 1502.21(c) does not require use of the social cost of carbon protocol as it is not generally accepted as a scientific method to estimate environmental impacts for a specific project.  Nor is there agreement on a threshold for declaring

impacts "significant."  Nonetheless, the Commission estimated the social cost of Project-related greenhouse gas emissions for informational purposes.  The Commission further recognized that the Project would contribute to future climate change, without characterizing that impact as significant or insignificant, but concluding that the Project (with appropriate mitigation conditions) would be environmentally acceptable.

Finally, the Commission found that nothing in its updated environmental analysis called into question its earlier conclusion that the Project should be authorized under the Natural Gas Act.

Petitioners Sierra Club, City of Port Isabel, Carrizo Comecrudo Tribe of Texas, and Vecinos para el Bienestar de la Comunidad Costera (collectively, Sierra Club) take issue with certain substantive aspects of the Commission's updated analysis.  None of their criticisms has merit.

The same is true of Sierra Club's claim that the Project's environmental review – which began more than 8 years ago – must be drawn out further with the preparation of a supplemental environmental impact statement (EIS) to address environmental justice

4

matters or Rio Grande's proposal to add a carbon capture system at the terminal.

The remand proceeding was appropriately limited to the discrete issues identified by the Court – *i.e.*, use of the social cost of carbon protocol and the scope of the environmental justice analysis. All information pertaining to those issues was available to interested parties. Indeed, Sierra Club and others submitted extensive comments on that information. And the Commission responded to those comments in its orders on remand, which were subject to rehearing. Neither the National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.* (NEPA), nor any other authority, requires anything more.

## STATEMENT OF THE ISSUES

The issues presented for review are:

1.     Did the Commission reasonably respond to the Court's remand when it expanded the scope of its environmental justice analysis to include all communities that could potentially experience direct impacts from the Project?

2.     Did the Commission reasonably respond to the Court's remand by explaining that neither the social cost of carbon, nor any

other methodology, is generally accepted in the scientific community for assessing whether a particular project will have a "significant" impact on climate change?

3.      Did the Commission reasonably explain that its updated environmental analysis did not undermine its previous authorization of the Project under the Natural Gas Act?

4.      Did the Commission reasonably conclude that neither its updated environmental justice analysis, nor Rio Grande's recent proposal to add a carbon capture and sequestration system, required the preparation of a supplemental EIS where neither matter presented significant new information bearing on the Project's environmental impacts?

## STATUTORY AND REGULATORY PROVISIONS

The pertinent statutes and regulations are contained in the Addendum to this brief.

## STATEMENT OF FACTS

## I.    STATUTORY AND REGULATORY BACKGROUND

### A.    Natural Gas Act

The "principal purpose" of the Natural Gas Act is to "encourage the orderly development of plentiful supplies of … natural gas at

6

reasonable prices." *NAACP v. FPC*, 425 U.S. 662, 669-70 (1976). The Act declares that "the business of transporting and selling natural gas for ultimate distribution to the public" and in "foreign commerce" is affected with the public interest. 15 U.S.C. § 717(a). To meet these aims, Congress vested the Commission with jurisdiction over the transportation and wholesale sale of natural gas in interstate commerce. *Id*. §§ 717(b), (c).

Section 3 of the Act, 15 U.S.C. § 717b, prohibits natural gas exports without "first having secured an order of the Commission authorizing" such transactions. The Act deems exports to a country with which the United States has a free trade agreement "to be consistent with the public interest." *Id*. § 717b(c). Applications for such "exportation shall be granted without modification or delay." *Id*.

The Commission and the Department of Energy share regulatory responsibility under Natural Gas Act section 3. The Department has sole authority over the export of LNG as a commodity. *See* 42 U.S.C. § 7151(b). The Commission has delegated authority under Natural Gas Act section 3(e), 15 U.S.C. § 717b(e), to approve the siting, construction, or operation of LNG terminal facilities used for export. *See* DOE

Delegation Order No. S1-DEL-FERC-2006 (effective May 16, 2006)

(renewing delegation to the Commission of authority over the

construction and operation of liquefied natural gas facilities); *see also*

*Vecinos I*, 6 F.4th at 1325 (explaining division of statutory

responsibilities).

With respect to the Commission's review, the Natural Gas Act

provides that the Commission "shall" authorize a proposed LNG

terminal unless it finds that construction and operation "will not be

consistent with the public interest." 15 U.S.C. § 717b(a). Section 3 thus

"sets out a general presumption favoring such authorization." *W. Va.*

*Pub. Servs. Comm'n v. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir.

1982).

Before a company may construct a natural gas pipeline, it must

obtain a "certificate of public convenience and necessity" from the

Commission and "comply with all other federal, state, and local

regulations not preempted by the" Act. *Dominion Transmission, Inc. v.*

*Summers*, 723 F.3d 238, 240 (D.C. Cir. 2013). Under section 7(e) of the

Act, the Commission "shall" issue a certificate if it determines that a

proposed pipeline "is or will be required by the present or future public

convenience and necessity."  15 U.S.C. § 717f(e).

### B.    National Environmental Policy Act

Before authorizing an LNG terminal or pipeline, the Commission must conduct an environmental review under NEPA.  That statute sets out procedures to be followed by federal agencies to ensure that the environmental effects of proposed actions are "adequately identified and evaluated."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  "NEPA imposes only procedural requirements . . . with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions."  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004).  Accordingly, an agency must "take a 'hard look' at the environmental consequences before taking a major action."  *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

### C.    Environmental Justice

Executive Order 12,898, 59 Fed. Reg. 7,629 (Feb. 11, 1994), requires federal agencies to "identify[] and address[], as appropriate, disproportionately high and adverse human health or environmental effects of [their] programs, policies, and activities on minority populations and low-income populations."  *Id*. § 1-101.  The Order

directs federal agencies to conduct "environmental justice" analyses by considering "information on the race, national origin, [and] income level" of "areas surrounding facilities or sites expected to have a substantial environmental, human health, or economic effect on the surrounding populations." *See id.* §§ 1-103, 3-302(a)-(b).

While the Commission is not one of the federal agencies specified in the Order, the Commission addresses environmental justice issues in its NEPA reviews. *See, e.g., Rio Grande LNG, LLC*, 183 FERC ¶ 61,046, P 103 (2023) (R. 3011) (Remand Order), JA ___.

## II.    THE COMMISSION'S REVIEW

### A.    An Overview of Liquefied Natural Gas

Natural gas liquefies when cooled to minus 260 degrees Fahrenheit.  This permits the liquefied gas to be transported by ship to terminals around the world.  At those terminals, the LNG is warmed to return it to a gaseous state before being sent into a pipeline network for delivery. *See* FERC, *Energy Primer:  A Handbook of Energy Market Basics* 14-15 (Dec. 2023), https://perma.cc/Q4ZZ-7WR7.

Historically, the United States has been an LNG importer. Starting in 2010, however, increased domestic production led to numerous proposals to export LNG. *Id.* 15-16.  As of January 2024,

10

there are eight export terminals in operation, seven under construction, and ten that have been approved but have not started construction. *See* FERC, LNG Export Terminals, https://perma.cc/K5HB-B6A8.

## B. The Rio Grande Project

The Project consists of two components: an export terminal being developed by Rio Grande on the Brownsville Ship Channel in Cameron County, Texas (the Terminal), and a pipeline, being developed by Rio Bravo, to transport natural gas from the existing interstate pipeline grid to that terminal (the Pipeline). See *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131, PP 1, 2 (2019) (R. 1314) (Authorization Order), JA ___, ___.

As originally proposed, the Terminal was to include six liquefaction facilities, referred to as "trains," each with a nominal output capacity of 4.5 million metric tons per year, for a total nominal capacity of 27 million metric tons annually. *Id*. P 6, JA ___. Once liquefied, the natural gas would be loaded onto vessels for export overseas.

The Terminal would be serviced by a 137.9-mile-long pipeline system designed to provide up to 4.5 billion cubic feet per day of

transportation service.  As originally designed, the Pipeline was to

primarily consist of two, parallel 42-inch-diameter pipes that would

receive gas from the existing grid in Kleberg and Jim Wells Counties,

Texas and deliver it to the Terminal.  *See id.* P 9, JA ____.



*See* EIS 1-2 (R. 1277), JA ___.

### C.    The Commission's Environmental Review

In April 2015, the Commission approved the developers' request to utilize the agency's pre-filing process.  That process afforded an opportunity for resource agencies, affected communities, and other stakeholders to learn about the Project and identify environmental issues for detailed review.  *See id*. ES-3, JA ___.  In October 2018, Commission staff issued a draft EIS, which addressed the issues raised during the scoping period.  *See* Authorization Order P 54, JA ___.  Subsequently, Commission staff held three public comment sessions, and received 861 written comments from federal and state agencies, Native American Tribes, organizations, and individuals.  *Id*.

The final EIS, issued in April 2019, spanned more than 1,350 pages, and analyzed the Project along several dimensions, including potential impacts on wetlands, vegetation, fish and wildlife, land use, visual resources, socioeconomics, air quality, and noise.  *Id*. P 55, JA ___.  The EIS evaluated alternatives to the Project and analyzed mitigation measures that could help reduce certain environmental impacts.  The EIS concluded that the Project would result in some adverse environmental impacts that could be mitigated.  *Id*. P 56,

13

JA ___.  The Project would, however, result in significant cumulative impacts to certain resources, including surface water quality in the Brownsville Ship Channel and the federally-listed ocelot, jaguarundi, and aplomado falcon.  *Id.*

### D.    Project Approval

#### 1.    The Department of Energy

In August 2016, the Department of Energy authorized Rio Grande to export up to 1,318 billion cubic feet of natural gas per year – which is roughly equivalent to the Project's annual capacity – to countries with which the Unites States has a free trade agreement.  *Rio Grande LNG, LLC*, DOE/FE Docket No. 15-190-LNG, Order No. 3869 at 3, 10 (2016), https://perma.cc/V53X-52EE.  In February 2020, the Department extended that authorization to non-free trade agreement countries.  *See Rio Grande LNG, LLC*, DOE/FE Docket No. 15-190-LNG, Order No. 4492 (2020), https://perma.cc/5DHL-T2S9.

The Department concluded that exports would provide the United States with net economic benefits, without affecting the ability to meet projected domestic demand.  *Id.* 38-40.  Exports would also improve energy security for the United States' allies and trading partners, which in turn would provide domestic economic and strategic benefits.  *Id.* 42-

14

43.

### 2.    The Commission

On November 22, 2019, the Commission approved the Terminal under section 3 of the Natural Gas Act, 15 U.S.C. § 717b(a), and issued a certificate of public convenience and necessity for the Pipeline under section 7, *id*. § 717f.  *See* Authorization Order P 3, JA ___.

The Commission explained that the Terminal would be sited in an industrial area along a man-made shipping channel and has been designed to comply with all federal safety standards.  *Id*. PP 22-23, JA ___-___.  Most of the Project's direct environmental impacts would be temporary and – except for certain cumulative impacts – reduced to less-than-significant levels by the implementation of required mitigation measures.  *Id*. PP 22, 56, JA ___, __.  The Commission thus found that the Project would be an environmentally acceptable action and consistent with the public interest. *Id*. P 133, JA ___.

The Commission denied all requests for rehearing of the Authorization Order.  *See Rio Grande LNG, LLC*, 170 FERC ¶ 61,046 (2020) (R. 1349) (Authorization Rehearing Order), JA ___.

E.     **Subsequent Design Changes**

1.     **The Terminal**

In April 2020, while the Authorization Orders were under appeal,

Rio Grande proposed a design change that would allow the Project to

achieve its authorized export levels with five liquefaction trains, instead

of six.  The Commission approved that change in August 2020.  *See*

Letter Order in *Rio Grande LNG, LLC,* (Aug. 13, 2020) (R. 1453),

JA ___, *reh'g denied*, 174 FERC ¶ 61,048 (2021) (R. 2384), JA ___.

Sierra Club voluntarily withdrew its petition for review of those

orders in 2021.  *See* Order, *Vecinos para el Bienestar de la Comunidad*

*Costera, v. FERC*, D.C. Cir. No. 20-1491 (Aug. 27, 2021), ECF No.

1911943.

2.     **The Pipeline**

In June 2020, Rio Bravo sought to amend its FERC-issued

certificate to incorporate a new design that would, among other things,

eliminate two compressor stations and enlarge the diameter of one of

the two parallel pipelines.

Commission staff analyzed the environmental impacts of the

proposed redesign in an Environmental Assessment issued in December

2020.  *See* Environmental Assessment (EA) (R. 2374), JA ___.  The

16

Commission approved the revised pipeline design in the remand orders at issue here.  *See infra* pp. 19-20.

### 3.     The carbon capture system

In November 2021, Rio Grande proposed another modification to the Terminal design:  the addition of a carbon capture and sequestration system.  The system would employ processes to remove carbon dioxide emissions during liquefaction and transport it by pipeline to an EPA-authorized underground injection well for sequestration.  Rio Grande projected that the system would capture at least 90% of the carbon dioxide that would have been emitted during commercial operations.  *See* Am. Appl. in FERC Docket CP22-17 at 1-2, Nov. 17, 2021.[1]

Commission staff anticipated issuing an Environmental Assessment of the proposed system in May 2023.  That schedule has been suspended while staff waits for Rio Grande to respond to several data requests.  *See* Notice, 88 Fed. Reg. 24,407 (Apr. 20, 2023).

---

[1] Documents relating to this proposal are available on the FERC eLibrary system in Docket No. CP22-17-000, https://elibrary.ferc.gov/eLibrary/search.

## III.   THE *VECINOS* DECISIONS

In August 2021, the Court addressed challenges to the Commission's Authorization Orders in two companion opinions.

### A.     *Vecinos I*

In the first – a published opinion referred to here as *Vecinos I* – the Court found that the Commission failed to adequately justify its choice to examine environmental justice impacts within a two-mile radius of the Project, when some impacts, such as air quality, would extend beyond that area.  *See* 6 F.4th at 1330-31.  The Court instructed the Commission to better explain its choice of a two-mile scope or analyze the Project's impacts within a different radius.  *Id*. at 1331.

The Court also found that the Commission failed to adequately respond to the contention that the Council on Environmental Quality's regulations (at 40 C.F.R. § 1502.21(c)) required the Commission to use the social cost of carbon protocol or some other generally accepted methodology to assess the climate impact of the Project's emissions.  *See id*. at 1328-30.  The Court directed the Commission to "explain whether 40 C.F.R. § 1502.21(c) calls for it to apply the social cost of carbon protocol" or some other scientifically accepted tool, "and if not, why not." *Id*. at 1329-30.

18

The Court further directed the Commission to reconsider its public interest determinations under the Natural Gas Act after addressing these two deficiencies. *Id.* at 1331. The Court did not vacate the Authorization Orders, finding it likely the Commission could remedy the deficiencies on remand. *Id.* at 1332.

### B.    *Vecinos II*

In the second opinion – an unpublished decision referred to here as *Vecinos II* – the Court "denied in all respects" all other challenges to the Authorization Orders. 2021 WL 3716769 at *1. Those rejected challenges included the contention that the Commission should have prepared a supplemental EIS to assess Terminal design changes (*id.* at *1-3), and that the agency failed to adequately consider cumulative ozone impacts. *Id.* at *3-4.

## IV.    THE REMAND ORDERS

In the orders on review, the Commission addressed Rio Bravo's proposed revisions to the Pipeline and the issues remanded by the Court.

### A.    Approval Of The Revised Pipeline Proposal

The Commission approved Rio Bravo's proposed redesign, finding that it "decreas[es] the project's aboveground footprint" which in turn

19

"reduce[s] impacts to landowners and surrounding communities."
Remand Order P 29, JA ___.  The Commission further found that the
proposed modifications would not have significant environmental
impacts.  *Id.* P 51, JA __.  For instance, the revised design would not
permanently affect any additional wetlands.  *Id.* P 50, JA ___.  And the
elimination of two compressor stations would result in "a net reduction
in the [greenhouse gas emissions]."  *Id.* P 61, JA ___.

### B.    Addressing The Remand

Beginning in February 2022, Commission staff issued a series of
information requests to Rio Grande and Rio Bravo regarding
environmental justice communities, visual impacts, air quality
modeling, and emergency planning, to be used to respond to the issues
identified in the Court's remand.  *See id.* P 82, JA ___.  In September
2022, the Commission issued a notice seeking public comment on the
responses received up to that point.  *See* Notice Seeking Public
Comment, 87 Fed. Reg. 60,669 (Oct. 6, 2022) (R. 2922), JA ___.
Pertinent comments filed in response to that notice were addressed in
the Remand Order.  *See, e.g.*, Remand Order PP 85, 87, JA ___, ____.

### 1.    Environmental justice

### a.    Geographic scope

The Commission updated its environmental justice analysis using fresh census information and an expanded area of review, consistent with Council on Environmental Quality and EPA guidance.  *See* Remand Order PP 102, 110, JA ___, ___.  Specifically, the Commission looked to 2020 census data to identify minority and low-income communities within a geographic area that corresponded with the farthest, conservatively estimated impact associated with each Project site.  *Id*. PP 104-108, JA ___-___.

The Commission's analysis (1) identified the environmental impact with the broadest geographic scope, (2) conservatively estimated the possible range of that impact, (3) identified environmental justice communities within that radius, (4) verified that impacts would not exceed the estimated range, and then (5) evaluated whether and how those communities would be affected by each of the expected impacts arising from that site.  (The community data for areas affected by the Project, along with maps detailing the affected block groups, were included in Appendix B to the Remand Order, JA ___-___.)

21

### i.    Terminal

Thus, for the Terminal, the Commission examined impacts on environmental justice communities within a 50-kilometer (31-mile) radius.  That figure reflects "a conservative estimate" of possible air quality impacts, which are the most far-reaching impacts associated with the construction and operation of the Terminal.  *Id*. P 118, JA ___. Fifty kilometers is also the distance used by the EPA for Clean Air Act permitting, and "is generally considered to be the maximum distance" that can be accommodated in "air modeling applications."  *Id*. P 118 n.268, JA ___.  The geographic scope of the Commission's analysis of Terminal-related environmental justice impacts is illustrated below:



**Far-Field View of Census Blocks within 50 km of RGLNG**

Remand Order, App. B-18, JA ___.

### ii.   Pipeline

The Pipeline's sole compressor station would be located near the start of the system in Kleberg County, Texas.  *See id.* P 13, JA ___.  As the name implies, the facility compresses incoming gas to increase its

23

flow pressure, thereby providing the necessary energy to move through the system. Because emissions are typically the farthest-reaching impact of this process, the Commission used a conservative 50-kilometer radius to identify potential environmental justice impacts associated with that station. *Id.* P 165, JA ___.



*Id.* App. B-30, JA ___.

For the actual pipes themselves, the Commission looked at the census block groups actually crossed, because "impacts related to noise, visual, traffic, and air emissions from construction and operation … would be localized." *Id*. P 178, JA ___-___.[2]

### b.    Conclusions

The Commission next identified which of those potentially affected communities were environmental justice communities. *See, e.g.,* Remand Order PP 76 (pipeline facilities), 119 (terminal), 165 (compressor station), 179 (pipeline facilities), 204 (terminal), 205 (pipeline facilities), JA ___, ___, ___, ___, ___, ___. The Commission then went on to analyze the impacts expected to arise from each Project site – *i.e.*, wetlands, visual, traffic, noise, recreational, air quality, safety, and socioeconomic impacts – on the identified communities. *See id*. PP 120-163 (Terminal impacts), 164-202 (Pipeline impacts), JA ___-___, ___-___.

---

[2] The Commission used a 1-mile radius to examine environmental justice impacts arising from the Pipeline's metering stations and contractor yards and the Terminal's off-site parking and storage lots. That radius was based on the farthest-reaching impact of those sites (noise or traffic). *See* Remand Order PP 112, 166-167, JA ___, ___-___.

The Commission found that the impacts arising from the Terminal, pipeline contractor yards, and most of the parallel pipelines "would be predominately borne by environmental justice communities" and thus the Project would have a "disproportionately high and adverse" impact on such communities. *Id*. P 206, JA ___. But, with one exception, those impacts "would be less than significant." *Id*.

The one exception was the Terminal's impact on the local visual landscape. The Commission found that environmental justice communities near the Terminal "may experience significant cumulative visual impacts" if additional projects (such as the Texas LNG project) are developed. *Id*.; *see also id*. P 204 (identifying closest census block groups), JA ___.

## 2. Social cost of carbon protocol

In the Remand Order, the Commission also addressed whether section 1502.21(c) of the Council on Environmental Quality's regulations requires the use of the social cost of carbon protocol to assess the Project's climate change impacts.[3]

---

[3] In 2016, the protocol was updated to include the social costs of additional greenhouse gases, leading to the "social cost of GHGs" nomenclature. *See* Remand Order P 92 n.206, JA ___. This brief uses

26

The Commission explained that the regulation did not require the protocol's use because the protocol was "not developed for project level review" and "does not enable the Commission to credibly determine whether the [greenhouse gas emissions] are significant." *Id*. P 92, JA ___. Nonetheless, for informational purposes, the Commission used the protocol to estimate the social cost of the Project's greenhouse gas emissions. *Id*. PP 90-99, JA ___-___. Using a variety of discount rates, those calculations resulted in values ranging between $1.5 billion and $8.9 billion for the Terminal, and $178 million to $1 billion for the Pipeline. *Id*. PP 98-99, JA ___-___.

### 3.    Natural Gas Act analysis

The Commission found that nothing in its updated environmental analysis undermined its conclusion that the "public convenience and necessity" requires approval of the Pipeline. Likewise, nothing altered the Commission's prior determination that the Terminal is not inconsistent with the public interest. *See, e.g*., Remand Order P 208, JA ___.

---

the "social cost of carbon" for consistency with the terminology in *Vecinos I*.

27

The Commission affirmed its findings on rehearing.  *See Rio Grande LNG, LLC*, 185 FERC ¶ 61,080 (2023) (R. 3080) (Remand Rehearing Order), JA ___.  One Commissioner dissented from both orders.  In its opening brief, Sierra Club does not reference the dissent. *See infra* p. 66 n.9 (any argument based on dissent now waived).

## SUMMARY OF ARGUMENT

***Environmental Justice:***  The Commission reasonably responded to the Court's remand by expanding the geographic scope of its environmental justice analysis to coincide with the farthest-reaching impact from each Project site.  The Commission's updated analysis appropriately concluded that the Project would have a disproportionate and adverse impact on environmental justice communities since they would predominately bear its impacts.  But, with the exception of cumulative visual impacts near the Terminal, those impacts would not be substantial.

***Social Cost of Carbon***:  The Commission reasonably responded to the Court's remand by explaining that 40 C.F.R. § 1502.21(c) does not require use of the social cost of carbon protocol because it was not developed for project-level reviews and there is no generally accepted

threshold for assessing whether a particular amount of emissions is significant.  Nonetheless, the Commission calculated the social cost of the Project's emissions, explained that the Project would have an incremental impact on climate change, and discussed potential climate change impacts to the Project region.

*Natural Gas Act*:  The Commission reasonably addressed the Court's remand by explaining that nothing in its updated analysis, in response to the two deficiencies identified by the Court, altered its prior conclusion that the Project is an "environmentally acceptable action" and should continue to be authorized under the Natural Gas Act.

*Supplemental EIS*:  The Commission reasonably found that it was not required to prepare a supplemental EIS in connection with its updated environmental justice analysis.  That analysis did not reveal a "seriously different picture" of the Project's impacts.  The Commission's conclusion – that environmental justice communities will bear the brunt of the Project's impact, but those impacts, for the most part, will not be substantial – is the same as that reached previously.  Moreover, the Commission's procedures on remand ensured that interested parties were able to participate in, and comment on, the Commission's review.

The Commission also reasonably determined that Rio Grande's recent proposal to add a carbon capture system is amenable to a separate environmental review process. The Terminal is not a "connected action" within the meaning of the NEPA regulations because it can go forward with or without the proposed system.

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews Commission actions under the Administrative Procedure Act's narrow arbitrary and capricious standard. 5 U.S.C. § 706(2)(A). Under that standard, the question is not "whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). Rather, the reviewing court must uphold the Commission's determination "if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (cleaned up); *see also FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("deferential" arbitrary-and-capricious standard requires only that agency action "be reasonable and reasonably explained").

30

The grant or denial of an authorization under sections 3 and 7 of the Natural Gas Act, 15 U.S.C. §§ 717b, 717f, is within the Commission's discretion, and the Court does not substitute its judgment for that of the agency. *See Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1319 (D.C. Cir. 2015) (section 7 certification is "peculiarly within the discretion of the Commission"); *W. Va. Pub. Serv. Comm'n v. Dep't of Energy*, 777 F.2d 31, 35 (D.C. Cir. 1985) (Commission's section 3 discretion is "elastic," i.e., "even more flexible than the discretion afforded" under section 7).

The arbitrary and capricious standard also applies to NEPA challenges. *Nev. v. Dep't of Energy*, 457 F.3d 78, 87 (D.C. Cir. 2006). The statute is purely procedural and thus "the court's role is 'simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" *Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (quoting *Balt. Gas*, 462 U.S. at 97-98). The Commission's environmental analysis is subject to a "rule of reason" standard, and the Court has "consistently decline[d] to flyspeck" that analysis. *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1182

31

(D.C. Cir. 2023) (quotations omitted); *see also City of Boston Delegation v. FERC*, 897 F.3d 241, 251 (D.C. Cir. 2018) (same).

This narrow standard also applies to an agency's decision not to supplement its environmental analysis. *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 375-76 (1989). The question is simply "whether [the Commission's] 'decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1059 (D.C. Cir. 2017) (quoting *Marsh*, 490 U.S. at 378).

## II.  THE COMMISSION REASONABLY RESPONDED TO THE COURT'S REMAND

The Court gave the Commission three discrete tasks on remand: (1) reconsider the geographic scope of its environmental justice analysis, (2) explain whether 40 C.F.R. § 1502.21(c) requires the use of the social cost of carbon protocol, and (3) assess whether the response to either task altered its previous conclusion that the Project is consistent with the public interest under the Natural Gas Act. The Commission reasonably responded to each issue. *See Process Gas Consumers Grp. v. FERC*, 292 F.3d 831, 840 (D.C. Cir. 2002) (question on review is whether agency determinations are responsive to the Court's mandate).

32

A.    **The Commission Reasonably Analyzed Environmental Justice Impacts**

1.    **The Commission reasonably expanded the geographic scope of its analysis**

The *Vecinos* court held that the Commission arbitrarily limited the geographic scope of its environmental justice analysis to communities within a two-mile radius of the Project when certain impacts could extend beyond that radius. *See Vecinos I*, 6 F.4th at 1330-31. The Court instructed the Commission to either better justify its two-mile limitation, "or else analyze the projects' impacts on communities within a different radius." *Id.* at 1331.

The Commission chose the latter. It looked at each of the Project's sites and identified the associated environmental impact with the broadest geographical impact for each. The Commission then estimated a geographic radius that would capture that impact. Within that radius, the Commission identified environmental justice communities and then analyzed whether and how the impacts associated with the relevant Project site would affect them. *See supra* pp. 21-26.

The Commission's expanded delineation of the areas potentially affected by the Project "was reasonable and adequately explained." *Vecinos I*, 6 F.4th at 1330 (quoting *Cmtys. Against Runway Expansion,*

*Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004)).  The geographic scope

was reasonable because it was broad enough to encompass all possible

impacts from each site.  *See, e.g.,* EIS 4-394 (identifying potential scope

of impacts), JA ___.  For example, the air quality, noise, and visual

impacts associated with off-site contractor yards would be extremely

localized, but the Commission chose a one-mile radius to ensure that

any possible traffic impact was captured.  *See, e.g.*, Remand Order

P 112 (noting that "roadway level of service" would not be impacted

within one mile, so "a one-mile radius is sufficient), JA ___-___.

The delineations were also reasonably explained.  For instance,

the Commission found that emissions are the Terminal's farthest-

reaching impact.  It explained that a 50-kilometer radius was

appropriate given that is the distance used by the EPA for Clean Air

Act permitting and the maximum distance that can be reasonably

forecasted in air modeling applications.  *Id*. P 119 n.268, JA ___; *see also*

*id*. P 166 (discussing choice of 1-mile radius around Pipeline metering

stations since the farthest-reaching impact – noise – would not be

perceptible at that distance), JA ___; EIS 4-301-302, JA ___-___.

Having chosen a reasonable geographic scope for its analysis and

34

adequately explained that choice, the Commission's methodology "is entitled to deference." *Runway Expansion, Inc.*, 355 F.3d at 689.

### 2. The Commission reasonably explained its conclusions

The Court also directed the Commission to address whether its prior conclusion – that the Project would not have a "disproportionate" effect, since all affected communities were minority or low-income – still held. *Vecinos I*, 6 F.4th at 1331.

Based on its updated analysis, the Commission found that the impacts associated with construction and operation of the Terminal, certain contractor yards, and a majority of the pipeline would "be disproportionately high and adverse because they would be predominately borne by environmental justice communities." Remand Order P 206, JA ___; *see also id*. PP 120-163 (discussing Terminal-related impacts); 164-202 (discussing Pipeline-related impacts), JA ___-___; ___-___. But apart from cumulative visual impacts near the Terminal, those impacts would not be substantial. *See id*. P 206 ("impacts associated with wetlands, surface water, recreational and subsistence fishing, tourism, socioeconomics, traffic, visual resources, noise, and air quality would be less than significant"), JA ___.

35

That explanation appropriately responds to the Court's remand and satisfies the "goal of an environmental-justice analysis" by "recogniz[ing] and discuss[ing]" the Project's "impacts on predominately-minority communities." *Sierra Club v. FERC*, 867 F.3d 1357, 1370 (D.C. Cir. 2017).

### 3.    Sierra Club's objections lack merit

Sierra Club raises a series of substantive objections to the Commission's analysis.  All are without merit.

### a.    Air pollution impacts

First, Sierra Club claims that "FERC did not even purport to state whether air emissions would have a disproportionate adverse effect on environmental justice communities."  Br. 40.  Not so.

The Commission determined that impacts on environmental justice communities – including air quality impacts – from the construction and operation of the Terminal (as well as aspects of the Pipeline) "would be disproportionately high and adverse because they would be predominately borne" by such communities.  Remand Order P 206, JA __.

The Commission further explained that Terminal construction emissions would "have the largest impact within a short radius around"

36

the construction footprint (Remand Order P 139, JA ___-___), and

"should not adversely affect any residences," the closest of which are

over 2 miles away.  Remand Rehearing Order P 36, JA ___; *see also*

Remand Order PP 76, 173 (finding that Pipeline compressor station is

not in an environmental justice community, and air quality impacts

would be localized), JA ___, ___.

The Commission also addressed the possibility of cumulative

construction emission impacts.  These temporary impacts would be "in

the immediate vicinity of the LNG terminal sites" and would not affect

any residences.  Remand Order P 147, JA ___; *see also id.* P 204

(identifying the four census block groups closest to the Terminal),

JA ___.  The Commission explained, however, that they could impact

"individuals from environmental justice communities fishing or

otherwise recreating near the terminal."  *Id.* P 147, JA ___; *see also id.*

P 139 (identifying Laguna Atascosa National Wildlife Refuge as nearby

area that could experience short-term, elevated air pollution levels),

JA ___.  The Commission imposed mitigation measures to help ensure

that emission levels would remain below the National Ambient Air

Quality Standards (NAAQS) during construction and start up.  *Id*.

PP 140-142, JA ___-___.

### i.    No National Ambient Air Quality Standards violations

As for operational emissions – both direct and cumulative – the

Commission explained that they could potentially impact air quality up

to 50 kilometers from the Terminal and compressor station.

*See* Remand Order PP 118, 165, JA ___, ___.  But communities within

that radius would not face significant air quality impacts because

operation of the Terminal would not cause air pollutant concentrations

to exceed the NAAQS, which are designed "to protect sensitive

populations."  *Id*. P 151, JA ___; *see also id*. PP 146-50 (discussing

Terminal air quality analysis), JA ___-___; P 165 (discussing compressor

station emissions), JA ___-___.

### ii.    Reliance on National Ambient Air Quality Standards

Pointing to a passage from the EPA's *Promising Practices*, Sierra

Club contends that a finding of no significant impacts to the general

population cannot, standing alone, establish that there are no

disproportionately high and adverse impacts to environmental justice

communities.  Br. 41.  Sierra Club charges that "FERC offers no

explanation" for failing to apply this principle when analyzing the Project's "air impacts." *Id.* 42. Not true.

The Commission explained that it measured emissions against the "applicable NAAQS thresholds, which are meant to protect sensitive populations." Remand Rehearing Order P 32, JA ___; *see also Murray Energy Corp. v. EPA*, 936 F.3d 597, 604 (D.C. Cir. 2019) (NAAQS "protect public health," including that of "sensitive populations"). And the Court has already held that the Commission may rely on those standards to "appropriately capture potential health risks." *Vecinos II*, 2021 WL 3716769 at *4; *see also Sierra Club*, 867 F.3d at 1370 n.7 ("FERC appropriately relied on EPA's national ambient air quality standards").

Sierra Club offers no reason to expect that the relevant environmental justice communities would be vulnerable to air quality impacts in a manner not already accounted for in the NAAQS. *See* Authorization Rehearing Order P 74, JA ___. Moreover, Sierra Club ignores that the Commission previously analyzed whether any Project impacts would disproportionately affect environmental justice communities in the area due to "factors unique to [those] populations,"

39

including "health factors." *Id*. P 69, JA ___.  Ultimately, the

Commission concluded that the demographic characteristics of these

communities would not cause emissions to have a disproportionately

adverse impact as compared to the broader population. *Id*. PP 74-77,

JA ___-___.

### b.     Geographic scope

Having previously claimed that the geographic scope of the

Commission's analysis was too narrow, *see Vecinos I*, 6 F.4th at 1330,

Sierra Club now complains that the analysis is "over-inclusiv[e]" and

"untethered from FERC's estimates of impacts." Br. 43-44.  This issue

was not presented to the Commission on rehearing and the Court

therefore lacks jurisdiction to consider it. *See* Reh'g Req. 29-30

(R.3021), JA ___-___; *see also* 15 U.S.C. § 717r(b) ("No objection to the

order of the Commission shall be considered by the court unless such

objection shall have been urged before the Commission in the

application for rehearing unless there is reasonable ground for failure

so to do."); *Food & Water Watch v. FERC*, 28 F.4th 277, 284 (D.C. Cir.

2022) (holding the NGA's issue exhaustion requirement is

jurisdictional).

In any event, Sierra Club does not dispute that air quality impacts could occur as far as 50-kilometers away from a project. Br. 43. That alone establishes that the Commission reasonably established the geographic scope of its analysis. *See Runway Expansion*, 355 F.3d at 689 (agency's choice "among reasonable analytical methodologies is entitled to deference from this court").

Sierra Club seizes upon the Commission's statement that, beyond 12.8 kilometers, there are no Clean Air Act criteria pollutants above "the defined significant impact level." Br. 43 (quoting Remand Order P 118, JA __). But that is a distraction.

First, the refence was simply "to give context for Commission staff's determination that a more conservative radius of 50 kilometers" was an "appropriate unit of geographic analysis." Remand Rehearing Order P 31, JA ___.

Second, "significant impact levels" are established by the EPA under the Clean Air Act. If emissions fall below the pertinent level, they are not considered to have an adverse impact on ambient air quality. *See* Remand Order P 118 n.270, JA ___. If the level is exceeded, then further testing is required. *See* Remand Rehearing

Order P 30 n.72, JA ___.  Here, although initial testing indicated that only nitrogen dioxide exceeded the significant impact level, the Commission required cumulative air modeling for all criteria pollutants. *Id*. P 31, JA ___.  That modeling established that, even under a worst-case scenario, emissions "would remain under applicable NAAQS thresholds."  *Id*. P 32, JA __.

### c.    The Isla Blanca air monitor

Baseline data for the Commission's air quality analysis was gathered from a particulate matter monitor located in Brownsville, 28 kilometers from the Terminal.  *See* Remand Rehearing Order P 26, JA ___.  Sierra Club charges that the Commission "arbitrarily refused to consider" data from the Isla Blanca monitor, located roughly 13 kilometers from the Terminal.  Br. 46.

But as the Commission explained, EPA regulations and modeling guidance state that three years-worth of data should be used.  Remand Rehearing Order P 27, JA ___.  The background data underlying the air quality analysis covered 2019 through 2021.  *See* Jan. 27, 2023 Rio Grande Resp., Attach. 1. at 22-23 (R. 2967), JA ___-__.  The Isla Blanca monitor, which began collecting reliable data in October 2019, "did not

42

have three years of data at the time the analysis was completed."
Remand Rehearing Order P 27, JA __.

Moreover, after examining mapping data, the Commission
determined that the Brownsville monitor was close to environmental
justice communities, and thus was "adequately representative to
identify impacts to potentially affected population centers." *Id.* The
Commission's use of data from the Brownsville monitor was thus
reasonable. *See Biological Diversity*, 67 F.4th at 1182 (court
"consistently decline[s] to flyspeck an agency's environmental
analysis").

### d.    Ozone

In the pre-remand Authorization Orders, the Commission found
that, in a "worst-case scenario," the "cumulative impact on regional air
quality from ozone could be significant." Authorization Rehearing
Order P 55, JA ___. Following the redesign of the Terminal, and the
cancellation of a proposed nearby LNG terminal, the Commission asked
Rio Grande to provide an updated ozone analysis. *See* Remand Order
P 150, JA ___; *see also Rio Grande LNG*, 174 FERC ¶ 61,048 at P 12
n.40 (noting "large reduction" in ozone precursors would "reduce the

43

cumulative ozone levels"), JA ___.  That analysis showed that, even

with the estimated Project impact, the cumulative ozone concentrations

would be well below the NAAQS.  *See* Remand Order P 150, JA ___.

Sierra Club contends that the Commission's discussion of the

updated ozone modeling is subject to challenge for failure to comply

with NEPA.  Br. 49-50.  But the Court already determined that the

Commission's initial analysis fulfilled its NEPA obligations:  "FERC

was aware of and adequately considered the cumulative ozone effects

when it decided to approve the [Project].  The NEPA demands no more."

*Vecinos II*, 2021 WL 3716769 at *4; *see also* Remand Rehearing Order

P 29 (discussing *Vecinos* II), JA ___.  Questions regarding the

Commission's ozone analysis are thus beyond the scope of the remand

proceeding.

In any event, the Commission explained that the underlying study

"complies with EPA's current Modeled Emissions Rates for Precursors

guidance and associated databases and with guidance from the Texas

Commission on Environmental Quality."  Remand Rehearing Order

P 29, JA ___.  There was thus no basis to doubt the completeness or

accuracy of those calculations.  *Id.*[4]

### B.  The Commission Reasonably Addressed 40 C.F.R. § 1502.21(c)

#### 1.  Section 1502.21(c) does not compel use of the social cost of carbon protocol

The Court directed the Commission to "explain whether 40 C.F.R. § 1502.21(c) calls for it to apply the social cost of carbon protocol or some other analytical framework" and "if not, why not."  *Vecinos I*, 6 F.4th at 1329-30.  Section 1502.21(c) requires agencies to evaluate impacts "based upon theoretical approaches or research methods generally accepted in the scientific community."  The Commission explained that the regulation does not require the use of the social cost of carbon protocol in this proceeding for two reasons.  Remand Order P 92, JA ___

#### a.  Project-level review

First, the "tool was not developed for project level review."  *Id.* Sierra Club asserts that this finding is "completely unsupported" (Br. 54) and that the Commission has "conceded" the protocol is

---

[4] Citing 40 C.F.R. § 1501.12, Sierra Club argues that the failure to provide the underlying modeling analysis "is itself a NEPA violation." Br. 49.  This argument was not raised on rehearing and the Court lacks jurisdiction to consider it.  *See* Reh'g Req. 19-20, JA __-___; 15 U.S.C. § 717r(b).

"generally accepted in the scientific community."  Br. 53.  Neither is correct.

In the Remand Order, the Commission pointed to its *Florida Southeast Connection* proceeding to support its long-standing position that the protocol is not appropriate for assessing individual infrastructure projects.  *See* Remand Order P 93, n.207, JA ___. There, the Commission explained that the "EPA note[d] that [the] tool was developed to aid the monetary cost-benefit analysis of rulemakings."  *Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099, P 35 n.103 (2018).  By contrast, when analyzing a specific project under NEPA, the Commission does not – and often cannot – quantitively capture all benefits.  *See id*. PP 28, 32, 36.  Qualitative assessments are required.  *Id*. P 36.  Using the social cost of emissions on one side of the equation would thus result in a "distorted cost-benefit analysis." *Id*. P 28; *see also* 40 C.F.R. § 1502.22 (monetary cost-benefit analysis should not be used "when there are important qualitative considerations").

Moreover, "it remains the case that there is a lack of consensus about how to apply the social cost of carbon on a long-time horizon."

46

Remand Rehearing Order P 59 n.176, JA ___;[5] *see also Fla. Se.*

*Connection, LLC*, 162 FERC ¶ 61,233, P 49 (2018).  This results in

signification variations in output that "belies the[] contention that the

Commission acted unreasonably in finding the tool inadequately

accurate to warrant inclusion under NEPA."  *EarthReports, Inc. v.*

*FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016); *see also Biological Diversity*,

67 F.4th at 1184 (claim that the "generally accepted in the scientific

community" regulation "mandates a social cost of carbon analysis" is "in

tension with *EarthReports*" and other cases finding a "lack of scientific

consensus").

     Thus, while the protocol may be generally accepted in the

scientific community" for "rulemaking proceedings" (*Fla. Se.*

*Connection*, 164 FERC ¶ 61,099 at P 35), the Commission found that

such a consensus does not exist for project-level reviews.  *See* Remand

Rehearing Order PP 56-57, JA __-___; *see also Del. Riverkeeper Network*

---

[5] Sierra Club falsely asserts that the Commission has "abandoned" this historic concern about the lack of consensus regarding an appropriate discount rate.  Br. 56-57.  Equally untrue is the claim that the Commission "abandoned" its concern that the protocol does not measure environmental impacts.  *See* Remand Rehearing Order P 59 n.176 ("it remains the case that . . . the [protocol] . . . does not measure environmental impacts as such"), JA ___.

*v. FERC*, 45 F.4th 104, 111 (D.C. Cir. 2022) (upholding determination that protocol is not appropriate for project-specific review).

As Sierra Club notes, agencies whose responsibilities are more directly tied to fossil fuel production or consumption have chosen to use the protocol.  Br. 53.  But that does not establish that it is scientifically accepted for use in a project-specific infrastructure analysis under NEPA.  And, in any event, the Commission used the protocol to generate a range of the Project's social costs.  *See* Remand Order PP 96-101, JA ___; *see supra* pp. 26-27.

### b.    Significance threshold

Separately, section 1502.21(c) does not mandate use of the protocol because it does not "enable the Commission to determine credibly" whether a project's emissions "are significant or not significant in terms of their impact on global climate change."  Remand Order P 93, JA ___; *see also* Remand Rehearing Order P 57, JA ___-___.  "[T]here are currently no criteria to identify what monetized values are significant for NEPA purposes."  Remand Order P 93 n.210 (quoting *LA Storage, LLC*, 182 FERC ¶ 61,026, P 14 (2023)), JA ___; *see also NEPA Guidance on Consideration of Greenhouse Gas Emissions and Climate*

48

*Change*, 88 Fed. Reg. 1196, 1200 (Jan. 9, 2023) ("This guidance does not establish any particular quantity of GHG emissions as 'significantly' affecting the quality of the human environment.").

Recognizing the lack of scientific consensus, the Court has repeatedly found that the Commission has "no obligation . . . to consider the social cost of carbon." *Biological Diversity*, 67 F.4th at 1184; *see also EarthReports*, 828 F.3d at 956 (same); *Sierra Club v. FERC*, 672 F. App'x 38, 39 (D.C. Cir. 2016) (per curiam) (same); *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199 at *2 (D.C. Cir. Feb. 19, 2019) (per curiam) (same).

Sierra Club says the Commission should just make a "policy judgment" as to whether a particular level of emissions, or its monetized cost, constitutes a significant environmental impact. Br. 57. But the issue here is whether section 1502.21(c) requires use of the social cost of carbon protocol. And that regulation addresses "methods generally accepted in the scientific community," not policy calls by regulators. 40 C.F.R. § 1502.21(c)(4); *see also* Remand Rehearing Order P 59, JA ___.

Sierra Club also asserts that the Commission "ignored" the Court's "instruction to consider other analytic methods." Br. 57. Not true: "we [are not] aware of any other currently scientifically accepted method that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions." Remand Order P 93, JA ___; *see also* Remand Rehearing Order P 57 (same), JA ___; EIS 4-481-482 (discussing review of other potential models and methodologies), JA ___-___; EA 46 (same), JA ___.

Sierra Club's only rejoinder is to say that the Commission could have just "made an ad-hoc determination." Br. 58. They point to the Commission's case-specific significance determination in *Northern Natural Gas Co.*, 174 FERC ¶ 61,189 (2021). But in that one case, the Commission did not use any generally accepted methodology. It simply concluded the impact of a project increasing state emission levels by 0.000078 percent and 0.0002 percent would, under any approach, be insignificant. *Id*. PP 33-36.

Sierra Club also notes that the Commission at one time proposed a significance threshold of 100,000 tons per year of carbon dioxide equivalent. Br. 58-59. That threshold – since suspended – was set "as a

matter of policy." *See* Remand Order P 101 n.229, JA ___.  Again, the

question under § 1502.21(c) is the use of scientifically accepted

methodologies.  An eye-ball test or policy preference does not suffice.

*See* Remand Rehearing Order P 56 (declining to use ad hoc emission

level), JA ___; *see also Driftwood Pipeline LLC*, 183 FERC ¶ 61,049,

P 61 (2023) (explaining limited value of monetizing social cost of

pipeline emissions).

### 2.  The Commission addressed the significance of the Project's potential climate impacts

Sierra Club asserts that, notwithstanding the lack of any scientific

consensus regarding the social cost of carbon protocol, other Council on

Environmental Quality and FERC regulations require the Commission

to make an up-or-down call as to whether potential climate change

impacts cross a "significant" threshold.  Br. 57-58.  But these

regulations were not even cited in Sierra Club's request for agency

rehearing, much less argued.  The Court thus lacks jurisdiction to

consider this contention.  *See* Reh'g Req. 42-47, JA ___-___; *see also*

15 U.S.C. § 717r(b); *Constellation Energy Commodities Grp. v. FERC*,

457 F.3d 14, 21 (D.C. Cir. 2006) (argument waived where rehearing

request "never even cited the sections of the tariff upon which they now

rely"). Moreover, the question of whether the Commission must make a binary significance determination is beyond the scope of the remand. *See* Remand Rehearing Order PP 53-54, JA ___-___.

In any event, the now-cited regulation – 40 C.F.R. § 1502.16(a)(1) – requires the Commission to discuss the "significance of [a project's] impacts." Plainly the Commission did so here.[6]

The Commission estimated the Project's greenhouse gas emissions. *See* Remand Order PP 96-97, JA ___-___. The Commission determined that they would contribute incrementally to climate change. *See id.* P 101, JA ___. The Commission calculated an estimated social cost of those emissions (*see id.* PP 98-99, JA ___-___), after having contextualized emissions from the Project as originally designed by comparing them to the national inventory. *See* Authorization Order P 108, JA ___. And the Commission discussed the environmental impacts in the region attributable to climate change, such as flooding

_____

[6] Sierra Club also cites to 18 C.F.R. § 380.7(a), but that section does not say the Commission must definitively determine whether an impact crosses a "significant" threshold. It simply provides that that the "staff conclusion section" in an EIS "will include summaries of [t]he significant environmental impacts of the proposed action." *Id.*

and increased hurricane intensity. *See* EIS 4-479-482, JA \_\_\_-\_\_\_;

EA 44-47, JA \_\_\_-\_\_\_. That satisfies "the required 'hard look.'" Remand

Order P 101, JA \_\_\_; *see also WildEarth Guardians v. Jewell*, 738 F.3d

298, 309 (D.C. Cir. 2013) (quantifying emissions and comparing them to

national and state inventory levels is a "reasonable proxy" for assessing

climate impacts); *Biological Diversity*, 67 F.4th at 1184 (comparing

Project emissions with state and national inventories is "reasonable").

## C.    The Commission Reasonably Reassessed Its Public Interest Determinations

The Court directed the Commission to "revisit its determinations

of public interest and convenience under Sections 3 and 7 of the NGA"

after addressing the remand. *Vecinos I*, 6 F.4th at 1331. The

Commission did so.

### 1.    The Commission reaffirmed its Natural Gas Act findings

It "continue[d] to find" that the Project was "environmentally

acceptable." Remand Order P 208, JA \_\_\_. The Commission also

"continue[d] to support [its] previous findings of the [Project's] benefits."

*Id*. Those benefits include "boosting the domestic economy and the

balance of international trade; and supporting domestic jobs in gas

production, transportation, and distribution, and domestic jobs in

industrial sectors that rely on gas or support the production, transportation, and distribution of gas." Authorization Rehearing Order P 18, JA ___; *see also* Authorization Order PP 22-25, 32, JA ___-___, ___.

The Commission thus reaffirmed that the Terminal "is not inconsistent with the public interest" and that the Pipeline "is required by the public convenience and necessity." Remand Order P 208, JA ___; *see also* Remand Rehearing Order PP 46-52, JA ___; *supra* pp. 6-9. (explaining statutory standard). This determination "is a matter peculiarly within the discretion of the Commission" and its conclusion is afforded deference. *Myersville*, 783 F.3d at 1308.

### 2. Sierra Club's complaint lacks merit

Sierra Club asserts that the Commission "failed to comply" with the Court's mandate because it did not precisely lay out the "steps" of its public interest determination, in particular the weight given to one specific element (greenhouse gas emissions). Br. 59.

Of course, a public interest finding is not susceptible to a mathematical equation. It "entails not merely economic and mathematical analysis but value judgment." *City of Columbia v. Omni*

54

*Outdoor Advert., Inc.*, 499 U.S. 365, 377 (1991); *see also FPC v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 29 (1961) ("a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency"). In any event, the entirety of the record demonstrates that the Commission considered all factors bearing on the public interest – including environmental considerations—consistent with its responsibilities under Natural Gas Act.

### a.    The Pipeline

The Commission found that there was a market need for the Pipeline, as reflected by a 20-year agreement for its full capacity. Authorization Order P 32, JA ___. The Commission further found that the Pipeline would further the "principal purpose" of the Natural Gas Act "by encourage[ing] the orderly development of reasonably-priced gas supplies." Authorization Rehearing Order P 15, JA ___. It will provide "additional transportation options" in the Agua Dulce Market Area in Nueces, Texas (*id.* P 19, JA ___), and "contribut[e] to the development of the gas market," which aids economic growth. *Id.* P 18, JA __; *see also* Remand Order PP 30, 208, JA __-__.

55

As for environmental impacts, the Commission reasonably concluded, after an extensive NEPA review – which included an analysis of greenhouse gas emissions (*see, e.g.*, Remand Order P 97, JA ___; EA 25-26, 45-47, JA ___-___, ___-___) – that the Pipeline was an environmentally acceptable action. *See* Remand Order PP 79, 208, JA ___, ___.  The Commission therefore found that "the public convenience and necessity requires approval" of the Pipeline. *Id*. P 80, JA ___; *see also* Authorization Rehearing Order P 123, JA ___.

### b.    The Terminal

The Commission similarly explained that the Terminal would facilitate the exportation of natural gas, which Congress has declared to be in the national interest. *See* Authorization Rehearing Order P 17, JA ___.  Those exports boost "the balance of international trade" (*id*. P 18, JA ___), and contribute to the growth of the domestic economy. *Id*. P 19, JA ___; *see also* Remand Rehearing Order P 52, JA ___.

As to environmental impacts, the Commission explained that the Terminal would be constructed on a man-made shipping channel that "is currently undeveloped [and] zoned for commercial and industrial use." Authorization Order P 22, JA __.  Nonetheless, the Commission

acknowledged there would be environmental costs.  *See, e.g.*,
Authorization Rehearing Order P 62, JA __.  Those costs included a
"contribut[ion] incrementally to future climate change impacts,
including impacts in the project region."  Remand Order P 101, JA __;
*see also* Remand Rehearing Order P 58, JA ___.

The Commission ultimately concluded that construction and
operation of the Terminal as conditioned by the Commission, is an
"environmentally acceptable action[]."  Remand Order P 208, JA ___.
Thus, the Natural Gas Act's presumption in favor of authorization, *see*
15 U.S.C. § 717b(a), "was not overcome."  Remand Rehearing Order
P 53, JA ___; *see also supra* pp. 6-9 (discussing section 3 standards);
*Biological Diversity*, 67 F.4th at 1188 (rejected NEPA challenges "fare
no better when framed as [Natural Gas Act] challenges").

## III.  THE COMMISSION REASONABLY PREPARED ITS UPDATED ENVIRONMENTAL JUSTICE ANALYSIS

In connection with its updated environmental justice analysis, the
Commission directed Rio Grande and Rio Bravo to provide updated
cumulative emissions modeling to account for, among other things, the
redesign of the Terminal and Pipeline.  *See, e.g.*, Remand Order P 148,
JA ___.  That modeling – like the modeling used in the EIS's cumulative

impact analysis – covered a 50-kilometer radius from the Terminal and the remaining compressor station. *See* EIS 4-474, 4-478, JA ___-___; EA 42, JA ___; Remand Order PP 149, 165, JA ___, ___.

The Commission's requests for information and the developers' responses were placed on the public docket. And, in September 2022, the Commission requested public comment on those responses. *See* Notice, JA ___.[7] The Commission's updated analysis, and its response to pertinent public comments, were set forth in the Remand Order, which was subject to rehearing.

In Sierra Club's view, that was not enough and a supplemental EIS was required. Sierra Club is incorrect.

## A.    A Supplemental EIS Was Not Required By 40 C.F.R. § 1502.9(d)(1)

Sierra Club contends that, because the Commission's updated analysis employed a broader geographic scope, 40 C.F.R. § 1502.9(d) required the Commission to prepare a supplemental EIS. Br. 28. But

---

[7] Requests for information after that date primarily sought (1) a tally of the Terminal and Pipeline's greenhouse gas emissions, (2) maps reflecting the geographic scope of the Commission's analysis (like those including in Appendix B to the Remand Order), and (3) further updates to previously submitted air modeling. *See* R. 2957, R. 2962, R. 2963, R 2972, R 2976.

as this Court explained earlier, the obligation imposed by that regulation only attaches when "new information will affect the quality of the human environment in a significant manner or to a significant extent not already considered," *Vecinos II*, 2021 WL 3716769 at *2 (quoting *Cap. Crescent Trail*, 877 F.3d at 1060), not simply "every time new information comes to light." *Id.* (quoting *Marsh*, 490 U.S. at 373). Put another way, "a [supplemental EIS] must be prepared only where new information provides a *seriously* different picture of the environmental landscape." *Stand Up for California! v. Dep't of Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021) (internal quotations omitted).

Here, there was no "significant new" information regarding "environmental concerns." Remand Rehearing Order P 42, JA ___. The updated emissions analyses revealed that the neither the Project nor the Pipeline would have a significant impact on air quality for communities within a 50-kilometer radius of the Terminal and the Pipeline's compressor station. *Id.* P 36, JA ___. This was the same conclusion reached for the original design's air quality impacts from criteria pollutants covered under the NAAQS. *See id; see also*

59

Authorization Order P 104, JA ___; Authorization Rehearing Order

PP 50, 55, 60 JA ___, ___, ___.

Given that air quality impacts within a 50-kilometer (31-mile)

radius of the Terminal had been studied before, the truly new

information in the Commission's updated analysis was the

demographics of the communities beyond the previously analyzed two-

mile radius.  The Commission gathered that publicly available

information and found, within that expanded radius, Project impacts

"would be predominately borne by environmental justice communities."

Remand Order P 206, JA ___.  But, apart from cumulative visual

impacts, those impacts would be "less than significant."  *Id*.

This is not a "seriously different picture" than that generated by

the Commission's original analysis.  *New River*, 373 F.3d at 1330.  The

Commission previously concluded that environmental justice

communities would bear all the Project's impacts (*see* Authorization

Rehearing Order P 69, JA ___), but that the vast majority of those

impacts would be less than significant.  *See id*. PP 74 (air quality

impacts would not exceed NAAQS), 75 (discussing potential ozone

exceedance), JA ___-___; *see also* Authorization Order P 119 (noting

60

potential for significant cumulative visual impacts), JA ___.

Accordingly, a supplemental EIS was not required under 40 C.F.R.

§ 1502.9(d).  *See* Remand Rehearing Order P 43, JA ___.

### B.    The Commission Reasonably Presented Its Analysis In The Remand Order

Sierra Club argues that a supplemental EIS is "separately"

required by case law purportedly establishing that "NEPA does not

permit filling gaps other than by using NEPA procedures."  Br. 25.  The

Court lacks jurisdiction to consider this argument because it was not

presented to the Commission on rehearing.  *See* Reh'g Req. 35-38,

JA ___-___; 15 U.S.C. § 717r(b).  Indeed, Sierra Club's principal case –

*Idaho Sporting Congress Inc. v. Alexander*, 222 F.3d 562 (9th Cir. 2000)

– is not even cited in its rehearing request.  *See Constellation Energy*,

475 F.3d at 21.

In any event, *Idaho Sporting Congress* faulted the Forest Service

for issuing a supplementary analysis without reopening its decision-

making process.  *See* 222 F.3d at 568.  As a result, the new information

could not "serve practically as an important contribution to the

decisionmaking process."  *Id*. at 567.  Here, by contrast, the Commission

expressly considered its updated environmental justice analysis – along

61

with public comments on that analysis – when determining that the

Project was an environmentally acceptable action and should be

authorized under the Natural Gas Act.  *See* Remand Order PP 206-208,

JA ___-___.  Indeed, unlike the "*post-hoc*" analysis at issue in *Idaho*

*Sporting Congress* (222 F.3d at 568), the Commission imposed new

mitigation measures based on the results of its updated analysis.  *See*

Remand Order P 147 (requiring localized air quality monitoring during

Terminal construction), JA ___.

The Commission's process here satisfied NEPA's fundamental

purpose of ensuring that environmental information was available to

decisionmakers and the public before the Commission rendered its

decision on remand.  In such circumstances, as Sierra Club

acknowledges (Br. 36-37), this Court has repeatedly declined to order

further procedures.  *See, e.g.*, *Oglala Sioux Tribe v. NRC*, 45 F.4th 291,

301 (D.C. Cir. 2022) (permissible for agency to "present[] the substance

of its findings in publicly accessible decisions after on-the-record

hearings"); *Nat. Res. Def. Council v. NRC*, 879 F.3d 1202, 1211 (D.C.

Cir. 2018) (permissible for agency to evaluate information omitted from

EIS during a subsequent hearing and present its findings in a publicly

accessible order); *see also Friends of the River v. FERC*, 720 F.2d 93, 106-08 (D.C. Cir. 1983) (permissible for agency to include the required analysis in a publicly accessible opinion "composed after due investigation and before the matter was brought to court"); *cf. Marsh*, 490 U.S. at 380-83 (permitting agency reliance on non-NEPA document in assessing whether new information requires a supplemental EIS).

## C. The Commission's Process Fostered Public Participation

Sierra Club raises a series of contentions to support its claim that the Commission's process did not permit appropriate public participation. None has merit.

Initially, it is important to recognize that members of the public, including those in environmental justice communities, have had ample opportunities to participate in the review process – a process which began more than 8 years ago. *See* EIS 1-11, JA ___. FERC and the project sponsors held numerous public scoping and comment meetings in the Project region. The draft EIS was circulated widely to state and local governments, community organizations, and individuals within and beyond the 50-kilometer radius used in the Commission's updated environmental justice analysis. *See, e.g.*, EIS 1-11 to 1-13, 4-468, App.

63

A, JA ___-___, ___, ___-___; *see also* Remand Order P 85 (discussing

public participation), JA ___.  And from the start, the Commission's

environmental analysis explained that Project impacts could extend 50

kilometers.  *See* EIS 4-394 (studying air quality impacts within a 31-

mile radius of terminal and compressor stations), JA ___.

Nonetheless, Sierra Club contends that the information put out

for public comment lacked "comprehensive context" and was too

"technical" to permit meaningful comment.  Br. 32.  In fact, the

materials are very similar to the type of information found in an EIS.

*See, e.g.*, Mar. 3, 2022 Rio Grande Resp. (R. 2825), JA ___-___.  As for

context, Rio Grande's March 2022 submission states that "98.6% of the

census block groups extending to 50 kilometers from the … Terminal

include environmental justice communities."  *Id*. 4, JA ___.

The submission further explains in plain language that the

"[r]esults of the updated modeling demonstrate that emissions of

criteria pollutants from the … Terminal and mobile sources do not

result in exceedance of the National Ambient Air Quality Standards

(NAAQS), or state standards.  In terms of significance and

measurability, although the modeling indicates potential air quality

impacts out to 31 miles (50 km), these impacts are below or approaching the detection limit of state and federally administered NAAQS air quality monitors." *Id.*, Attach. 3, JA ___.

The 150 public comments submitted in response to the Commission's solicitation – including Sierra Club's detailed critique of the developers' submissions – further demonstrate that the process fostered meaningful participation. *See* Remand Order P 85, JA ___.

Sierra Club also complains that the comment period was too short and that the Commission did not "provide notice that there would be no further comment opportunities." Br. 32. But again, the Commission's deadline was long enough for over 150 people to submit comments. Nor did the Commission's procedures prevent Sierra Club from filing post-deadline comments that were considered and addressed in the Remand Order. *See* Remand Order P 87, JA ___; *see also id*. P 42 (noting additional instances where Sierra Club has filed, and the Commission accepted, unsolicited comments), JA ___.

As for those filings after the Commission's September 2022 request for comments, parties to the docket were aware of any subsequent filings "and could have provided comment on it at any

time." Remand Rehearing Order P 42, JA ___. And, of course, all parties had the 30 days afforded to them by the Natural Gas Act to seek rehearing of the Commission's determinations. *See Minisink Residents for Env't Pres. and Safety v. FERC*, 762 F.3d 97, 115 (D.C. Cir. 2014) (commentator who had ample time to comment on evidence before rehearing deadline had meaningful opportunity to participate); *Myersville*, 783 F.3d at 1327 (same).[8]

Sierra Club also complains that the Commission's process did not afford another opportunity for interested parties to intervene. But as the Commission explained, "any person may file comments on the docket, even if the person did not formally move to intervene," as a party. *See* Remand Rehearing Order P 44, JA ___.[9]

---

[8] Sierra Club attempts to support its complaint about the Commission's procedures by noting two modeling issues discussed in the Remand Order. Br. 35. But the rehearing deadline for raising issues regarding orders is established by Congress, *see* 15 U.S.C. § 717r(a), not the Commission.

[9] Commissioner Clements' dissent made additional arguments in support of her view that a supplemental EIS was appropriate here. *See* Dissent PP 3-12, JA ___-___. Sierra Club has not raised those arguments – or even cited the dissent – and it is too late to do so now. *See Johnston v. SEC*, 49 F.4th 569, 578 n.3 (D.C. Cir. 2022) (argument not raised in opening brief "is forfeit[ed]").

When acting on remand, the Commission possesses the "administrative discretion" to decide "how, in light of internal organizational considerations, it may best proceed to develop the needed evidence and how its prior decision should be modified in light of such evidence." *FPC v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976) (per curiam). The Commission's procedures here reflect an appropriate exercise of that discretion. *See, e.g., Chamber of Com. v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006) (noting, in rulemaking remand context, that "notice and comment are not required" when additional fact gathering "confirm[s] or corroborat[es] data in the rulemaking record").

## IV. The Commission Reasonably Determined That The Proposed Carbon Capture System Is Amenable To A Separate NEPA Process

In November 2021, Rio Grande sought to amend the Terminal's existing authorization to add a carbon capture and sequestration system. *See* Remand Rehearing Order P 15, JA __. The Commission initially anticipated issuing an environmental assessment of the proposal in May 2023. In April 2023, however, the Commission suspended its review schedule because Rio Grande had failed to provide

67

complete and timely responses to the Commission's data requests. *See id*. As of early-February 2024, Rio Grande has not provided any additional responses to the Commission's inquiries.

Nonetheless, Sierra Club contends that the Commission is obligated to re-open and supplement the Project's NEPA analysis because it is a "connected action" to the carbon capture system. Br. 66. The Commission reasonably found, however, that the Terminal and the potential carbon capture system are amenable to separate NEPA analyses.

## A.    The Projects Are Not "Connected Actions"

Sierra Club contends that the carbon capture system and Terminal are "connected actions" within the meaning of 40 C.F.R. § 1501.9(e)(1)(ii). The Court has looked primarily to two factors – temporal overlap and independent utility – in assessing whether separate NEPA reviews are appropriate. *See Boston Delegation*, 897 F.3d at 252. Both support the Commission's decision here.

### 1.    Temporal overlap

The process for identifying significant environmental issues associated with the Project began in 2015. A formal application was filed with the Commission in 2016. The final EIS issued in April 2019,

68

and the Project was approved under the Natural Gas Act in November 2019. *See* Authorization Order PP 1, 25, 32, 55, JA ___, ___, ___-___, ___.

By contrast, the carbon capture amendment was filed in November 2021, and there is no schedule for completion of its NEPA review. *See* Remand Rehearing Order P 19, JA ___. The lack of temporal overlap supports the Commission's decision to use separate NEPA reviews. *See Boston Delegation*, 897 F.3d at 252 (actions are not connected where first project was authorized in March 2015 and application for purportedly connected action was filed in October 2015); *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1318 (D.C. Cir. 2014) (actions are connected where "FERC's consideration of" first project "overlapped with its consideration of the remaining two projects"); *cf.* 40 C.F.R. § 1501.9(e)(1)(i) (actions connected if they "[a]utomatically trigger other actions").

Sierra Club suggests that a focus on timing is "not required by the regulations." Br. 67. But section 1501.9 addresses obligations during "scoping." That phase is at the start of the NEPA process, where issues are identified for further analysis. 40 C.F.R. § 1501.9(a). A focus on

what purportedly connected actions existed at that point is thus compelled by the regulation.  Here, the Project's scoping began in 2015, six years before the carbon capture amendment was filed.

## 2.    Independent utility

A project has independent utility when it can stand alone both functionally and commercially.  *See Boston Delegation*, 897 F.3d at 252. The Commission reasonably found that "[t]he terminal has independent utility regardless of the outcome of the" carbon capture amendment proceeding.  Remand Rehearing Order P 20, JA ___.

The Project was authorized before the carbon capture system was proposed, and the Terminal "could exist and operate without" that technology "ever being implemented."  *Id.*  And Rio Grande has chosen to proceed with the Terminal without Commission approval of the carbon capture system.  *See Rio Grande LNG, LLC*, 186 FERC ¶ 61,021, P 7 (2024)*; cf.* 40 C.F.R. § 1501.9(e)(1)(ii) (actions are connected where they "cannot or will not proceed unless other actions are taken").

Sierra Club contends the independent utility test is not met here because the carbon capture system would not go forward without the Terminal.  Br. 68.  But "[t]he proper question is whether one project will

serve a significant purpose even if a second related project is not built."
*Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987).
Here, as to the Project, the answer is yes. *See Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 836 F.2d 760, 763 (2d Cir. 1988) (port project and family housing project not connected actions where port would go forward without housing project, but not vice versa).

Moreover, the point of the connected action inquiry is to make sure that an agency does not "segment" its review and blind itself to "the true scope and impact" of a project. *Del. Riverkeeper*, 753 F.3d at 1313. The Project's environmental impacts have been exhaustively examined. The Commission's remand proceeding addressed the two analytical gaps identified by this Court in *Vecinos I*. And if the carbon capture proposal proceeds further, the Commission will examine and determine whether the system's benefits outweigh its environmental costs, including its cumulative impacts to the Project area. *Cf. Del. Riverkeeper*, 753 F.3d at 1320 (NEPA analysis faulty where it did not "assess cumulative impacts" by studying projects collectively). There is no segmentation here.

71

### B.    The Commission Is Not Required To Analyze Carbon Capture As An Alternative

Sierra Club's contention that the Commission must issue a supplemental EIS to address carbon capture as an alternative fails for several reasons.  Br. 67

First, the issue is beyond the scope of the remand proceeding.  The Court rejected those challenges to the Commission's alternatives analysis that Sierra Club chose to pursue.  *Vecinos II*, 2021 WL 3716769 at *3.  With respect to carbon emissions, the Commission was only directed to "explain whether 40 C.F.R. § 1502.21(c) calls for it to apply the social cost of carbon protocol or some other analytical framework." *Vecinos I*, 6 F.4th at 1330; *see also* Remand Rehearing Order P 22, JA ___.

Second, supplemental environmental analyses are required when there is new information bearing on the "proposed action or its impacts."  40 C.F.R. § 1502.9(d).  Details about a carbon capture system are not information about the now authorized action – i.e., the Project – that was studied in the EIS and EA.  That system represents a separate proposal.  *See* Remand Rehearing Order P 22, JA ___.

Third, Sierra Club's reliance on *Alaska Wilderness Recreation &*

72

*Tourism Ass'n v. Morrison*, 67 F.3d 723 (9th Cir. 1995), is misplaced. Br. 69. There, the court required the Forest Service to prepare a supplemental EIS after cancellation of the long-term timber contract upon which the agency's chosen alternative depended. 67 F.3d at 728-30. The case involved "a basic change that undercut the rationale upon which the agency action depended." *Cap. Crescent Trail*, 877 F.3d at 1061.

Here, by contrast, the Commission's analysis of potential alternatives and necessary mitigation measures "was not influenced by any assumption or determination about carbon capture and sequestration technology." Remand Rehearing Order P 23, JA __. The Commission has determined that the Project, with the mitigation measures imposed in the Authorization and Remand Orders, is properly authorized under the Natural Gas Act. The Commission is not required to suspend that authorization to analyze a later-filed proposal that does not call its prior approval into question. *See id.* P 22, JA ___.

73

## CONCLUSION

The petitions for review should be denied.

Respectfully submitted,

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

*/s/ Robert M. Kennedy*
Robert M. Kennedy
Senior Attorney

Federal Energy Regulatory
   Commission
Washington, D.C.  20426
Tel.: (202) 502-8904
Fax: (202) 273-0901
Email: robert.kennedy@ferc.gov

February 5, 2024

74

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(e), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,799 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Century Schoolbook 14-point font using Microsoft Word 365.

*/s/ Robert M. Kennedy*
Robert M. Kennedy
Senior Attorney

Federal Energy Regulatory
    Commission
Washington, D.C.  20426
Tel.: (202) 502-8904
Fax: (202) 273-0901
Email: robert.kennedy@ferc.gov

February 5, 2024

# ADDENDUM

## STATUTES

### AND

## REGULATIONS

# TABLE OF CONTENTS

ADMINISTRATIVE PROCEDURE ACT

    5 U.S.C. § 706 ...............................................................A-1

NATURAL GAS ACT

    15 U.S.C. § 717 ............................................................A-3

    15 U.S.C. § 717b ..........................................................A-4

    15 U.S.C. § 717f ..........................................................A-7

    15 U.S.C. § 717r...........................................................A-9

DEPARTMENT OF ENERGY ORGANIZATION ACT

    42 U.S.C. § 7151 ........................................................A-12

REGULATIONS

    18 C.F.R. § 380.7 .......................................................A-15

    40 C.F.R. § 1501.9 .....................................................A-16

    40 C.F.R. § 1501.12 ...................................................A-19

    40 C.F.R. § 1502.9 .....................................................A-20

    40 C.F.R. § 1502.16 ...................................................A-22

    40 C.F.R. § 1502.21 ...................................................A-24

    40 C.F.R. § 1502.22 ...................................................A-24

# ADDENDUM

## STATUTES

## AND

## REGULATIONS

# TABLE OF CONTENTS

Administrative Procedure Act

    5 U.S.C. § 706(2)(A) ..................................................................A-1

Natural Gas Act

    15 U.S.C. § 717 ........................................................................A-3

    15 U.S.C. § 717b ......................................................................A-4

    15 U.S.C. § 717f. ......................................................................A-7

    15 U.S.C. § 717r ......................................................................A-9

Department of Energy Organization Act

    42 U.S.C. § 7151(b) ................................................................A-12

Regulations

    18 C.F.R. § 380.7(a) ................................................................A-15

    40 C.F.R. § 1501.9(a) ..............................................................A-17

    40 C.F.R. § 1501.9(e) ..............................................................A-19

    40 C.F.R. § 1501.12 ................................................................A-19

    40 C.F.R. § 1502.9(d) ..............................................................A-20

    40 C.F.R. § 1502.16(a) ............................................................A-22

    40 C.F.R. § 1502.21(c) ............................................................A-24

    40 C.F.R. § 1502.22 ................................................................A-24

to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

### Editorial Notes

#### AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

## § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### Statutory Notes and Related Subsidiaries

#### ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof,

that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.     Congressional review.
802.     Congressional disapproval procedure.
803.     Special rule on statutory, regulatory, and judicial deadlines.
804.     Definitions.
805.     Judicial review.
806.     Applicability; severability.
807.     Exemption for monetary policy.
808.     Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a rule that would not take effect by reason of subsection (a)(3) may take effect, if the President makes a determination under paragraph (2) and submits written notice of such determination to the Congress.

(2) Paragraph (1) applies to a determination made by the President by Executive order that the rule should take effect because such rule is—

(A) necessary because of an imminent threat to health or safety or other emergency;

(B) necessary for the enforcement of criminal laws;

(C) necessary for national security; or

(D) issued pursuant to any statute implementing an international trade agreement.

(3) An exercise by the President of the authority under this subsection shall have no effect on the procedures under section 802 or the effect of a joint resolution of disapproval under this section.

(d)(1) In addition to the opportunity for review otherwise provided under this chapter, in the case of any rule for which a report was submitted in accordance with subsection (a)(1)(A) during the period beginning on the date occurring—

(A) in the case of the Senate, 60 session days, or

(B) in the case of the House of Representatives, 60 legislative days,

before the date the Congress adjourns a session of Congress through the date on which the same

Sec.
717b–1.  State and local safety considerations.
717c.    Rates and charges.
717c–1.  Prohibition on market manipulation.
717d.    Fixing rates and charges; determination of
         cost of production or transportation.
717e.    Ascertainment of cost of property.
717f.    Construction, extension, or abandonment of
         facilities.
717g.    Accounts; records; memoranda.
717h.    Rates of depreciation.
717i.    Periodic and special reports.
717j.    State compacts for conservation, transpor-
         tation, etc., of natural gas.
717k.    Officials dealing in securities.
717l.    Complaints.
717m.    Investigations by Commission.
717n.    Process coordination; hearings; rules of pro-
         cedure.
717o.    Administrative powers of Commission; rules,
         regulations, and orders.
717p.    Joint boards.
717q.    Appointment of officers and employees.
717r.    Rehearing and review.
717s.    Enforcement of chapter.
717t.    General penalties.
717t–1.  Civil penalty authority.
717t–2.  Natural gas market transparency rules.
717u.    Jurisdiction of offenses; enforcement of li-
         abilities and duties.
717v.    Separability.
717w.    Short title.
717x.    Conserved natural gas.
717y.    Voluntary conversion of natural gas users to
         heavy fuel oil.
717z.    Emergency conversion of utilities and other
         persons.

## §717. Regulation of natural gas companies

### (a) Necessity of regulation in public interest

As disclosed in reports of the Federal Trade Commission made pursuant to S. Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

### (b) Transactions to which provisions of chapter applicable

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

### (c) Intrastate transactions exempt from provisions of chapter; certification from State commission as conclusive evidence

The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States. A certification from such State commission to the Federal Power Commission that such State commission has regulatory jurisdiction over rates and service of such person and facilities and is exercising such jurisdiction shall constitute conclusive evidence of such regulatory power or jurisdiction.

### (d) Vehicular natural gas jurisdiction

The provisions of this chapter shall not apply to any person solely by reason of, or with respect to, any sale or transportation of vehicular natural gas if such person is—

    (1) not otherwise a natural-gas company; or
    (2) subject primarily to regulation by a State commission, whether or not such State commission has, or is exercising, jurisdiction over the sale, sale for resale, or transportation of vehicular natural gas.

(June 21, 1938, ch. 556, §1, 52 Stat. 821; Mar. 27, 1954, ch. 115, 68 Stat. 36; Pub. L. 102–486, title IV, §404(a)(1), Oct. 24, 1992, 106 Stat. 2879; Pub. L. 109–58, title III, §311(a), Aug. 8, 2005, 119 Stat. 685.)

### Editorial Notes

#### Amendments

2005—Subsec. (b). Pub. L. 109–58 inserted "and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation," after "such transportation or sale,".

1992—Subsec. (d). Pub. L. 102–486 added subsec. (d).

1954—Subsec. (c). Act Mar. 27, 1954, added subsec. (c).

### Statutory Notes and Related Subsidiaries

#### Termination of Federal Power Commission; Transfer of Functions

The Federal Power Commission was terminated, and its functions, personnel, property, funds, etc., were transferred to Secretary of Energy (except for certain functions which were transferred to the Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a), 7291, and 7293 of Title 42, The Public Health and Welfare.

#### State Laws and Regulations

Pub. L. 102–486, title IV, §404(b), Oct. 24, 1992, 106 Stat. 2879, provided that: "The transportation or sale of natural gas by any person who is not otherwise a public utility, within the meaning of State law—

    "(1) in closed containers; or

    "(2) otherwise to any person for use by such person as a fuel in a self-propelled vehicle,

shall not be considered to be a transportation or sale of natural gas within the meaning of any State law, regulation, or order in effect before January 1, 1989. This subsection shall not apply to any provision of any State law, regulation, or order to the extent that such provision has as its primary purpose the protection of public safety."

### EMERGENCY NATURAL GAS ACT OF 1977

Pub. L. 95–2, Feb. 2, 1977, 91 Stat. 4, authorized President to declare a natural gas emergency and to require emergency deliveries and transportation of natural gas until the earlier of Apr. 30, 1977, or termination of emergency by President and provided for antitrust protection, emergency purchases, adjustment in charges for local distribution companies, relationship to Natural Gas Act, effect of certain contractual obligations, administrative procedure and judicial review, enforcement, reporting to Congress, delegation of authorities, and preemption of inconsistent State or local action.

#### Executive Documents

##### EXECUTIVE ORDER NO. 11969

Ex. Ord. No. 11969, Feb. 2, 1977, 42 F.R. 6791, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, which delegated to the Secretary of Energy the authority vested in the President by the Emergency Natural Gas Act of 1977 except the authority to declare and terminate a natural gas emergency, was revoked by Ex. Ord. No. 12553, Feb. 25, 1986, 51 F.R. 7237.

##### PROCLAMATION NO. 4485

Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, declared that a natural gas emergency existed within the meaning of section 3 of the Emergency Natural Gas Act of 1977, set out as a note above, which emergency was terminated by Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, formerly set out below.

##### PROCLAMATION NO. 4495

Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, terminated the natural gas emergency declared to exist by Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, formerly set out above.

### § 717a. Definitions

When used in this chapter, unless the context otherwise requires—

(1) "Person" includes an individual or a corporation.

(2) "Corporation" includes any corporation, joint-stock company, partnership, association, business trust, organized group of persons, whether incorporated or not, receiver or receivers, trustee or trustees of any of the foregoing, but shall not include municipalities as hereinafter defined.

(3) "Municipality" means a city, county, or other political subdivision or agency of a State.

(4) "State" means a State admitted to the Union, the District of Columbia, and any organized Territory of the United States.

(5) "Natural gas" means either natural gas unmixed, or any mixture of natural and artificial gas.

(6) "Natural-gas company" means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale.

(7) "Interstate commerce" means commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, but only insofar as such commerce takes place within the United States.

(8) "State commission" means the regulatory body of the State or municipality having jurisdiction to regulate rates and charges for the sale of natural gas to consumers within the State or municipality.

(9) "Commission" and "Commissioner" means the Federal Power Commission, and a member thereof, respectively.

(10) "Vehicular natural gas" means natural gas that is ultimately used as a fuel in a self-propelled vehicle.

(11) "LNG terminal" includes all natural gas facilities located onshore or in State waters that are used to receive, unload, load, store, transport, gasify, liquefy, or process natural gas that is imported to the United States from a foreign country, exported to a foreign country from the United States, or transported in interstate commerce by waterborne vessel, but does not include—

(A) waterborne vessels used to deliver natural gas to or from any such facility; or

(B) any pipeline or storage facility subject to the jurisdiction of the Commission under section 717f of this title.

(June 21, 1938, ch. 556, § 2, 52 Stat. 821; Pub. L. 102–486, title IV, § 404(a)(2), Oct. 24, 1992, 106 Stat. 2879; Pub. L. 109–58, title III, § 311(b), Aug. 8, 2005, 119 Stat. 685.)

#### Editorial Notes

##### AMENDMENTS

2005—Par. (11). Pub. L. 109–58 added par. (11).

1992—Par. (10). Pub. L. 102–486 added par. (10).

#### Statutory Notes and Related Subsidiaries

##### TERMINATION OF FEDERAL POWER COMMISSION; TRANSFER OF FUNCTIONS

The Federal Power Commission was terminated, and its functions, personnel, property, funds, etc., were transferred to the Secretary of Energy (except for certain functions which were transferred to the Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a)(1), 7291, and 7293 of Title 42, The Public Health and Welfare.

### § 717b. Exportation or importation of natural gas; LNG terminals

#### (a) Mandatory authorization order

After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

#### (b) Free trade agreements

With respect to natural gas which is imported into the United States from a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, and with respect to liquefied natural gas—

(1) the importation of such natural gas shall be treated as a "first sale" within the meaning of section 3301(21) of this title; and

(2) the Commission shall not, on the basis of national origin, treat any such imported natural gas on an unjust, unreasonable, unduly discriminatory, or preferential basis.

**(c) Expedited application and approval process**

For purposes of subsection (a), the importation of the natural gas referred to in subsection (b), or the exportation of natural gas to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such importation or exportation shall be granted without modification or delay.

**(d) Construction with other laws**

Except as specifically provided in this chapter, nothing in this chapter affects the rights of States under—

(1) the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.);

(2) the Clean Air Act (42 U.S.C. 7401 et seq.); or

(3) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.).

**(e) LNG terminals**

(1) The Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal. Except as specifically provided in this chapter, nothing in this chapter is intended to affect otherwise applicable law related to any Federal agency's authorities or responsibilities related to LNG terminals.

(2) Upon the filing of any application to site, construct, expand, or operate an LNG terminal, the Commission shall—

(A) set the matter for hearing;

(B) give reasonable notice of the hearing to all interested persons, including the State commission of the State in which the LNG terminal is located and, if not the same, the Governor-appointed State agency described in section 717b–1 of this title;

(C) decide the matter in accordance with this subsection; and

(D) issue or deny the appropriate order accordingly.

(3)(A) Except as provided in subparagraph (B), the Commission may approve an application described in paragraph (2), in whole or part, with such modifications and upon such terms and conditions as the Commission find[1] necessary or appropriate.

(B) Before January 1, 2015, the Commission shall not—

(i) deny an application solely on the basis that the applicant proposes to use the LNG terminal exclusively or partially for gas that the applicant or an affiliate of the applicant will supply to the facility; or

(ii) condition an order on—

(I) a requirement that the LNG terminal offer service to customers other than the ap-

plicant, or any affiliate of the applicant, securing the order;

(II) any regulation of the rates, charges, terms, or conditions of service of the LNG terminal; or

(III) a requirement to file with the Commission schedules or contracts related to the rates, charges, terms, or conditions of service of the LNG terminal.

(C) Subparagraph (B) shall cease to have effect on January 1, 2030.

(4) An order issued for an LNG terminal that also offers service to customers on an open access basis shall not result in subsidization of expansion capacity by existing customers, degradation of service to existing customers, or undue discrimination against existing customers as to their terms or conditions of service at the facility, as all of those terms are defined by the Commission.

**(f) Military installations**

(1) In this subsection, the term "military installation"—

(A) means a base, camp, post, range, station, yard, center, or homeport facility for any ship or other activity under the jurisdiction of the Department of Defense, including any leased facility, that is located within a State, the District of Columbia, or any territory of the United States; and

(B) does not include any facility used primarily for civil works, rivers and harbors projects, or flood control projects, as determined by the Secretary of Defense.

(2) The Commission shall enter into a memorandum of understanding with the Secretary of Defense for the purpose of ensuring that the Commission coordinate and consult[2] with the Secretary of Defense on the siting, construction, expansion, or operation of liquefied natural gas facilities that may affect an active military installation.

(3) The Commission shall obtain the concurrence of the Secretary of Defense before authorizing the siting, construction, expansion, or operation of liquefied natural gas facilities affecting the training or activities of an active military installation.

(June 21, 1938, ch. 556, §3, 52 Stat. 822; Pub. L. 102–486, title II, §201, Oct. 24, 1992, 106 Stat. 2866; Pub. L. 109–58, title III, §311(c), Aug. 8, 2005, 119 Stat. 685.)

### Editorial Notes

#### REFERENCES IN TEXT

The Coastal Zone Management Act of 1972, referred to in subsec. (d)(1), is title III of Pub. L. 89–454 as added by Pub. L. 92–583, Oct. 27, 1972, 86 Stat. 1280, which is classified generally to chapter 33 (§1451 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1451 of Title 16 and Tables.

The Clean Air Act, referred to in subsec. (d)(2), is act July 14, 1955, ch. 360, 69 Stat. 322, which is classified generally to chapter 85 (§7401 et seq.) of Title 42, The Public Health and Welfare. For complete classification

---

[1] So in original. Probably should be "finds".

[2] So in original. Probably should be "coordinates and consults".

of this Act to the Code, see Short Title note set out under section 7401 of Title 42 and Tables.

The Federal Water Pollution Control Act, referred to in subsec. (d)(3), is act June 30, 1948, ch. 758, as amended generally by Pub. L. 92–500, §2, Oct. 18, 1972, 86 Stat. 816, which is classified generally to chapter 26 (§1251 et seq.) of Title 33, Navigation and Navigable Waters. For complete classification of this Act to the Code, see Short Title note set out under section 1251 of Title 33 and Tables.

#### AMENDMENTS

2005—Pub. L. 109–58, §311(c)(1), inserted "; LNG terminals" after "natural gas" in section catchline.

Subsecs. (d) to (f). Pub. L. 109–58, §311(c)(2), added subsecs. (d) to (f).

1992—Pub. L. 102–486 designated existing provisions as subsec. (a) and added subsecs. (b) and (c).

#### Executive Documents

##### TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of Energy and Commission, Commissioners, or other official in Federal Energy Regulatory Commission related to compliance with authorizations for importation of natural gas from Alberta as predeliveries of Alaskan gas issued under this section with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to the Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§102(d), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out under section 719e of this title. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of this title. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of this title.

##### DELEGATION OF FUNCTIONS

Functions of President respecting certain facilities constructed and maintained on United States borders delegated to Secretary of State, see Ex. Ord. No. 11423, Aug. 16, 1968, 33 F.R. 11741, set out as a note under section 301 of Title 3, The President.

EX. ORD. NO. 10485. PROVIDING FOR THE PERFORMANCE OF CERTAIN FUNCTIONS HERETOFORE PERFORMED BY THE PRESIDENT WITH RESPECT TO ELECTRIC POWER AND NATURAL GAS FACILITIES LOCATED ON THE BORDERS OF THE UNITED STATES

Ex. Ord. No. 10485, Sept. 3, 1953, 18 F.R. 5397, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, provided:

SECTION 1. (a) The Secretary of Energy is hereby designated and empowered to perform the following-described functions:

(1) To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the transmission of electric energy between the United States and a foreign country.

(2) To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the exportation or importation of natural gas to or from a foreign country.

(3) Upon finding the issuance of the permit to be consistent with the public interest, and, after obtaining the favorable recommendations of the Secretary of State and the Secretary of Defense thereon, to issue to the applicant, as appropriate, a permit for such construction, operation, maintenance, or connection. The Secretary of Energy shall have the power to attach to the issuance of the permit and to the exercise of the rights granted thereunder such conditions as the public interest may in its judgment require.

(b) In any case wherein the Secretary of Energy, the Secretary of State, and the Secretary of Defense cannot agree as to whether or not a permit should be issued, the Secretary of Energy shall submit to the President for approval or disapproval the application for a permit with the respective views of the Secretary of Energy, the Secretary of State and the Secretary of Defense.

SEC. 2. [Deleted.]

SEC. 3. The Secretary of Energy is authorized to issue such rules and regulations, and to prescribe such procedures, as it may from time to time deem necessary or desirable for the exercise of the authority delegated to it by this order.

SEC. 4. All Presidential Permits heretofore issued pursuant to Executive Order No. 8202 of July 13, 1939, and in force at the time of the issuance of this order, and all permits issued hereunder, shall remain in full force and effect until modified or revoked by the President or by the Secretary of Energy.

SEC. 5. Executive Order No. 8202 of July 13, 1939, is hereby revoked.

### § 717b–1. State and local safety considerations

#### (a) Promulgation of regulations

The Commission shall promulgate regulations on the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) pre-filing process within 60 days after August 8, 2005. An applicant shall comply with pre-filing process required under the National Environmental Policy Act of 1969 prior to filing an application with the Commission. The regulations shall require that the pre-filing process commence at least 6 months prior to the filing of an application for authorization to construct an LNG terminal and encourage applicants to cooperate with State and local officials.

#### (b) State consultation

The Governor of a State in which an LNG terminal is proposed to be located shall designate the appropriate State agency for the purposes of consulting with the Commission regarding an application under section 717b of this title. The Commission shall consult with such State agency regarding State and local safety considerations prior to issuing an order pursuant to section 717b of this title. For the purposes of this section, State and local safety considerations include—

(1) the kind and use of the facility;

(2) the existing and projected population and demographic characteristics of the location;

(3) the existing and proposed land use near the location;

(4) the natural and physical aspects of the location;

(5) the emergency response capabilities near the facility location; and

(6) the need to encourage remote siting.

#### (c) Advisory report

The State agency may furnish an advisory report on State and local safety considerations to the Commission with respect to an application no later than 30 days after the application was filed with the Commission. Before issuing an

**(b) Costs of production and transportation**

The Commission upon its own motion, or upon the request of any State commission, whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transportation of natural gas by a natural-gas company in cases where the Commission has no authority to establish a rate governing the transportation or sale of such natural gas.

(June 21, 1938, ch. 556, § 5, 52 Stat. 823.)

## § 717e. Ascertainment of cost of property

**(a) Cost of property**

The Commission may investigate and ascertain the actual legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation and the fair value of such property.

**(b) Inventory of property; statements of costs**

Every natural-gas company upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 21, 1938, ch. 556, § 6, 52 Stat. 824.)

## § 717f. Construction, extension, or abandonment of facilities

**(a) Extension or improvement of facilities on order of court; notice and hearing**

Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided,* That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

**(b) Abandonment of facilities or services; approval of Commission**

No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

**(c) Certificate of public convenience and necessity**

(1)(A)  No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however,* That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

(B) In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however,* That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

(2) The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of—

(A) natural gas sold by the producer to such person; and

(B) natural gas produced by such person.

**(d) Application for certificate of public convenience and necessity**

Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

### (e) Granting of certificate of public convenience and necessity

Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

### (f) Determination of service area; jurisdiction of transportation to ultimate consumers

(1) The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which each authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying increased market demands in such service area without further authorization; and

(2) If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

### (g) Certificate of public convenience and necessity for service of area already being served

Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company.

### (h) Right of eminent domain for construction of pipelines, etc.

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided*, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

(June 21, 1938, ch. 556, § 7, 52 Stat. 824; Feb. 7, 1942, ch. 49, 56 Stat. 83; July 25, 1947, ch. 333, 61 Stat. 459; Pub. L. 95–617, title VI, § 608, Nov. 9, 1978, 92 Stat. 3173; Pub. L. 100–474, § 2, Oct. 6, 1988, 102 Stat. 2302.)

#### Editorial Notes

##### Amendments

1988—Subsec. (f). Pub. L. 100–474 designated existing provisions as par. (1) and added par. (2).
1978—Subsec. (c). Pub. L. 95–617, § 608(a), (b)(1), designated existing first paragraph as par. (1)(A) and existing second paragraph as par. (1)(B) and added par. (2).
Subsec. (e). Pub. L. 95–617, § 608(b)(2), substituted "subsection (c)(1)" for "subsection (c)".
1947—Subsec. (h). Act July 25, 1947, added subsec. (h).
1942—Subsecs. (c) to (g). Act Feb. 7, 1942, struck out subsec. (c), and added new subsecs. (c) to (g).

#### Statutory Notes and Related Subsidiaries

##### Effective Date of 1988 Amendment

Pub. L. 100–474, § 3, Oct. 6, 1988, 102 Stat. 2302, provided that: "The provisions of this Act [amending this section and enacting provisions set out as a note under section 717w of this title] shall become effective one hundred and twenty days after the date of enactment [Oct. 6, 1988]."

#### Executive Documents

##### Transfer of Functions

Enforcement functions of Secretary or other official in Department of Energy and Commission, Commissioners, or other official in Federal Energy Regulatory Commission related to compliance with certificates of public convenience and necessity issued under this section with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§ 102(d), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out under section 719e of this title. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of this title. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of this title.

## § 717g. Accounts; records; memoranda

### (a) Rules and regulations for keeping and preserving accounts, records, etc.

Every natural-gas company shall make, keep, and preserve for such periods, such accounts,

mission to hold any hearings. The action of such board shall have such force and effect and its proceedings shall be conducted in such manner as the Commission shall by regulations prescribe. The Board shall be appointed by the Commission from persons nominated by the State commission of each State affected, or by the Governor of such State if there is no State commission. Each State affected shall be entitled to the same number of representatives on the board unless the nominating power of such State waives such right. The Commission shall have discretion to reject the nominee from any State, but shall thereupon invite a new nomination from that State. The members of a board shall receive such allowances for expenses as the Commission shall provide. The Commission may, when in its discretion sufficient reason exists therefor, revoke any reference to such a board.

**(b) Conference with State commissions regarding rate structure, costs, etc.**

The Commission may confer with any State commission regarding rate structures, costs, accounts, charges, practices, classifications, and regulations of natural-gas companies; and the Commission is authorized, under such rules and regulations as it shall prescribe, to hold joint hearings with any State commission in connection with any matter with respect to which the Commission is authorized to act. The Commission is authorized in the administration of this chapter to avail itself of such cooperation, services, records, and facilities as may be afforded by any State commission.

**(c) Information and reports available to State commissions**

The Commission shall make available to the several State commissions such information and reports as may be of assistance in State regulation of natural-gas companies. Whenever the Commission can do so without prejudice to the efficient and proper conduct of its affairs, it may, upon request from a State commission, make available to such State commission as witnesses any of its trained rate, valuation, or other experts, subject to reimbursement of the compensation and traveling expenses of such witnesses. All sums collected hereunder shall be credited to the appropriation from which the amounts were expended in carrying out the provisions of this subsection.

(June 21, 1938, ch. 556, §17, 52 Stat. 830.)

**§ 717q. Appointment of officers and employees**

The Commission is authorized to appoint and fix the compensation of such officers, attorneys, examiners, and experts as may be necessary for carrying out its functions under this chapter; and the Commission may, subject to civil-service laws, appoint such other officers and employees as are necessary for carrying out such functions and fix their salaries in accordance with chapter 51 and subchapter III of chapter 53 of title 5.

(June 21, 1938, ch. 556, §18, 52 Stat. 831; Oct. 28, 1949, ch. 782, title XI, §1106(a), 63 Stat. 972.)

EDITORIAL NOTES

CODIFICATION

Provisions that authorized the Commission to appoint and fix the compensation of such officers, attorneys, examiners, and experts as may be necessary for carrying out its functions under this chapter "without regard to the provisions of other laws applicable to the employment and compensation of officers and employees of the United States" are omitted as obsolete and superseded.

As to the compensation of such personnel, sections 1202 and 1204 of the Classification Act of 1949, 63 Stat. 972, 973, repealed the Classification Act of 1923 and all other laws or parts of laws inconsistent with the 1949 Act. The Classification Act of 1949 was repealed by Pub. L. 89–554, Sept. 6, 1966, §8(a), 80 Stat. 632, and reenacted as chapter 51 and subchapter III of chapter 53 of Title 5, Government Organization and Employees. Section 5102 of Title 5 contains the applicability provisions of the 1949 Act, and section 5103 of Title 5 authorizes the Office of Personnel Management to determine the applicability to specific positions and employees.

Such appointments are now subject to the civil service laws unless specifically excepted by those laws or by laws enacted subsequent to Executive Order 8743, Apr. 23, 1941, issued by the President pursuant to the Act of Nov. 26, 1940, ch. 919, title I, §1, 54 Stat. 1211, which covered most excepted positions into the classified (competitive) civil service. The Order is set out as a note under section 3301 of Title 5.

"Chapter 51 and subchapter III of chapter 53 of title 5" substituted in text for "the Classification Act of 1949, as amended" on authority of Pub. L. 89–554, §7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5.

AMENDMENTS

1949—Act Oct. 28, 1949, substituted "Classification Act of 1949" for "Classification Act of 1923".

STATUTORY NOTES AND RELATED SUBSIDIARIES

REPEALS

Act Oct. 28, 1949, ch. 782, cited as a credit to this section, was repealed (subject to a savings clause) by Pub. L. 89–554, Sept. 6, 1966, §8, 80 Stat. 632, 655.

**§ 717r. Rehearing and review**

**(a) Application for rehearing; time**

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

**(b) Review of Commission order**

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

**(d) Judicial review**

**(1) In general**

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or oper-

ated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

**(2) Agency delay**

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

**(3) Court action**

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

**(4) Commission action**

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

**(5) Expedited review**

The Court shall set any action brought under this subsection for expedited consideration.

(June 21, 1938, ch. 556, § 19, 52 Stat. 831; June 25, 1948, ch. 646, § 32(a), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 85–791, § 19, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title III, § 313(b), Aug. 8, 2005, 119 Stat. 689.)

### Editorial Notes

#### References in Text

The Coastal Zone Management Act of 1972, referred to in subsec. (d)(1), (2), is title III of Pub. L. 89–454, as added by Pub. L. 92–583, Oct. 27, 1972, 86 Stat. 1280, which is classified generally to chapter 33 (§ 1451 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1451 of Title 16 and Tables.

CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended [28 U.S.C. 346, 347]" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

AMENDMENTS

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).

1958—Subsec. (a). Pub. L. 85–791, §19(a), inserted sentence providing that until record in a proceeding has been filed in a court of appeals, Commission may modify or set aside any finding or order issued by it.

Subsec. (b). Pub. L. 85–791, §19(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and, in third sentence, substituted "petition" for "transcript", and "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

**Statutory Notes and Related Subsidiaries**

CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals" wherever appearing.

**§ 717s. Enforcement of chapter**

**(a) Action in district court for injunction**

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper district court of the United States, or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices or concerning apparent violations of the Federal antitrust laws to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings.

**(b) Mandamus**

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

**(c) Employment of attorneys by Commission**

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interest in investigations made by it, or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

**(d) Violation of market manipulation provisions**

In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as the court determines, any individual who is engaged or has engaged in practices constituting a violation of section 717c–1 of this title (including related rules and regulations) from—

(1) acting as an officer or director of a natural gas company; or

(2) engaging in the business of—

(A) the purchasing or selling of natural gas; or

(B) the purchasing or selling of transmission services subject to the jurisdiction of the Commission.

(June 21, 1938, ch. 556, §20, 52 Stat. 832; June 25, 1948, ch. 646, §1, 62 Stat. 875, 895; Pub. L. 109–58, title III, §318, Aug. 8, 2005, 119 Stat. 693.)

**Editorial Notes**

CODIFICATION

The words "the District Court of the United States for the District of Columbia" in subsec. (a) following "district court of the United States" and in subsec. (b) following "district courts of the United States" omitted as superfluous in view of section 132(a) of Title 28, Judiciary and Judicial Procedure, which states that "There shall be in each judicial district a district court which shall be a court of record known as the United States District Court for the district", and section 88 of title 28 which states that "The District of Columbia constitutes one judicial district".

AMENDMENTS

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).

**§ 717t. General penalties**

(a) Any person who willfully and knowingly does or causes or suffers to be done any act, matter, or thing in this chapter prohibited or declared to be unlawful, or who willfully and knowingly omits or fails to do any act, matter, or thing in this chapter required to be done, or willfully and knowingly causes or suffers such omission or failure, shall, upon conviction thereof, be punished by a fine of not more than $1,000,000 or by imprisonment for not more than 5 years, or both.

(b) Any person who willfully and knowingly violates any rule, regulation, restriction, condition, or order made or imposed by the Commission under authority of this chapter, shall, in addition to any other penalties provided by law, be punished upon conviction thereof by a fine of not exceeding $50,000 for each and every day during which such offense occurs.

(June 21, 1938, ch. 556, §21, 52 Stat. 833; Pub. L. 109–58, title III, §314(a)(1), Aug. 8, 2005, 119 Stat. 690.)

**Editorial Notes**

AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58, §314(a)(1)(A), substituted "$1,000,000" for "$5,000" and "5 years" for "two years".

**(c) Location**

The Secretary shall locate such office at a university with expertise and experience in the matters specified in subsection (b).

(Pub. L. 106–398, § 1 [div. C, title XXXI, § 3197], Oct. 30, 2000, 114 Stat. 1654, 1654A–482.)

**Editorial Notes**

CODIFICATION

Section was enacted as part of the Floyd D. Spence National Defense Authorization Act for Fiscal Year 2001, and not as part of the Department of Energy Organization Act which comprises this chapter.

### § 7144e. Office of Indian Energy Policy and Programs

**(a) Establishment**

There is established within the Department an Office of Indian Energy Policy and Programs (referred to in this section as the "Office"). The Office shall be headed by a Director, who shall be appointed by the Secretary and compensated at a rate equal to that of level IV of the Executive Schedule under section 5315 of title 5.

**(b) Duties of Director**

The Director, in accordance with Federal policies promoting Indian self-determination and the purposes of this chapter, shall provide, direct, foster, coordinate, and implement energy planning, education, management, conservation, and delivery programs of the Department that—

(1) promote Indian tribal energy development, efficiency, and use;

(2) reduce or stabilize energy costs;

(3) enhance and strengthen Indian tribal energy and economic infrastructure relating to natural resource development and electrification; and

(4) bring electrical power and service to Indian land and the homes of tribal members located on Indian lands or acquired, constructed, or improved (in whole or in part) with Federal funds.

(Pub. L. 95–91, title II, § 217, as added Pub. L. 109–58, title V, § 502(a), Aug. 8, 2005, 119 Stat. 763.)

**Editorial Notes**

REFERENCES IN TEXT

This chapter, referred to in subsec. (b), was in the original "this Act", meaning Pub. L. 95–91, Aug. 4, 1977, 91 Stat. 565, as amended, known as the Department of Energy Organization Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 7101 of this title and Tables.

## SUBCHAPTER III—TRANSFERS OF FUNCTIONS

### § 7151. General transfers

(a) Except as otherwise provided in this chapter, there are transferred to, and vested in, the Secretary all of the functions vested by law in the Administrator of the Federal Energy Administration or the Federal Energy Administration, the Administrator of the Energy Research and Development Administration or the Energy Research and Development Administration; and

the functions vested by law in the officers and components of either such Administration.

(b) Except as provided in subchapter IV, there are transferred to, and vested in, the Secretary the function of the Federal Power Commission, or of the members, officers, or components thereof. The Secretary may exercise any power described in section 7172(a)(2) of this title to the extent the Secretary determines such power to be necessary to the exercise of any function within his jurisdiction pursuant to the preceding sentence.

(Pub. L. 95–91, title III, § 301, Aug. 4, 1977, 91 Stat. 577.)

**Editorial Notes**

REFERENCES IN TEXT

This chapter, referred to in subsec. (a), was in the original "this Act", meaning Pub. L. 95–91, Aug. 4, 1977, 91 Stat. 565, as amended, known as the Department of Energy Organization Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 7101 of this title and Tables.

**Executive Documents**

EMERGENCY PREPAREDNESS FUNCTIONS

For assignment of certain emergency preparedness functions to the Secretary of Energy, see Parts 1, 2, and 7 of Ex. Ord. No. 12656, Nov. 18, 1988, 53 F.R. 47491, set out as a note under section 5195 of this title.

EX. ORD. NO. 12038. TRANSFER OF CERTAIN FUNCTIONS TO SECRETARY OF ENERGY

Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, as amended by Ex. Ord. No. 12156, Sept. 10, 1979, 44 F.R. 53073, provided:

By virtue of the authority vested in me as President of the United States of America, in order to reflect the responsibilities of the Secretary of Energy for the performance of certain functions previously vested in other officers of the United States by direction of the President and subsequently transferred to the Secretary of Energy pursuant to the Department of Energy Organization Act (91 Stat. 565; 42 U.S.C. 7101 et seq.) it is hereby ordered as follows:

SECTION 1. *Functions of the Federal Energy Administration.* In accordance with the transfer of all functions vested by law in the Federal Energy Administration, or the Administrator thereof, to the Secretary of Energy pursuant to Section 301(a) of the Department of Energy Organization Act [subsec. (a) of this section], hereinafter referred to as the Act, the Executive Orders and Proclamations referred to in this Section, which conferred authority or responsibility upon the Administrator of the Federal Energy Administration, are amended as follows:

(a) Executive Order No. 11647, as amended [formerly set out as a note under 31 U.S.C. 501], relating to Federal Regional Councils, is further amended by deleting "The Federal Energy Administration" in Section 1(a)(10) and substituting "The Department of Energy", and by deleting "The Deputy Administrator of the Federal Energy Administration" in Section 3(a)(10) and substituting "The Deputy Secretary of Energy".

(b) Executive Order No. 11790 of June 25, 1974 [set out as a note under 15 U.S.C. 761], relating to the Federal Energy Administration Act of 1974, is amended by deleting "Administrator of the Federal Energy Administration" and "Administrator" wherever they appear in Sections 1 through 6 and substituting "Secretary of Energy" and "Secretary", respectively, and by deleting Section 7 through 10.

(c) Executive Order No. 11912, as amended [set out as a note under 42 U.S.C. 6201], relating to energy policy

and conservation, and Proclamation No. 3279, as amended [formerly set out as a note under 19 U.S.C. 1862], relating to imports of petroleum and petroleum products, are further amended by deleting "Administrator of the Federal Energy Administration", "Federal Energy Administration", and "Administrator" (when used in reference to the Federal Energy Administration) wherever those terms appear and by substituting "Secretary of Energy", "Department of Energy", and "Secretary", respectively, and by deleting "the Administrator of Energy Research and Development" in Section 10(a)(1) of Executive Order No. 11912, as amended.

SEC. 2. *Functions of the Federal Power Commission.* In accordance with the transfer of functions vested in the Federal Power Commission to the Secretary of Energy pursuant to Section 301(b) of the Act [subsec. (b) of this section], the Executive Orders referred to in this Section, which conferred authority or responsibility upon the Federal Power Commission, or Chairman thereof, are amended or modified as follows:

(a) Executive Order No. 10485 of September 3, 1953, [set out as a note under 15 U.S.C. 717b], relating to certain facilities at the borders of the United States is amended by deleting Section 2 thereof, and by deleting "Federal Power Commission" and "Commission" wherever those terms appear in Sections 1, 3 and 4 of such Order and substituting for each "Secretary of Energy".

(b) Executive Order No. 11969 of February 2, 1977 [formerly set out as a note under 15 U.S.C. 717], relating to the administration of the Emergency Natural Gas Act of 1977 [formerly set out as a note under 15 U.S.C. 717], is hereby amended by deleting the second sentence in Section 1, by deleting "the Secretary of the Interior, the Administrator of the Federal Energy Administration, other members of the Federal Power Commission" and in Section 2, and by deleting "Chairman of the Federal Power Commission" and "Chairman" wherever those terms appear and substituting thereof "Secretary of Energy" and "Secretary", respectively.

(c) Paragraph (2) of Section 3 of Executive Order No. 11331, as amended [formerly set out as a note under 42 U.S.C. 1962b], relating to the Pacific Northwest River Basins Commission, is hereby amended by deleting "from each of the following Federal departments and agencies" and substituting therefor "to be appointed by the head of each of the following Executive agencies", by deleting "Federal Power Commission" and substituting therefor "Department of Energy", and by deleting "such member to be appointed by the head of each department or independent agency he represents,".

SEC. 3. *Functions of the Secretary of the Interior.* In accordance with the transfer of certain functions vested in the Secretary of the Interior to the Secretary of Energy pursuant to Section 302 of the Act [42 U.S.C. 7152], the Executive Orders referred to in this Section, which conferred authority or responsibility on the Secretary of the Interior, are amended or modified as follows:

(a) Sections 1 and 4 of Executive Order No. 8526 of August 27, 1940, relating to functions of the Bonneville Power Administration, are hereby amended by substituting "Secretary of Energy" for "Secretary of the Interior", by adding "of the Interior" after "Secretary" in Sections 2 and 3, and by adding "and the Secretary of Energy," after "the Secretary of the Interior" wherever the latter term appears in Section 5.

(b) Executive Order No. 11177 of September 16, 1964, relating to the Columbia River Treaty, is amended by deleting "Secretary of the Interior" and "Department of the Interior" wherever those terms appear and substituting therefor "Secretary of Energy" and "Department of Energy", respectively.

SEC. 4. *Functions of the Atomic Energy Commission and the Energy Research and Development Administration.*

(a) In accordance with the transfer of all functions vested by law in the Administrator of Energy Research and Development to the Secretary of Energy pursuant to Section 301(a) of the Act [subsec. (a) of this section] the Executive Orders referred to in this Section are amended or modified as follows:

(1) All current Executive Orders which refer to functions of the Atomic Energy Commission, including Executive Order No. 10127, as amended; Executive Order No. 10865, as amended [set out as a note under 50 U.S.C. 3161]; Executive Order No. 10899 of December 9, 1960 [set out as a note under 42 U.S.C. 2162]; Executive Order No. 11057 of December 18, 1962 [set out as a note under 42 U.S.C. 2162]; Executive Order No. 11477 of August 7, 1969 [set out as a note under 42 U.S.C. 2187]; Executive Order No. 11752 of December 17, 1973 [formerly set out as a note under 42 U.S.C. 4331]; and Executive Order No. 11761 of January 17, 1974 [formerly set out as a note under 20 U.S.C. 1221]; are modified to provide that all such functions shall be exercised by (1) the Secretary of Energy to the extent consistent with the functions of the Atomic Energy Commission that were transferred to the Administrator of Energy Research and Development pursuant to the Energy Organization Act of 1974 (Public Law 93–438; 88 Stat. 1233) [42 U.S.C. 5801 et seq.], and (2) the Nuclear Regulatory Commission to the extent consistent with the functions of the Atomic Energy Commission that were transferred to the Commission by the Energy Reorganization Act of 1974 [42 U.S.C. 5801 et seq.].

(2) [Former] Executive Order No. 11652, as amended, relating to the classification of national security matters, is further amended by substituting "Department of Energy" for "Energy Research and Development Administration" in Sections 2(A), 7(A) and 8 and by deleting "Federal Power Commission" in Section 2(B)(3).

(3) Executive Order No. 11902 of February 2, 1976 [formerly set out as a note under 42 U.S.C. 5841], relating to export licensing policy for nuclear materials and equipment, is amended by substituting "the Secretary of Energy" for "the Administrator of the United States Energy Research and Development Administration, hereinafter referred to as the Administrator" in Section 1(b) and for the "Administrator" in Sections 2 and 3.

(4) [Former] Executive Order No. 11905, as amended, relating to foreign intelligence activities, is further amended by deleting "Energy Research and Development Administration", "Administrator or the Energy Research and Development Administration", and "ERDA" wherever those terms appear and substituting "Department of Energy", "Secretary of Energy", and "DOE" respectively.

(5) Section 3(2) of each of the following Executive Orders is amended by substituting "Department of Energy" for "Energy Research and Development Administration":

(i) Executive Order No. 11345, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Great Lakes River Basin Commission.

(ii) Executive Order No. 11371, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the New England River Basin Commission.

(iii) Executive Order No. 11578, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Ohio River Basin Commission.

(iv) Executive Order No. 11658, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Missouri River Basin Commission.

(v) Executive Order No. 11659, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Mississippi River Basin Commission.

SEC. 5. *Special Provisions Relating to Emergency Preparedness and Mobilization Functions.*

(a) Executive Order No. 10480, as amended [formerly set out as a note under former 50 U.S.C. App. 2153], is further amended by adding thereto the following new Sections:

"Sec. 609. Effective October 1, 1977, the Secretary of Energy shall exercise all authority and discharge all responsibility herein delegated to or conferred upon (a) the Atomic Energy Commission, and (b) with respect to petroleum, gas, solid fuels and electric power, upon the Secretary of the Interior.

"Sec. 610. Whenever the Administrator of General Services believes that the functions of an Executive

agency have been modified pursuant to law in such manner as to require the amendment of any Executive order which relates to the assignment of emergency preparedness functions or the administration of mobilization programs, he shall promptly submit any proposals for the amendment of such Executive orders to the Director of the Office of Management and Budget in accordance with the provisions of Executive Order No. 11030, as amended [set out as a note under 44 U.S.C. 1505].

(b) Executive Order No. 11490, as amended [formerly set out as a note under 50 U.S.C. app. 2251], is further amended by adding thereto the following new section:

"Sec. 3016. Effective October 1, 1977, the Secretary of Energy shall exercise all authority and discharge all responsibility herein delegated to or conferred upon (a) the Federal Power Commission, (b) the Energy Research and Development Administration, and (c) with respect to electric power, petroleum, gas and solid fuels, upon the Department of the Interior.".

Sec. 6. This Order shall be effective as of October 1, 1977, the effective date of the Department of Energy Organization Act [this chapter] pursuant to the provisions of section 901 [42 U.S.C. 7341] thereof and Executive Order No. 12009 of September 13, 1977 [formerly set out as a note under 42 U.S.C. 7341], and all actions taken by the Secretary of Energy on or after October 1, 1977, which are consistent with the foregoing provisions are entitled to full force and effect.

JIMMY CARTER.

### § 7151a. Jurisdiction over matters transferred from Energy Research and Development Administration

Notwithstanding any other provision of law, jurisdiction over matters transferred to the Department of Energy from the Energy Research and Development Administration which on the effective date of such transfer were required by law, regulation, or administrative order to be made on the record after an opportunity for an agency hearing may be assigned to the Federal Energy Regulatory Commission or retained by the Secretary at his discretion.

(Pub. L. 95–238, title I, § 104(a), Feb. 25, 1978, 92 Stat. 53.)

#### Editorial Notes

##### Codification

Section was enacted as part of the Department of Energy Act of 1978—Civilian Applications, and not as part of the Department of Energy Organization Act which comprises this chapter.

### § 7152. Transfers from Department of the Interior

#### (a) Functions relating to electric power

(1) There are transferred to, and vested in, the Secretary all functions of the Secretary of the Interior under section 825s of title 16, and all other functions of the Secretary of the Interior, and officers and components of the Department of the Interior, with respect to—

    (A) the Southeastern Power Administration;
    (B) the Southwestern Power Administration;
    (C) the Bonneville Power Administration including but not limited to the authority contained in the Bonneville Project Act of 1937 [16 U.S.C. 832 et seq.] and the Federal Columbia River Transmission System Act [16 U.S.C. 838 et seq.];
    (D) the power marketing functions of the Bureau of Reclamation, including the con-

struction, operation, and maintenance of transmission lines and attendant facilities; and

    (E) the transmission and disposition of the electric power and energy generated at Falcon Dam and Amistad Dam, international storage reservoir projects on the Rio Grande, pursuant to the Act of June 18, 1954, as amended by the Act of December 23, 1963.

(2) The Southeastern Power Administration, the Southwestern Power Administration, and the Bonneville Power Administration,[1] shall be preserved as separate and distinct organizational entities within the Department. Each such entity shall be headed by an Administrator appointed by the Secretary. The functions transferred to the Secretary in paragraphs (1)(A), (1)(B), (1)(C), and (1)(D) shall be exercised by the Secretary, acting by and through such Administrators. Each such Administrator shall maintain his principal office at a place located in the region served by his respective Federal power marketing entity.

(3) The functions transferred in paragraphs (1)(E) and (1)(F)[2] of this subsection shall be exercised by the Secretary, acting by and through a separate and distinct Administration within the Department which shall be headed by an Administrator appointed by the Secretary. The Administrator shall establish and shall maintain such regional offices as necessary to facilitate the performance of such functions. Neither the transfer of functions effected by paragraph (1)(E) of this subsection nor any changes in cost allocation or project evaluation standards shall be deemed to authorize the reallocation of joint costs of multipurpose facilities theretofore allocated unless and to the extent that such change is hereafter approved by Congress.

#### (b), (c) Repealed. Pub. L. 97–100, title II, § 201, Dec. 23, 1981, 95 Stat. 1407

#### (d) Functions of Bureau of Mines

There are transferred to, and vested in, the Secretary those functions of the Secretary of the Interior, the Department of the Interior, and officers and components of that Department under the Act of May 15, 1910, and other authorities, exercised by the Bureau of Mines, but limited to—

    (1) fuel supply and demand analysis and data gathering;
    (2) research and development relating to increased efficiency of production technology of solid fuel minerals, other than research relating to mine health and safety and research relating to the environmental and leasing consequences of solid fuel mining (which shall remain in the Department of the Interior); and
    (3) coal preparation and analysis.

(Pub. L. 95–91, title III, § 302, Aug. 4, 1977, 91 Stat. 578; Pub. L. 97–100, title II, § 201, Dec. 23, 1981, 95 Stat. 1407; Pub. L. 104–58, title I, § 104(h), Nov. 28, 1995, 109 Stat. 560.)

---

[1] So in original. The comma probably should not appear.
[2] See References in Text note below.

**§ 380.7 Format of an environmental impact statement.**

In addition to the requirements for an environmental impact statement prescribed in 40 CFR 1502.10 of the regulations of the Council, an environmental impact statement prepared by the Commission will include a section on the literature cited in the environmental impact statement and a staff conclusion section. The staff conclusion section will include summaries of:

(a) The significant environmental impacts of the proposed action;

(b) Any alternative to the proposed action that would have a less severe environmental impact or impacts and the action preferred by the staff;

(c) Any mitigation measures proposed by the applicant, as well as additional mitigation measures that might be more effective;

(d) Any significant environmental impacts of the proposed action that cannot be mitigated; and

(e) References to any pending, completed, or recommended studies that might provide baseline data or additional data on the proposed action.

**§ 380.8 Preparation of environmental documents.**

The preparation of environmental documents, as defined in § 1508.10 of the regulations of the Council (40 CFR 1508.10), on hydroelectric projects, natural gas facilities, and electric transmission facilities in national interest electric transmission corridors is the responsibility of the Commission's Office of Energy Projects, 888 First Street NE., Washington, DC 20426, (202) 502–8700. Persons interested in status reports or information on environmental impact statements or other elements of the NEPA process, including the studies or other information the Commission may require on these projects, can contact this office.

[Order 689, 71 FR 69471, Dec. 1, 2006, as amended by Order 756, 77 FR 4895, Feb. 1, 2012]

**§ 380.9 Public availability of NEPA documents and public notice of NEPA related hearings and public meetings.**

(a)(1) The Commission will comply with the requirements of 40 CFR 1506.6

of the regulations of the Council for public involvement in NEPA.

(2) If an action has effects of primarily local concern, the Commission may give additional notice in a Commission order.

(b) The Commission will make environmental impact statements, environmental assessments, the comments received, and any underlaying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552 (1982)). The exclusion in the Freedom of Information Act for interagency memoranda is not applicable where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Such materials will be made available to the public at the Commission's Public Reference Room at 888 First Street NE., Room 2A, Washington, DC 20426 at a fee and in the manner described in Part 388 of this chapter. A copy of an environmental impact statement or environmental assessment for hydroelectric projects may also be made available for inspection at the Commission's regional office for the region where the proposed action is located.

[Order 486, 52 FR 47910, Dec. 17, 1987, as amended by Order 603–A, 64 FR 54537, Oct. 7, 1999]

**§ 380.10 Participation in Commission proceedings.**

(a) *Intervention proceedings involving a party or parties*—(1) *Motion to intervene.* (i) In addition to submitting comments on the NEPA process and NEPA related documents, any person may file a motion to intervene in a Commission proceeding dealing with environmental issues under the terms of § 385.214 of this chapter. Any person who files a motion to intervene on the basis of a draft environmental impact statement will be deemed to have filed a timely motion, in accordance with § 385.214, as long as the motion is filed within the comment period for the draft environmental impact statement.

(ii) Any person that is granted intervention after petitioning becomes a party to the proceeding and accepts the record as developed by the parties as of the time that intervention is granted.

with jurisdiction by law or special expertise, to the maximum extent practicable.

(3) Meet with a cooperating agency at the latter's request.

(4) Determine the purpose and need, and alternatives in consultation with any cooperating agency.

(i) The lead agency shall develop a schedule, setting milestones for all environmental reviews and authorizations required for implementation of the action, in consultation with any applicant and all joint lead, cooperating, and participating agencies, as soon as practicable.

(j) If the lead agency anticipates that a milestone will be missed, it shall notify appropriate officials at the responsible agencies. As soon as practicable, the responsible agencies shall elevate the issue to the appropriate officials of the responsible agencies for timely resolution.

### § 1501.8  Cooperating agencies.

(a) The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any Federal agency with jurisdiction by law shall be a cooperating agency. In addition, upon request of the lead agency, any other Federal agency with special expertise with respect to any environmental issue may be a cooperating agency. A State, Tribal, or local agency of similar qualifications may become a cooperating agency by agreement with the lead agency. An agency may request that the lead agency designate it a cooperating agency, and a Federal agency may appeal a denial of its request to the Council, in accordance with § 1501.7(e).

(b) Each cooperating agency shall:

(1) Participate in the NEPA process at the earliest practicable time.

(2) Participate in the scoping process (described in § 1501.9).

(3) On request of the lead agency, assume responsibility for developing information and preparing environmental analyses, including portions of the environmental impact statement or environmental assessment concerning which the cooperating agency has special expertise.

(4) On request of the lead agency, make available staff support to en-

hance the lead agency's interdisciplinary capability.

(5) Normally use its own funds. To the extent available funds permit, the lead agency shall fund those major activities or analyses it requests from cooperating agencies. Potential lead agencies shall include such funding requirements in their budget requests.

(6) Consult with the lead agency in developing the schedule (§ 1501.7(i)), meet the schedule, and elevate, as soon as practicable, to the senior agency official of the lead agency any issues relating to purpose and need, alternatives, or other issues that may affect any agencies' ability to meet the schedule.

(7) Meet the lead agency's schedule for providing comments and limit its comments to those matters for which it has jurisdiction by law or special expertise with respect to any environmental issue consistent with § 1503.2 of this chapter.

(8) To the maximum extent practicable, jointly issue environmental documents with the lead agency.

(c) In response to a lead agency's request for assistance in preparing the environmental documents (described in paragraph (b)(3), (4), or (5) of this section), a cooperating agency may reply that other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental impact statement or environmental assessment. The cooperating agency shall submit a copy of this reply to the Council and the senior agency official of the lead agency.

### § 1501.9  Scoping.

(a) *Generally.* Agencies shall use an early and open process to determine the scope of issues for analysis in an environmental impact statement, including identifying the significant issues and eliminating from further study non-significant issues. Scoping may begin as soon as practicable after the proposal for action is sufficiently developed for agency consideration. Scoping may include appropriate pre-application procedures or work conducted prior to publication of the notice of intent.

**Council on Environmental Quality**                    **§ 1501.9**

(b) *Invite cooperating and participating agencies.* As part of the scoping process, the lead agency shall invite the participation of likely affected Federal, State, Tribal, and local agencies and governments, the proponent of the action, and other likely affected or interested persons (including those who might not be in accord with the action), unless there is a limited exception under §1507.3(f)(1) of this chapter.

(c) *Scoping outreach.* As part of the scoping process the lead agency may hold a scoping meeting or meetings, publish scoping information, or use other means to communicate with those persons or agencies who may be interested or affected, which the agency may integrate with any other early planning meeting. Such a scoping meeting will often be appropriate when the impacts of a particular action are confined to specific sites.

(d) *Notice of intent.* As soon as practicable after determining that a proposal is sufficiently developed to allow for meaningful public comment and requires an environmental impact statement, the lead agency shall publish a notice of intent to prepare an environmental impact statement in the FEDERAL REGISTER, except as provided in §1507.3(f)(3) of this chapter. An agency also may publish notice in accordance with §1506.6 of this chapter. The notice shall include, as appropriate:

(1) The purpose and need for the proposed action;

(2) A preliminary description of the proposed action and alternatives the environmental impact statement will consider;

(3) A brief summary of expected impacts;

(4) Anticipated permits and other authorizations;

(5) A schedule for the decision-making process;

(6) A description of the public scoping process, including any scoping meeting(s);

(7) A request for identification of potential alternatives, information, and analyses relevant to the proposed action (*see* §1502.17 of this chapter); and

(8) Contact information for a person within the agency who can answer questions about the proposed action

and the environmental impact statement.

(e) *Determination of scope.* As part of the scoping process, the lead agency shall determine the scope and the significant issues to be analyzed in depth in the environmental impact statement. To determine the scope of environmental impact statements, agencies shall consider:

(1) Actions (other than unconnected single actions) that may be connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions that may require environmental impact statements;

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; or

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Alternatives, which include the no action alternative; other reasonable courses of action; and mitigation measures (not in the proposed action).

(3) Impacts.

(f) *Additional scoping responsibilities.* As part of the scoping process, the lead agency shall:

(1) Identify and eliminate from detailed study the issues that are not significant or have been covered by prior environmental review(s) (§1506.3 of this chapter), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

(2) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

(3) Indicate any public environmental assessments and other environmental impact statements that are being or will be prepared and are related to but are not part of the scope of the impact statement under consideration.

(4) Identify other environmental review, authorization, and consultation

615

**A-17**

requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently and integrated with the environmental impact statement, as provided in §1502.24 of this chapter.

(5) Indicate the relationship between the timing of the preparation of environmental analyses and the agencies' tentative planning and decision-making schedule.

(g) *Revisions.* An agency shall revise the determinations made under paragraphs (b), (c), (e), and (f) of this section if substantial changes are made later in the proposed action, or if significant new circumstances or information arise which bear on the proposal or its impacts.

## § 1501.10  Time limits.

(a) To ensure that agencies conduct NEPA reviews as efficiently and expeditiously as practicable, Federal agencies should set time limits appropriate to individual actions or types of actions (consistent with the time intervals required by §1506.11 of this chapter).

(b) To ensure timely decision making, agencies shall complete:

(1) Environmental assessments within 1 year unless a senior agency official of the lead agency approves a longer period in writing and establishes a new time limit. One year is measured from the date of agency decision to prepare an environmental assessment to the publication of an environmental assessment or a finding of no significant impact.

(2) Environmental impact statements within 2 years unless a senior agency official of the lead agency approves a longer period in writing and establishes a new time limit. Two years is measured from the date of the issuance of the notice of intent to the date a record of decision is signed.

(c) The senior agency official may consider the following factors in determining time limits:

(1) Potential for environmental harm.

(2) Size of the proposed action.

(3) State of the art of analytic techniques.

(4) Degree of public need for the proposed action, including the consequences of delay.

(5) Number of persons and agencies affected.

(6) Availability of relevant information.

(7) Other time limits imposed on the agency by law, regulations, or Executive order.

(d) The senior agency official may set overall time limits or limits for each constituent part of the NEPA process, which may include:

(1) Decision on whether to prepare an environmental impact statement (if not already decided).

(2) Determination of the scope of the environmental impact statement.

(3) Preparation of the draft environmental impact statement.

(4) Review of any comments on the draft environmental impact statement from the public and agencies.

(5) Preparation of the final environmental impact statement.

(6) Review of any comments on the final environmental impact statement.

(7) Decision on the action based in part on the environmental impact statement.

(e) The agency may designate a person (such as the project manager or a person in the agency's office with NEPA responsibilities) to expedite the NEPA process.

(f) State, Tribal, or local agencies or members of the public may request a Federal agency to set time limits.

## § 1501.11  Tiering.

(a) Agencies should tier their environmental impact statements and environmental assessments when it would eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided or not yet ripe at each level of environmental review. Tiering may also be appropriate for different stages of actions.

(b) When an agency has prepared an environmental impact statement or environmental assessment for a program or policy and then prepares a subsequent statement or assessment on an action included within the entire program or policy (such as a project- or

**Council on Environmental Quality**

§ 1502.1

site-specific action), the tiered document needs only to summarize and incorporate by reference the issues discussed in the broader document. The tiered document shall concentrate on the issues specific to the subsequent action. The tiered document shall state where the earlier document is available.

(c) Tiering is appropriate when the sequence from an environmental impact statement or environmental assessment is:

(1) From a programmatic, plan, or policy environmental impact statement or environmental assessment to a program, plan, or policy statement or assessment of lesser or narrower scope or to a site-specific statement or assessment.

(2) From an environmental impact statement or environmental assessment on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or assessment at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues that are ripe for decision and exclude from consideration issues already decided or not yet ripe.

**§ 1501.12  Incorporation by reference.**

Agencies shall incorporate material, such as planning studies, analyses, or other relevant information, into environmental documents by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. Agencies shall cite the incorporated material in the document and briefly describe its content. Agencies may not incorporate material by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Agencies shall not incorporate by reference material based on proprietary data that is not available for review and comment.

## PART 1502—ENVIRONMENTAL IMPACT STATEMENT

Sec.
1502.1  Purpose of environmental impact statement.

1502.2  Implementation.
1502.3  Statutory requirements for statements.
1502.4  Major Federal actions requiring the preparation of environmental impact statements.
1502.5  Timing.
1502.6  Interdisciplinary preparation.
1502.7  Page limits.
1502.8  Writing.
1502.9  Draft, final, and supplemental statements.
1502.10  Recommended format.
1502.11  Cover.
1502.12  Summary.
1502.13  Purpose and need.
1502.14  Alternatives including the proposed action.
1502.15  Affected environment.
1502.16  Environmental consequences.
1502.17  Summary of submitted alternatives, information, and analyses.
1502.18  List of preparers.
1502.19  Appendix.
1502.20  Publication of the environmental impact statement.
1502.21  Incomplete or unavailable information.
1502.22  Cost-benefit analysis.
1502.23  Methodology and scientific accuracy.
1502.24  Environmental review and consultation requirements.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

SOURCE: 85 FR 43363, July 16, 2020, unless otherwise noted.

**§ 1502.1  Purpose of environmental impact statement.**

The primary purpose of an environmental impact statement prepared pursuant to section 102(2)(C) of NEPA is to ensure agencies consider the environmental impacts of their actions in decision making. It shall provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental

**Council on Environmental Quality**                                           **§ 1502.9**

avoid duplication and delay. Agencies may tier their environmental analyses to defer detailed analysis of environmental impacts of specific program elements until such program elements are ripe for final agency action.

### § 1502.5  Timing.

An agency should commence preparation of an environmental impact statement as close as practicable to the time the agency is developing or receives a proposal so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve as an important practical contribution to the decision-making process and will not be used to rationalize or justify decisions already made (§§ 1501.2 of this chapter and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies, the agency shall prepare the environmental impact statement at the feasibility analysis (go/no-go) stage and may supplement it at a later stage, if necessary.

(b) For applications to the agency requiring an environmental impact statement, the agency shall commence the statement as soon as practicable after receiving the application. Federal agencies should work with potential applicants and applicable State, Tribal, and local agencies and governments prior to receipt of the application.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances, the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking, the draft environmental impact statement shall normally accompany the proposed rule.

### § 1502.6  Interdisciplinary preparation.

Agencies shall prepare environmental impact statements using an interdisciplinary approach that will ensure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of

NEPA). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§ 1501.9 of this chapter).

### § 1502.7  Page limits.

The text of final environmental impact statements (paragraphs (a)(4) through (6) of § 1502.10) shall be 150 pages or fewer and, for proposals of unusual scope or complexity, shall be 300 pages or fewer unless a senior agency official of the lead agency approves in writing a statement to exceed 300 pages and establishes a new page limit.

### § 1502.8  Writing.

Agencies shall write environmental impact statements in plain language and may use appropriate graphics so that decision makers and the public can readily understand such statements. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which shall be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

### § 1502.9  Draft, final, and supplemental statements.

(a) *Generally.* Except for proposals for legislation as provided in § 1506.8 of this chapter, agencies shall prepare environmental impact statements in two stages and, where necessary, supplement them, as provided in paragraph (d)(1) of this section.

(b) *Draft environmental impact statements.* Agencies shall prepare draft environmental impact statements in accordance with the scope decided upon in the scoping process (§ 1501.9 of this chapter). The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. To the fullest extent practicable, the draft statement must meet the requirements established for final statements in section 102(2)(C) of NEPA as interpreted in the regulations in this subchapter. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and publish a supplemental draft of the appropriate portion. At appropriate points in the draft statement, the agency shall discuss all

619

**A-20**

major points of view on the environmental impacts of the alternatives including the proposed action.

(c) *Final environmental impact statements.* Final environmental impact statements shall address comments as required in part 1503 of this chapter. At appropriate points in the final statement, the agency shall discuss any responsible opposing view that was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(d) *Supplemental environmental impact statements.* Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and:

(i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall prepare, publish, and file a supplement to a statement (exclusive of scoping (§ 1501.9 of this chapter)) as a draft and final statement, as is appropriate to the stage of the statement involved, unless the Council approves alternative procedures (§ 1506.12 of this chapter).

(4) May find that changes to the proposed action or new circumstances or information relevant to environmental concerns are not significant and therefore do not require a supplement. The agency should document the finding consistent with its agency NEPA procedures (§ 1507.3 of this chapter), or, if necessary, in a finding of no significant impact supported by an environmental assessment.

### § 1502.10  Recommended format.

(a) Agencies shall use a format for environmental impact statements that will encourage good analysis and clear presentation of the alternatives including the proposed action. Agencies should use the following standard format for environmental impact statements unless the agency determines

that there is a more effective format for communication:

(1) Cover.

(2) Summary.

(3) Table of contents.

(4) Purpose of and need for action.

(5) Alternatives including the proposed action (sections 102(2)(C)(iii) and 102(2)(E) of NEPA).

(6) Affected environment and environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA).

(7) Submitted alternatives, information, and analyses.

(8) List of preparers.

(9) Appendices (if any).

(b) If an agency uses a different format, it shall include paragraphs (a)(1) through (8) of this section, as further described in §§ 1502.11 through 1502.19, in any appropriate format.

### § 1502.11  Cover.

The cover shall not exceed one page and include:

(a) A list of the responsible agencies, including the lead agency and any cooperating agencies.

(b) The title of the proposed action that is the subject of the statement (and, if appropriate, the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction(s), if applicable) where the action is located.

(c) The name, address, and telephone number of the person at the agency who can supply further information.

(d) A designation of the statement as a draft, final, or draft or final supplement.

(e) A one-paragraph abstract of the statement.

(f) The date by which the agency must receive comments (computed in cooperation with EPA under § 1506.11 of this chapter).

(g) For the final environmental impact statement, the estimated total cost to prepare both the draft and final environmental impact statement, including the costs of agency full-time equivalent (FTE) personnel hours, contractor costs, and other direct costs. If practicable and noted where not practicable, agencies also should include

**Council on Environmental Quality**                                     **§ 1502.16**

costs incurred by cooperating and participating agencies, applicants, and contractors.

### § 1502.12  Summary.

Each environmental impact statement shall contain a summary that adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of disputed issues raised by agencies and the public, and the issues to be resolved (including the choice among alternatives). The summary normally will not exceed 15 pages.

### § 1502.13  Purpose and need.

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

[87 FR 23469, Apr. 20, 2022]

### § 1502.14  Alternatives including the proposed action.

The alternatives section should present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16). In this section, agencies shall:

(a) Evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination.

(b) Discuss each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits.

(c) Include the no action alternative.

(d) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(e) Include appropriate mitigation measures not already included in the proposed action or alternatives.

(f) Limit their consideration to a reasonable number of alternatives.

### § 1502.15  Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration, including the reasonably foreseeable environmental trends and planned actions in the area(s). The environmental impact statement may combine the description with evaluation of the environmental consequences (§ 1502.16), and it shall be no longer than is necessary to understand the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

### § 1502.16  Environmental consequences.

(a) The environmental consequences section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA that are within the scope of the statement and as much of section 102(2)(C)(iii) of NEPA as is necessary to support the comparisons. This section should not duplicate discussions in § 1502.14. The discussion shall include:

(1) The environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts. The comparison of the proposed action and reasonable alternatives shall be based on this discussion of the impacts.

(2) Any adverse environmental effects that cannot be avoided should the proposal be implemented.

(3) The relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity.

(4) Any irreversible or irretrievable commitments of resources that would be involved in the proposal should it be implemented.

(5) Possible conflicts between the proposed action and the objectives of

621

Federal, regional, State, Tribal, and local land use plans, policies and controls for the area concerned. (§ 1506.2(d) of this chapter)

(6) Energy requirements and conservation potential of various alternatives and mitigation measures.

(7) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(8) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(9) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(e)).

(10) Where applicable, economic and technical considerations, including the economic benefits of the proposed action.

(b) Economic or social effects by themselves do not require preparation of an environmental impact statement. However, when the agency determines that economic or social and natural or physical environmental effects are interrelated, the environmental impact statement shall discuss and give appropriate consideration to these effects on the human environment.

### § 1502.17 Summary of submitted alternatives, information, and analyses.

(a) The draft environmental impact statement shall include a summary that identifies all alternatives, information, and analyses submitted by State, Tribal, and local governments and other public commenters during the scoping process for consideration by the lead and cooperating agencies in developing the environmental impact statement.

(1) The agency shall append to the draft environmental impact statement or otherwise publish all comments (or summaries thereof where the response has been exceptionally voluminous) received during the scoping process that identified alternatives, information, and analyses for the agency's consideration.

(2) Consistent with § 1503.1(a)(3) of this chapter, the lead agency shall invite comment on the summary identifying all submitted alternatives, information, and analyses in the draft environmental impact statement.

(b) The final environmental impact statement shall include a summary that identifies all alternatives, information, and analyses submitted by State, Tribal, and local governments and other public commenters for consideration by the lead and cooperating agencies in developing the final environmental impact statement.

### § 1502.18 List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement. Where possible, the environmental impact statement shall identify the persons who are responsible for a particular analysis, including analyses in background papers. Normally the list will not exceed two pages.

### § 1502.19 Appendix.

If an agency prepares an appendix, the agency shall publish it with the environmental impact statement, and it shall consist of:

(a) Material prepared in connection with an environmental impact statement (as distinct from material that is not so prepared and is incorporated by reference (§ 1501.12 of this chapter)).

(b) Material substantiating any analysis fundamental to the impact statement.

(c) Material relevant to the decision to be made.

(d) For draft environmental impact statements, all comments (or summaries thereof where the response has been exceptionally voluminous) received during the scoping process that identified alternatives, information, and analyses for the agency's consideration.

(e) For final environmental impact statements, the comment summaries and responses consistent with § 1503.4 of this chapter.

**Council on Environmental Quality**

**§ 1502.23**

**§ 1502.20 Publication of the environmental impact statement.**

Agencies shall publish the entire draft and final environmental impact statements and unchanged statements as provided in § 1503.4(c) of this chapter. The agency shall transmit the entire statement electronically (or in paper copy, if so requested due to economic or other hardship) to:

(a) Any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State, Tribal, or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement, any person, organization, or agency that submitted substantive comments on the draft.

**§ 1502.21 Incomplete or unavailable information.**

(a) When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement, and there is incomplete or unavailable information, the agency shall make clear that such information is lacking.

(b) If the incomplete but available information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives, and the overall costs of obtaining it are not unreasonable, the agency shall include the information in the environmental impact statement.

(c) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are unreasonable or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable;

(2) A statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;

(3) A summary of existing credible scientific evidence that is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and

(4) The agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.

(d) For the purposes of this section, ''reasonably foreseeable'' includes impacts that have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

**§ 1502.22 Cost-benefit analysis.**

If the agency is considering a cost-benefit analysis for the proposed action relevant to the choice among alternatives with different environmental effects, the agency shall incorporate the cost-benefit analysis by reference or append it to the statement as an aid in evaluating the environmental consequences. In such cases, to assess the adequacy of compliance with section 102(2)(B) of NEPA (ensuring appropriate consideration of unquantified environmental amenities and values in decision making, along with economical and technical considerations), the statement shall discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, agencies need not display the weighing of the merits and drawbacks of the various alternatives in a monetary cost-benefit analysis and should not do so when there are important qualitative considerations. However, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, that are likely to be relevant and important to a decision.

**§ 1502.23 Methodology and scientific accuracy.**

Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents.

623

**A-24**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 5, 2024, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>*/s/ Robert M. Kennedy*</u>
Robert M. Kennedy
Senior Attorney