FEDERAL ENERGY REGULATORY COMMISSION
WASHINGTON, D.C. 20426

June 17, 2024

<u>*Via ECF*</u>

Mark J. Langer
Clerk of the Court
United States Court of Appeals
  for the District of Columbia Circuit
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

**Re:** *City of Port Isabel, et al. v. FERC*, Nos. 23-1174, *et al*.
<u>Rule 28(j) Letter (argued May 17, 2024)</u>

Dear Mr. Langer:

On June 14, 2024, the Court issued its opinion in *Food & Water Watch v. FERC*, No. 22-1214, which addressed a challenge to the Federal Energy Regulatory Commission's discussion of greenhouse gas emissions associated with natural gas pipeline facilities. A copy is attached.

Sierra Club has argued here that the Commission violated the National Environmental Policy Act by not using the social cost of carbon tool to assess the significance of the authorized facilities' greenhouse gas emissions. *See* Pet'rs Br. 50-57. The same argument was presented to, and rejected by, the *Food & Water Watch* court.

In *Food & Water Watch* – which concerned emissions downstream from pipeline facilities – the Commission estimated the volume of emissions and compared them against state and national emission levels. Slip Op. 12. "And while reiterating its view that the Social Cost

of Carbon is not reliable for assessing individual projects," the Commission applied the model and disclosed a range of estimated climate-related costs.  *Id*. 13.  The Commission conducted a substantially identical analysis in this case.  *See* Resp't Br. 26-27, 52-53.

The *Food & Water Watch* court found that this analysis "went well beyond" what NEPA requires.  Slip Op. 12.  The Court expressly rejected the contention – made by Sierra Club here (*see* Resp't Br. 51-52; Pet'rs Br. 57-58; Pet'rs Reply 22-24, 30-32) – "that the Commission needed to label the increased emissions and ensuing costs as either significant or insignificant."  Slip Op. 13.  As the court recognized, "NEPA contains no such mandate."  *Id*.

In *Food & Water Watch*, the court also rejected the argument that the Commission's now-withdrawn policy statement and its *Northern Natural* precedent demonstrate that the agency can and must label emissions as significant or insignificant.  *See* Slip Op. 14.  Sierra Club has raised similar arguments here.  *See* Resp't Br. 49-51; Pet'rs Br. 58-59; Pet'rs Reply 24-25.

          Respectfully submitted,

          */s/ Robert M. Kennedy*
          Tel.:  (202) 502-8904
          robert.kennedy@ferc.gov

          *Counsel for Respondent*
          *Federal Energy Regulatory Commission*

cc:  service list

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 7, 2023        Decided June 14, 2024

No. 22-1214

FOOD & WATER WATCH,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. AND
TENNESSEE GAS PIPELINE COMPANY, L.L.C.,
INTERVENORS

Consolidated with 22-1315

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

*Erin E. Doran* argued the cause and filed the briefs for petitioner. *Daniel A. Greenhouse* entered an appearance.

*Scott Ray Ediger*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on

2

the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Brian D. O'Neill* argued the cause for respondent-intervenors Tennessee Gas Pipeline Company, L.L.C. and Consolidated Edison Company of New York, Inc. With him on the brief were *Michael R. Pincus*, *Neil H. Butterklee*, and *Blake R. Urban Sr.* *Susan J. LoFrumento* entered an appearance.

Before: WILKINS and KATSAS, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: The Federal Energy Regulatory Commission issued a certificate allowing the Tennessee Gas Pipeline Company to build facilities to expand service on a natural-gas pipeline running from western Pennsylvania to the New York metropolitan area. The additional gas transported as a result will alleviate shortages in Westchester County, New York.

Petitioner Food & Water Watch contends that FERC, in approving the project, arbitrarily overlooked environmental issues. Food & Water Watch argues that the Commission's Environmental Impact Statement impermissibly failed to quantify greenhouse-gas emissions from upstream drilling for the extra gas, to quantify ozone emissions from its downstream burning, and to categorize emissions impacts as either significant or insignificant. In addition, Food & Water Watch argues that FERC, in finding a need for the project, did not adequately consider New York State and New York City laws mandating reductions in carbon-dioxide emissions. We reject these contentions and deny the petitions for review.

3

I

A

The Natural Gas Act regulates the transportation and sale of natural gas in interstate commerce. 15 U.S.C. § 717(b). Section 7 of the Act prohibits companies from transporting or selling natural gas in interstate commerce, or from constructing or extending any facilities for doing so, without a "certificate of public convenience and necessity." *Id.* § 717f(c)(1)(A), (e). In considering whether to issue a certificate, FERC must examine "all factors bearing on the public interest," including environmental ones. *Atl. Refin. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 391 (1959).

The National Environmental Policy Act requires federal agencies to prepare an Environmental Impact Statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C) (2018). Under regulations promulgated by the Council on Environmental Quality and adopted by FERC, *see* 18 C.F.R. § 380.1 (2019), an EIS must analyze both "direct" and "indirect" environmental effects of the proposed project, 40 C.F.R. §§ 1502.16(a), (b), 1508.8(a), (b) (2019).[1] Indirect effects are "later in time or farther removed in distance" than direct effects, "but are still reasonably foreseeable." *Id.* § 1508.8(b). We have held that such indirect effects can include GHG emissions from upstream drilling for, or downstream burning of, the gas transported through a pipeline. *See*, *e.g.*, *Eagle Cnty. v. Surface Transp. Bd.*, 82 F.4th 1152, 1177–78 (D.C. Cir. 2023); *Sierra Club v. FERC*, 867 F.3d 1357, 1371–75 (D.C. Cir. 2017) (*Sabal Trail*). And when such

---

[1] All citations to the U.S. Code and Code of Federal Regulations reference the law in effect when FERC commenced environmental review in 2020. Both were later amended, but no party contends that the amendments apply here or materially change the provisions that we discuss.

4

emissions are reasonably foreseeable, FERC must either give a "quantitative estimate" of the emissions or else explain why it cannot. *See Sabal Trail*, 867 F.3d at 1374.

The NEPA regulations address how agencies should decide whether to prepare an EIS. Agencies may exclude from NEPA review categories of actions that normally have no "significant effect" on the environment. 40 C.F.R. § 1508.4. They may prepare an Environmental Assessment to decide whether a proposed action will have significant environmental effects and thus require an EIS. *Id.* § 1501.4(c). Or they may simply prepare an EIS. *Id.* § 1501.3(a). An EIS is a "detailed written statement" addressing significant environmental effects, *id.* § 1508.11; *see* 42 U.S.C. § 4332(C), whereas an Environmental Assessment is a "concise" document addressing only the threshold question whether there are such effects, 40 C.F.R. § 1508.9(a); *see also id.* § 1508.9(a)(1).

NEPA "does not mandate particular results." *DOT v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (cleaned up). It imposes "only procedural requirements," *id.* at 756–57, which ensure that agencies consider "significant" environmental impacts and that the public is also aware of them, *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (cleaned up). NEPA sometimes requires agencies to engage in "reasonable forecasting" based on "some educated assumptions." *Sabal Trail*, 867 F.3d at 1374 (cleaned up). But it does not require "forecasting that is not meaningfully possible." *Food & Water Watch v. FERC*, 28 F.4th 277, 285 (D.C. Cir. 2022) (cleaned up).

B

Tennessee Gas owns connected natural-gas pipelines running from Texas to New England. This case involves its Line 300, which runs from western Pennsylvania through New Jersey and into New York. In the project at issue, dubbed the East 300 Upgrade Project, Tennessee Gas sought to build or

5

expand three compressor stations in Pennsylvania and New Jersey. These upgrades will enable the company to push an additional 115,000 dekatherms of natural gas per day through the pipeline and into Westchester County, New York.

Consolidated Edison Company of New York (ConEd), a utility operating in New York City and Westchester County, has entered into a 20-year agreement to buy firm transportation service for all this additional gas. ConEd plans to use the gas to alleviate shortages in Westchester County, where the demand for natural gas has increased substantially over the last decade. As a result of the increased demand, ConEd has been unable to offer gas service to new customers, despite a state-law obligation to provide reliable service to all who seek it. It has also been forced to truck compressed natural gas into the county to meet peak winter demand. ConEd anticipates that the gas supplied by the project will solve these problems.

Tennessee Gas applied to FERC for a certificate of public convenience and necessity for the East 300 Upgrade Project. Initially, the Commission published an Environmental Assessment. But after receiving comments, it decided to prepare a full EIS, which devotes some 16 pages to addressing GHG emissions. J.A. 244–59. The EIS estimated the downstream carbon-dioxide emissions that would occur when ConEd customers burn the gas in Westchester County. However, FERC concluded that the sources of this gas were unknown, so the EIS declined to address upstream environmental effects—including GHG emissions—from drilling for the gas.

FERC then issued a certificate of public convenience and necessity, which incorporated and elaborated on the EIS. *Tenn. Gas Pipeline Co.*, 179 FERC ¶ 61,041, P 35 (Apr. 21, 2022) (Certificate Order). The Commission declined to characterize downstream emissions "as significant or insignificant." *Id.* P

6

49.  And it again declined to address upstream emissions from drilling for the gas.  *Id.* P 57.

FERC then denied rehearing.  *Tenn. Gas Pipeline Co.*, 181 FERC ¶ 61,051 (Oct. 24, 2022) (Rehearing Order).  For a third time, it declined to address upstream environmental effects.  *Id.* P 27.  Addressing downstream ozone, the Commission estimated the volume of ozone precursor chemicals caused by burning the gas from the project.  *Id.* P 30 n. 85.  However, it declined to estimate how much additional ozone their emission would ultimately cause.  *Id.* PP 30–32.

Food & Water Watch petitioned for review of the certificate and rehearing orders, and we consolidated the petitions.  We have jurisdiction under 15 U.S.C. § 717r(b).

II

Food & Water Watch raises three NEPA challenges to the Commission's analysis of environmental effects.  We review NEPA claims through the Administrative Procedure Act.  *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 799 (D.C. Cir. 2022).  Under the APA, we consider whether agency action is arbitrary or capricious, 5 U.S.C. § 706(2)(A), a standard of review "highly deferential to the agency," *Gulf Restoration Network*, 47 F.4th at 799 (cleaned up).  In particular, we "give deference to agency judgments as to how best to prepare an EIS."  *Id.* (cleaned up).  And because NEPA is a "purely procedural statute," we cannot force the agency to "change the course of action it proposes."  *Ctr. for Bio. Div. v. FERC*, 67 F.4th 1176, 1181 (D.C. Cir. 2023) (cleaned up).  Our job is to ensure that FERC's decision was "fully informed and well-considered," *Nevada v. DOE*, 457 F.3d 78, 93 (D.C. Cir. 2006) (cleaned up), not to override its judgment about whether the project is in the public interest*, see Balt. Gas*, 462 U.S. at 97–98; *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

7

A

Food & Water Watch first asserts that FERC erred by refusing to assess upstream environmental effects caused by extracting natural gas from the ground. Drilling new wells can cause such effects, ranging from increased traffic to GHG emissions. *See Eagle Cnty.*, 82 F.4th at 1176–77. But an EIS need not discuss such effects unless their nature and extent are "reasonably foreseeable." 40 C.F.R. § 1508.8(b). And we have squarely held that upstream consequences from the drilling of new wells are not "reasonably foreseeable" if FERC does not know "the number and location of any additional wells that would be drilled as a result of production demand created by the Project." *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 109 (D.C. Cir. 2022) (quoting *Birckhead v. FERC*, 925 F.3d 510, 517 (D.C. Cir. 2019) (per curiam)).

Here, FERC reasonably concluded that there was too much uncertainty regarding the number and location of additional upstream wells. As it explained, Line 300 receives natural gas from other pipelines across the country, stretching from the Rockies to the Gulf Coast to Appalachia. Rehearing Order, 181 FERC ¶ 61,051, P 27 & n.74. In the context of downstream emissions, we have held that pinpointing emissions to "somewhere in the Southeast" is not enough to trigger a duty to explain under NEPA. *See Birckhead*, 925 F.3d at 518, 520–21. Nor is pinpointing upstream emissions to somewhere along Tennessee Gas's pipeline network.

Food & Water Watch objects that the gas is unlikely to come from remote locations in the South or Midwest. It highlights evidence that Line 300 takes natural gas primarily from the Marcellus and Utica Shales. But that assertion, even if true, does not move the needle. The Marcellus and Utica deposits reach at least across West Virginia and Pennsylvania and into parts of Ohio and New York. *See* United States Energy Information Administration, *Utica Shale Play Geology*

8

*Review* 13 (2017); *see also Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1307 (D.C. Cir. 2014). And if "somewhere in the Southeast" is not good enough, neither is "somewhere in the Northeast."

Our decision in *Eagle County* is not to the contrary. There, we required the Surface Transportation Board to consider the upstream environmental effects from a rail line proposed to facilitate oil drilling in the Uinta Basin in northeastern Utah and northwestern Colorado. 82 F.4th at 1165, 1180. That area is a remote, 12,000-square-mile basin "bounded by high mountains or plateaus," with only small roads leading in or out. *Id.* at 1165–66 (cleaned up). The purpose of the project was to "connect the Uinta Basin to the national rail network" to facilitate the "transport of waxy crude oil produced in the Uinta Basin." *Id.* at 1166 (cleaned up). There was relatively little oil production in the basin, making it certain that the rail line would stimulate many new wells. *See id.* And the agency was able to "estimate[] the number of oil wells that would need to be constructed and operated in the Basin to satisfy the expected increased oil production volume." *Id.* at 1178 (cleaned up). We held that, with these estimates in hand, the agency had to either take the next step to "quantify the environmental impacts of the wells it reasonably expects in this already identified region" or else explain why it could not do so. *See id.* at 1179.

Here, in contrast, any prediction about the location and number of wells would be much less precise. For one thing, the point of this project is to bring fuel *to* a specific downstream area experiencing shortages, not to bring fuel *from* a specific upstream area with rich, underutilized deposits. So it is hardly surprising that upstream effects were more estimable in *Eagle County* than they are here. Moreover, the upstream formations here, stretching at least from southwestern West Virginia into central New York, are much larger, less remote, and more geographically diverse than the Uinta Basin. The thousands of existing wells make uncertain the number of new wells

9

necessary to bring the additional gas to Westchester County. And the geographic diversity of these shales makes uncertain the nature and extent of operations—and emissions— necessary to drill new wells. Food & Water Watch points to the number of *existing* wells in Pennsylvania and a graph showing that their production will diminish over time. But that tells us little if anything about the number and location of new wells that the project may stimulate.

Food & Water Watch notes that the Environmental Protection Agency, in comments to FERC, suggested quantifying upstream emissions, which it said would be reasonably foreseeable. EPA did not suggest, however, that the number or location of additional wells was known to any reasonable degree of precision. Instead, citing assertions in the draft about downstream emissions, it stated more generally that "GHG impacts do not depend on where they occur." J.A. 196. But as for upstream emissions, we have held that quantification is unnecessary where the "number and location of any additional wells" is unknown. *Del. Riverkeeper Network*, 45 F.4th at 109 (quoting *Birckhead*, 925 F.3d at 517). EPA thus urged FERC to do more than our precedents require, and FERC permissibly declined.

As a fallback, Food & Water Watch contends that FERC arbitrarily failed to ask Tennessee Gas for more information about the number and location of any additional wells. But NEPA "involves an almost endless series of judgment calls" left primarily to the agency, *Duncan's Point Lot Owners Ass'n v. FERC,* 522 F.3d 371, 376 (D.C. Cir. 2008) (cleaned up)— including the question of how much information to seek from regulated parties. Although we have criticized FERC for failing to demand more information about other pipeline projects, *see Birckhead*, 925 F.3d at 518, we have never set aside a certificate on that basis. Moreover, FERC here reasonably declined to seek more information from Tennessee Gas because no evidence suggests that a request would have

10

produced useful information. Tennessee Gas operates a pipeline; it will not drill gas wells for this project or control where others drill them. Additionally, when FERC granted the certificate, Tennessee Gas had a contract in place with the sole shipper of the gas in question—and no contracts in place with possible producers of the gas. *See* Certificate Order, 179 FERC ¶ 61,041, P 57; *see also* Rehearing Order, 181 FERC ¶ 61,051, P 27. Furthermore, FERC referenced a map of the pipeline at issue, which shows dozens of possible entry points for the gas just in one zone of the pipeline, to say nothing of other zones or other connected pipelines. Rehearing Order, 181 FERC ¶ 61,051, P 27 n.74. Finally, FERC explained that the source of the gas may change over the life of the project, *id.* P 27, and Food & Water Watch gives us no reason to think Tennessee Gas can predict these changes.

B

Food & Water Watch next objects to FERC's discussion of ozone pollution that might be caused by downstream burning of the gas in Westchester County.

In its Rehearing Order, FERC addressed ozone concerns at length. It explained that burning natural gas emits ozone precursor chemicals such as nitrogen oxides and volatile organic compounds, which then react with sunlight to form ozone. 181 FERC ¶ 61,051, P 29. It flagged in qualitative terms that "an increase in natural gas combustion in the region will likely lead to some increase in ozone pollution." *Id.* And it estimated the volume of nitrogen oxides and volatile organic compounds that could be released if the pipeline operated as Food & Water Watch claimed. *Id.* P 30 n.85. But FERC did not give a quantitative estimate of how much ozone would be produced as a result.

Food & Water Watch contends that FERC's failure to take that final step was arbitrary. We disagree. For one thing,

11

FERC reasonably explained its decision. It stated that "the quantity of ozone precursors can vary significantly based on the conditions under which the natural gas is combusted." Rehearing Order, 181 FERC ¶ 61,051, P 30. "Commercial, industrial, and residential uses" may emit significantly different amounts of the precursor chemicals. *Id.* So may commercial uses depending on the type of boilers that are used. *Id.* So may residential uses depending on whether the gas is combusted for home heating, water heating, or cooking. *Id.* For these reasons, estimating even the emission of precursor chemicals is challenging. *See id.* On top of that, conversion of the precursors into ozone depends on many further variables such as the "season, atmospheric conditions, and existing emissions in the region." *Id.* P 31. And attempting to quantify the conversion would require "complex regional photochemical modeling," *id.*, producing a "degree of uncertainty" that would deprive the ultimate ozone estimate "of utility for decisionmakers or stakeholders," *id.* P 32.

Our precedent supports FERC on this point. In *WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013), we upheld an agency decision to estimate ozone precursors as a reasonable proxy for ozone. *WildEarth* involved downstream emissions created by a mining project. *See id.* at 304. The permitting agency explained its decision to estimate only precursor chemicals in terms nearly identical to FERC's explanation here. *See id.* at 311–12. In upholding that decision, we stressed that "the line-drawing decisions necessitated by the NEPA process" are "almost endless," and we concluded that the agency's approach was reasonable even if it were "possible or even prudent" for the agency to hazard a guess at the volume of ozone. *Id.* at 312 (cleaned up).

Food & Water Watch seeks to distinguish *WildEarth* on the ground that Westchester County is not in compliance with ozone air-quality standards established under the Clean Air Act. But FERC acknowledged that point in discussing

12

downstream ozone pollution.  *See* Rehearing Order, 181 FERC ¶ 61,051, P 29.  And in any event, the scope of its NEPA obligation to explain environmental impacts turns on whether the proposed forecasting is sufficiently "reasonable" and whether the necessary assumptions are sufficiently "educated." *Sabal Trail*, 867 F.3d at 1374 (cleaned up); *see also Food & Water Watch*, 28 F.4th at 285.  Here, Food & Water Watch does not suggest that the current level of ozone in Westchester County would simplify any attempt to estimate increased ozone levels.  So, *WildEarth* remains controlling.

C

Finally, Food & Water Watch objects to FERC's discussion of downstream GHG emissions.  We have held that such emissions may be reasonably foreseeable if FERC can "reasonably identify the end users of the gas."  *See Ctr. for Bio. Div.*, 67 F.4th at 1185–86.  In that instance, FERC must either give a "quantitative estimate of the downstream greenhouse emissions" or explain why it cannot.  *Sabal Trail*, 867 F.3d at 1374.  But FERC need not attempt to monetize those emissions through a Social Cost of Carbon model, which FERC views as unreliable for analyzing individual projects.  *See Ala. Mun. Distribs. Grp. v. FERC*, 100 F.4th 207, 214 (D.C. Cir. 2024); *Ctr. for Bio. Div.*, 67 F.4th at 1183–84.

FERC here went well beyond these requirements.  Most importantly, the Commission did quantify downstream GHG emissions, and it compared those emissions to national and state totals.  Specifically, it estimated that the upgrade project could contribute up to 2.22 million metric tons of carbon to the atmosphere each year, which could increase national carbon emissions by .041 percent and New York emissions by 1.3 percent.  J.A. 247–50 (EIS); *see also* Certificate Order, 179 FERC ¶ 61,041, PP 50–54.  FERC also explained how increased GHG emissions contribute to climate changes such as higher temperatures, rising sea levels, and increased

13

rainfalls. J.A. 244–46 (EIS). And while reiterating its view that the Social Cost of Carbon is not reliable for assessing individual projects, it applied the model—for those who think it useful—to derive monetary estimates of climate-related costs. Making its best guess as to these costs, it calculated present values of $505 million, $1.9 billion, and $2.9 billion over the life of the project, using discount rates of 5%, 3%, and 2.5% respectively. Certificate Order, 179 FERC ¶ 61,041, P 61. And making a worst-case estimate of costs, it calculated a present value of $5.8 billion over the life of the project. *Id.*

Food & Water Watch still thinks FERC did not say enough. It contends that the Commission needed to label the increased emissions and ensuing costs as either significant or insignificant. But NEPA contains no such mandate. It merely requires an EIS if a "major" federal action "significantly" affects the environment. 42 U.S.C. § 4332(C). A finding of no significant impact is thus essential if an agency chooses not to prepare an EIS, *see* 40 C.F.R. § 1508.9(a)(1), but is immaterial where the agency simply prepares the EIS. Nor do NEPA regulations require an agency to classify every environmental impact as significant or insignificant. They require only a "discussion[]" of the "significance" of environmental impacts. *Id.* § 1502.16(a), (b). And our precedent simply restates that requirement. *See Sabal Trail*, 867 F.3d at 1374. A "discussion" is a "consideration of a question in open" form. *Discussion*, *Webster's Third New International Dictionary: Unabridged* 648 (1993). Here, FERC amply discussed the "significance" of GHG emissions—by estimating the amount of increased emissions, comparing them to national and statewide totals, setting forth downstream harms in qualitative terms, and even giving monetary, present-value estimates of the harms. Food & Water Watch cites no legal consequence that would follow from attaching a label of "significant" or "insignificant" to these various emissions and costs. And neither policymakers nor citizens, after perusing FERC's qualitative and quantitative

14

discussion of the various emissions and costs, would have learned much more had FERC attached either label.

We recognize that, in the recent past, FERC had chosen to label a project's carbon emissions as either "significant" or "insignificant" based on a threshold of 100,000 metric tons of greenhouse gases per year. *See Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project Reviews*, 178 FERC ¶ 61,108, PP 79–81 (Feb. 18, 2022); *N. Nat. Gas Co.*, 174 FERC ¶ 61,189, PP 29–36 (Mar. 22, 2021). But FERC never asserted that it was legally compelled to attach the label. To the contrary, the Commission later withdrew the policy statement pending further study about what level or kind of threshold might warrant such a classification. *Order on Draft Policy Statements*, 178 FERC ¶ 61,197, P 2 (Mar. 24, 2022). Food & Water Watch hints that the withdrawal was arbitrary. But the withdrawal showed FERC's awareness that it *was* pulling back, and a desire for further study is a reasonable basis for doing so. FERC's change in course was therefore not arbitrary. *See FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). We recently confirmed as much in *Alabama Municipal Distributors Group*. There, we held that FERC's withdrawal of its *Greenhouse Gas Emissions* policy statement cast no doubt on its failure to attach a "significant" or "insignificant" label to the GHG emissions addressed in the EIS at issue. *See* 100 F.4th at 215. So too here.

III

In addition to challenging FERC's discussion of environmental impacts under NEPA, Food & Water Watch also challenges the certificate of public convenience and necessity. This claim too is subject to deferential review for

15

arbitrariness.  *See*, *e.g.*, *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 105–06 (D.C. Cir. 2014).

Food & Water Watch argues that FERC placed too much weight on the contract between Tennessee Gas and ConEd as evidence of market demand.  But we repeatedly have held that such contracts—especially between unaffiliated entities—are "good evidence" of such demand.  *Del. Riverkeeper Network*, 45 F.4th at 114; *see Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1311 (D.C. Cir. 2015) (precedent agreement showing full subscription was "adequate to support a finding of market need" (cleaned up)); *Minisink*, 762 F.3d at 111 n.10 (precedent agreements "always will be important evidence of demand for a project" (cleaned up)).  Food & Water Watch counters with one decision stating that precedent agreements are not "*always sufficient*" to show need, but that case involved an agreement between corporate affiliates.  *See Env't Def. Fund v. FERC*, 2 F.4th 953, 972–73 (D.C. Cir. 2021).  In any event, FERC here relied on much more than just the contract.  As it explained, there was a natural-gas shortage in Westchester County, which was forcing ConEd to refuse service to certain new customers and to bring in compressed gas by truck during peak winter demand.  Certificate Order, 179 FERC ¶ 61,041, P 49.  That evidence was more than enough to support a finding of need.

Food & Water Watch objects that a recently enacted New York statute cuts against the finding of need.  The New York State Climate Leadership and Community Protection Act requires carbon emissions from the state to be reduced to 60 percent of 1990 levels by 2030 and to 15 percent of 1990 levels by 2050.  N.Y. Env't Conserv. Law § 75-0107(1)(a), (b).  And it creates a council to plan how the state will achieve those reductions.  *Id.* § 75-0103.

FERC reasonably explained why the statute did not undercut its finding of need.  To begin with, the statute does

16

not prescribe any particular way of achieving the required reductions.  *See* N.Y. Env't Conserv. Law §§ 75-0101 to 75-0119.  Nor does it "ban ConEd from providing natural gas to meet end-use demand." Certificate Order, 179 FERC ¶ 61,041, P 17.  To the contrary New York State law still *requires* ConEd to provide natural-gas service to all who seek it.  J.A. 50; *see* N.Y. Pub. Serv. Law. § 31.  And the project remains "fully subscribed," Rehearing Order, 181 FERC ¶ 61,051, P 17, meaning that ConEd has agreed to buy all the gas that the project will make available, *Sierra Club v. FERC*, 97 F.4th 16, 28 (D.C. Cir. 2024).  Given all of this, FERC reasonably declined to reject the upgrade project based on the Climate Leadership Act.

Food & Water Watch raises a similar argument based on a recent New York City ordinance that it characterizes as prohibiting nearly all use of natural gas in newly constructed or renovated buildings.  *See* N.Y.C. Admin. Code § 24-177.1.  We may not consider this argument, which was not properly preserved before FERC.  The Natural Gas Act prohibits us from considering any "objection" that was not "urged before" FERC in a petition for rehearing.  15 U.S.C. § 717r(b).  And FERC regulations require parties seeking rehearing to "include a separate section entitled 'Statement of Issues,' listing each issue in a separately enumerated paragraph."   18 C.F.R. § 385.713(c)(2).  Moreover, they provide that failure to do so means that the issue "will be deemed waived."  *Id.*  In its petition for rehearing, Food & Water Watch briefly mentioned the New York City ordinance, but it did not separately identify the ordinance in its Statement of Issues.  And where statutes bar us from addressing issues not raised before an agency, a party must do so consistent with valid agency rules.  *See*, *e.g.*, *Fleming v. USDA*, 987 F.3d 1093, 1098–1101 (D.C. Cir. 2021); *Spectrum Health—Kent Cmty. Campus v. NLRB*, 647 F.3d 341, 349 (D.C. Cir. 2011).  Food & Water Watch does not challenge

17

the validity of FERC's preservation rule, so its failure to comply with it bars our review here.

IV

For these reasons, we deny the petitions for review.

*So ordered.*

# CERTIFICATE OF SERVICE

I hereby certify that, on June 17, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all registered users by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Robert M. Kennedy*
Robert M. Kennedy
Senior Attorney