**ORAL ARGUMENT HELD ON MAY 17, 2024**
**DECISION ISSUED ON AUGUST 6, 2024**

No. 23-1174 (consolidated with 23-1221)
────────────────────────────────

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**
────────────────────────────────

CITY OF PORT ISABEL, et al.,

*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*,

RIO BRAVO PIPELINE COMPANY, LLC
and RIO GRANDE LNG, LLC,

*Respondent-Intervenors*.

─────────────────────

On Petitions for Review of Orders of the Federal Energy Regulatory Commission,
183 FERC ¶ 61,046 (Apr. 21, 2023) and 185 FERC ¶ 61,080 (Oct. 27, 2023)

─────────────────────

**PETITION FOR PANEL REHEARING OR REHEARING EN BANC OF**
**RESPONDENT-INTERVENOR RIO BRAVO PIPELINE COMPANY, LLC**

(Names and addresses of counsel appear inside cover.)

October 21, 2024

Jeremy C. Marwell
Matthew X. Etchemendy
James T. Dawson
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
Email: jmarwell@velaw.com
Email: metchemendy@velaw.com
Email: jamesdawson@velaw.com

James D. Seegers
VINSON & ELKINS LLP
845 Texas Ave.
Suite 4700
Houston, TX 77002
Phone: 713.758.2939
Email: jseegers@velaw.com

*Counsel for Respondent-Intervenor Rio Bravo Pipeline Company, LLC*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Authorities .......................................................................................... ii

Glossary ............................................................................................................. v

Introduction and Rule 35(b) Statement.......................................................... 1

Background ........................................................................................................ 3

Argument ........................................................................................................... 4

    I.     Any Remand Should Be Without Vacatur. ........................................... 4

          A.    The Panel's Decision to Vacate Reflects a Sharp Departure from this Court's Longstanding Remedial Framework. ................. 4

          B.    Under the Correct Standard, Any Remand Should Be Without Vacatur. ...................................................................................... 6

    II.    The Panel's New NEPA Supplementation Test Breaks With Precedent And Will Cause Government-Wide Disruption. ..................... 12

    III.   The Panel Should Vacate its Connected-Action Holding, Which Is Moot, Wrong, and Opens Unnecessary Circuit Splits. ........................... 16

Conclusion ....................................................................................................... 18

Certificate of Compliance ............................................................................... 20

Addendum...................................................................*(after Certificate of Compliance)*

Certificate of Service ...................................................................... *(after Addendum)*

i

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993)............................................................4

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
   22 F.4th 1018 (D.C. Cir. 2022)...........................................................11

*Califano v. Yamasaki*,
   442 U.S. 682 (1979)...........................................................................11

*Carducci v. Regan*,
   714 F.2d 171 (D.C. Cir. 1983).............................................................11

*Clarke v. United States*,
   915 F.2d 699 (D.C. Cir. 1990) (en banc)............................................16

*Coal. on Sensible Transp., Inc. v. Dole*,
   826 F.2d 60 (D.C. Cir. 1987)....................................................... 17, 18

*Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*,
   836 F.2d 760 (2d Cir. 1988) ...............................................................17

*In re Core Comm'cns, Inc.*,
   531 F.3d 849 (D.C. Cir. 2008)............................................................11

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989)................................................................ 2, 13, 16

*Mountain States Legal Found. v. Glickman*,
   92 F.3d 1228 (D.C. Cir. 1996)............................................................17

*North Carolina v. EPA*,
   550 F.3d 1176 (D.C. Cir. 2008) (per curiam)....................................6, 9

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
   896 F.3d 520 (D.C. Cir. 2018).............................................................9

*Sierra Club v. FERC*,
   No. 20-1512, 2023 WL 5537562 (D.C. Cir. Aug. 25, 2023) ..............16

**Cases—Continued:** **Page(s)**

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021)................................................................5

*Town of Weymouth v. Mass. Dep't of Envtl. Prot.*,
973 F.3d 143 (1st Cir. 2020) (per curiam)............................................9

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
6 F.4th 1321 (D.C. Cir. 2021)................................................................3

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978)................................................................................5

*W. Watersheds Project v. Haaland*,
69 F.4th 689 (10th Cir. 2023) ...............................................................6

**Statutes:**

5 U.S.C. § 706(2) ......................................................................................11

**Regulations:**

33 C.F.R. § 230.13(d)................................................................................12

40 C.F.R. § 1501.9(e)(1)(i) .......................................................................17

40 C.F.R. § 1501.9(e)(1)(ii) ................................................................ 16, 17

40 C.F.R. § 1507.1 ....................................................................................12

**Administrative Materials:**

516 U.S. Dep't of the Interior, Departmental Manual 11.6....................13

*Certification of New Interstate Natural Gas Facilities*,
179 FERC ¶ 61,012 (2022).....................................................................10

Exec. Order 12,898, 59 Fed. Reg. 7629 (Feb. 11, 1994)........................15

FAA Order 1050.1F § 9-2(a) ....................................................................13

Forest Service Handbook § 1909.15-18.1 (2023).....................................13

**Administrative Materials—Continued:**      **Page(s)**

Notice of Effectiveness of Withdrawal, *Rio Grande LNG, LLC*,
    FERC Dkt. CP22-17 (Sept. 10, 2024) (Accession No. 20240910-3042)...........16

*Notice of Intent to Prepare Supplemental Environmental Impact Statement*,
    89 Fed. Reg. 77,129 (Sept. 20, 2024) .................................................................9

**Other Authorities:**

*South Texas Cities: We Support the Rio Grande Liquefied Natural Gas Project*,
    Rio Grande Guardian (Sept. 30, 2024), https://perma.cc/RXN2-LC66 ..............1

White House, Fact Sheet: Biden-Harris Administration Takes Action
    to Deliver More Projects More Quickly, Accelerates Federal
    Permitting (Aug. 29, 2024), https://perma.cc/9ZS6-LK98.................................10

# **GLOSSARY**

As used herein,

**A-__** and **Addendum** refer to the addendum appended to this filing;

**Arg.** refers to the recording of the May 17, 2024 oral argument in this matter, which is available at https://perma.cc/2NEK-N3VS;

**FERC** or **Commission** refer to the Federal Energy Regulatory Commission;

**Intervenors' Brief** refers to the brief of Respondent-Intervenors in this appeal (Doc. 2045502), filed in final form on March 18, 2024;

**JA** means the Joint Appendix filed in this case on March 9, 2024 (Doc. 2044251);

**NEPA** refers to the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*;

**Opening Br.** refers to the opening brief of Petitioners in this appeal (Doc. 2045226), filed in final form on March 15, 2024;

**P** refers to the internal paragraph number within a FERC order;

**Remand Order** refers to *Rio Grande, LNG, LLC & Rio Bravo Pipeline Company, LLC*, 183 FERC ¶ 61,046 (Apr. 21, 2023), which appears in the record as R.3011 (JA1-176);

**Rehearing Order** and **Reh'g Order** refer to *Rio Grande, LNG, LLC & Rio Bravo Pipeline Company, LLC*, 185 FERC ¶ 61,080 (Oct. 27, 2023), which appears in the record as R.3080 (JA177-238);

**Rio Bravo** refers to Respondent-Intervenor Rio Bravo Pipeline Company, LLC;

**Rio Grande** refers to Respondent-Intervenor Rio Grande LNG, LLC; and

**Texas LNG** refers to Respondent-Intervenor Texas LNG Brownsville, LLC.

## INTRODUCTION AND RULE 35(b) STATEMENT

The panel in this case vacated the Federal Energy Regulatory Commission's reauthorization of the Rio Bravo Pipeline and Rio Grande LNG Terminal, in orders the agency issued after more than eight years of exhaustive environmental and Natural Gas Act review.  The Court's decision sent shockwaves through the energy industry and the South Texas communities that depend on these projects.  The leaders of seven nearby cities recently penned a bipartisan warning that the decision poses "a critical threat . . . to the economic vitality of the region" that their communities simply "cannot afford."[1]

Those concerns are just the beginning.  Vacating the pipeline reauthorization will be extraordinarily disruptive for Rio Bravo Pipeline, LLC, which has already spent $265 million and eight years developing the pipeline, and has committed $200 million more, on top of the $1 billion in additional financing needed to bring the project to fruition.  Vacating any Rio Bravo authorizations will impede the company's ability to obtain financing, sign contracts, procure materials, and construct the pipeline in time to supply the terminal—which cannot produce and export LNG without a reliable source of natural gas.

---

[1] *South Texas Cities: We Support the Rio Grande Liquefied Natural Gas Project*, Rio Grande Guardian (Sept. 30, 2024), https://perma.cc/RXN2-LC66.

The Court should grant rehearing and, at a minimum, amend its remedy to remand **without** vacatur. The decision to vacate was the product of a deeply flawed remedial test—one that creates intra- and inter-circuit splits, guts the *Allied-Signal* framework, and creates a hair-trigger for vacatur in NEPA process cases, upending critical projects, regulations, and other agency actions even absent significant environmental or human health impacts. The correct inquiry focuses on the disruptive consequences of vacatur and also the probability that the agency can reach the same substantive result on remand—here, reauthorizing infrastructure that the Commission has repeatedly found to be in the public interest. In this case, both factors (properly understood) clearly counsel **against** vacatur.

These remedial problems build on, and follow from, the panel's antecedent and erroneous merits determination that FERC was required to prepare a supplemental environmental impact statement. As Rio Grande and Texas LNG explain in their petitions for rehearing, that holding contravenes *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989), and splits from other circuits. Rio Bravo incorporates those arguments here. Rio Bravo writes separately to emphasize that this holding will have government-wide disruptive consequences, and is premised on a misunderstanding of FERC's orders and the nature of environmental justice analysis.

2

Finally, this Court should vacate as moot the "connected action" portion of the panel's opinion. That holding departs from text and precedent and will have significant repercussions in future cases involving networked linear infrastructure systems, from pipelines to highways to electric transmission lines. Retaining this discussion would create unnecessary intra- and inter-circuit splits on an issue that is now moot.

## BACKGROUND

This case concerns a natural gas pipeline developed by Rio Bravo and a liquefied natural gas terminal developed by Rio Grande that collectively represent some $20 billion in infrastructure investment. Following years of exhaustive review, the Commission authorized those facilities in 2019. This Court previously upheld those orders on most grounds, but remanded to the agency without vacatur on two specific issues. *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1332 (D.C. Cir. 2021).

On remand, the Commission issued orders that together span more than 200 pages. Remand Order, JA1-165; Reh'g Order, JA177-219. It responded to the *Vecinos* remand and separately authorized pipeline amendments to reduce that project's footprint, eliminate some approved facilities, and optimize its design. Petitioners sought review of the Commission's orders in this Court.

In an August 6, 2024 published opinion, this Court held that the Commission erred in not issuing its updated environmental justice analysis and considering a carbon capture and sequestration system for Rio Grande in the form of a supplemental environmental impact statement. A-4. The panel also held that FERC "failed to explain why it declined to consider [certain] air quality data." A-4. The panel vacated the challenged orders. A-34.

## ARGUMENT

**I.    Any Remand Should Be <u>Without</u> Vacatur.**

### A.    The Panel's Decision to Vacate Reflects a Sharp Departure from this Court's Longstanding Remedial Framework.

While merits issues also urgently warrant rehearing, *see infra* § II, the panel's rewriting and application of the remedial test inflicts immediate, unnecessary disruption and cannot stand. Under *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, for decades this Court has decided whether to vacate based on (1) the "seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)"; and (2) the "disruptive consequences" of vacatur. 988 F.2d 146, 150-51 (D.C. Cir. 1993). The panel's remedial analysis here replaces the first factor with a near-automatic-vacatur rule for NEPA procedural-error cases, and essentially eliminates the second factor. That approach departs from precedent and leaves this Circuit's remedial caselaw in disarray, as the sharply conflicting remedies

applied in recent FERC cases illustrate.  *See* Rio Grande Reh'g Pet. § II (No. 23-1174); Texas LNG Reh'g Pet. § II (No. 23-1175).

    **1.**  The panel applied and extended *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032 (D.C. Cir. 2021), to almost always require vacatur in cases involving NEPA procedural errors.  The panel asked not whether an agency could prospectively reach the same substantive result on remand (here, reauthorizing the projects), but rather whether an agency could "justify its decision to skip th[e] procedural step" of not preparing a supplemental environmental impact statement.  A-33.  That retrospective inquiry renders ineffectual the first *Allied-Signal* factor because the answer will almost always be "no" where—as here—a court has already found procedural error.  And the panel extended *Standing Rock* from a situation where an agency had declined to prepare an environmental impact statement at all, 985 F.3d at 1051-52, to the much larger universe of cases involving potential NEPA supplementation.  *Cf. id.* at 1054 (facts of *Standing Rock* "quite unusual").  This application and extension of *Standing Rock* improperly prioritizes a substantive remedy (vacatur of a permit) in response to a violation of NEPA's "essentially procedural" obligations.  *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).

    **2.**  Worse still, the panel appeared to write the disruption factor out of the analysis.  Notwithstanding "the significant disruption" vacatur would unleash, the

panel found that concern "weighty **only** insofar as the agency may be able to rehabilitate its rationale."  A-34 (emphasis added; cleaned up).  That approach is contrary to Circuit precedent, under which disruptive consequences, standing alone, can support remand without vacatur.  *See, e.g.*, *North Carolina v. EPA*, 550 F.3d 1176, 1177-78 (D.C. Cir. 2008) (per curiam) (remanding without vacatur given disruptive effects, even where panel identified "more than several fatal flaws in the [agency action]"); *see also W. Watersheds Project v. Haaland*, 69 F.4th 689, 722 (10th Cir. 2023) (similar).

> **B.    Under the Correct Standard, Any Remand Should Be Without Vacatur.**

**1. <u>Disruptive effect of vacatur.</u>**  Vacating the FERC orders challenged here would cause significant disruption to Rio Bravo, its customer Rio Grande, and the countless stakeholders domestically and internationally who will benefit from this critically important LNG export project.

After more than eight years of environmental and public interest review at FERC and various other agencies, Rio Bravo Pipeline has committed approximately $465 million in justifiable reliance on FERC's orders.  Langbauer Decl. ¶ 26.  In addition to $265 million already spent on project design, development, permitting, and right-of-way acquisition, Rio Bravo has executed another $200 million in binding agreements for, e.g., purchasing raw steel, key valves, and other equipment. *See id.* ¶¶ 17-18, 26.

Vacatur would have serious adverse consequences for pipeline financing, logistics, and timing. When the Court's opinion issued, the project was about to start raising the approximately $1 billion in debt financing necessary for construction and operation. Langbauer Decl. ¶ 29. Vacatur would almost certainly slam the door shut on reasonable financing and risk terms for Rio Bravo. *Id.* Moreover, pipeline development and construction must proceed in a linear fashion, with certain tasks completed before others can begin. If the Court's vacatur takes effect, it would have cascading effects on project timing. *See id.* ¶¶ 19-21, 25. For instance, vacatur would disrupt Rio Bravo's efforts to negotiate construction and labor contracts and procure materials, and would jeopardize contractual obligations. *See id.* ¶¶ 18, 21, 25, 28. Delays in undertaking key pre-construction activities would necessarily delay later phases, including installing the pipeline and placing it into service. *See id.* ¶¶ 19, 21.

Such delays would harm Rio Grande, as the terminal's ability to produce and export LNG depends on having a reliable means to transport natural gas supplies. Time is of the essence; construction of the first Rio Bravo pipeline and associated facilities is scheduled to commence in May 2025, to meet a planned in-service date of August 2026 for initial pipeline facilities. Langbauer Decl. ¶¶ 3, 20, 25.

If the Court were to clarify (as Rio Grande requests) that its vacatur applies only to the Remand and Rehearing Orders Petitioners challenged in this appeal and

not the original authorizations, that would mitigate the harm, but only in part—Rio Bravo would still experience significant disruption.  The Remand Order included FERC's approval of multiple beneficial amendments to the pipeline design, shrinking the pipeline's footprint, eliminating two previously approved compressor stations, and avoiding environmental and landowner impacts, as compared to the original design.  Langbauer Decl. ¶¶ 7-8.[2]  (Those amendments did not change the terminal design.)  If those amendments were vacated, Rio Bravo would encounter significant disruption associated with needing to align its current optimized pipeline design, as reviewed and approved by the Army Corps and Fish & Wildlife Service, among others, with the facilities as authorized in the remaining FERC authorizations.  *See id.* ¶¶ 23-24.

Of course, if the Court's opinion were understood to have vacated the Remand and Rehearing Orders **and** the original 2019 authorizations, the disruption would be multiplied several-fold.  To take just one example, without an effective FERC certificate, Rio Bravo would be unable to undertake many activities essential for the construction of the pipeline, such as accessing the right-of-way for surveys.  *See* Langbauer Decl. ¶ 24.

---

[2] FERC approved a second round of pipeline design improvements in 2024; that order was never challenged and is now final.  Langbauer Decl. ¶ 10.

The need for rehearing is underscored by the panel's expectation that the Commission would move "expeditiously" on remand—an assumption that has already been proven wrong. A-34. The Commission recently issued a schedule that does not contemplate a new substantive order until November 2025. *See* 89 Fed. Reg. 77,129, 77,131 (Sept. 20, 2024). Intervenors would face a steep uphill climb in sustaining these complex, multi-billion-dollar infrastructure investments across such a lengthy gap in a key federal authorization. *Cf. North Carolina*, 550 F.3d at 1178 (Rogers, J., concurring) (vacatur inappropriate, where rehearing petitions identified "serious implications that [panel's] previous remedy analysis . . . did not adequately take into account," including "impacts" on industry); *Town of Weymouth v. Mass. Dep't of Envtl. Prot.*, 973 F.3d 143 (1st Cir. 2020) (per curiam) (same, given evidence presented on rehearing that agency would not move as quickly on remand as the panel expected, and disruption from interruption in federal authorization for pipeline facilities).

**2. <u>Agency's ability to reach same result on remand</u>**. There is every reason to expect that FERC will "be []able to correct th[e] deficiencies" identified by the panel and reauthorize the project on remand. *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 538 (D.C. Cir. 2018). FERC has repeatedly found the pipeline to be required in the public convenience and necessity, and nothing in

this Court's latest opinion casts doubt on that conclusion.  *See* JA2, JA177-178, JA467, JA580.

**3.**  Rehearing is also warranted because the panel's vacatur ruling sets a precedent that will have widespread chilling effects for a broad range of energy infrastructure projects—including electric transmission lines, offshore wind, solar developments, and others. A system in which minor procedural foot-faults result in vacatur of key project authorizations, after developers have invested tens or hundreds of millions of dollars in navigating years of permitting and environmental reviews, will chill and even prevent investment. *See Certification of New Interstate Natural Gas Facilities*, 179 FERC ¶ 61,012, P 5 (2022) (Danly, Comm'r, concurring) ("[A]bout ten percent of overall project costs are incurred in [the] development phase [at FERC]. . . . One simply does not risk such capital under an uncertain regulatory regime." (cleaned up)); *accord* White House, Fact Sheet: Biden-Harris Administration Takes Action to Deliver More Projects More Quickly, Accelerates Federal Permitting (Aug. 29, 2024), https://perma.cc/9ZS6-LK98 (emphasizing commitment to "improv[ing] federal permitting processes to help advance" projects).

**4.**  If this Court is concerned about the timing of Commission action on remand, Circuit precedent would support changing the remedy to remand without vacatur, while setting a reasonable deadline for Commission action.  That approach

would avoid the disruption from vacatur, while providing the Court, project developers, and Petitioners an assurance of prompt action. Petitioners could return to this Court if FERC does not act in a timely fashion. *See In re Core Comm'cns, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring); *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 22 F.4th 1018, 1031 (D.C. Cir. 2022).

**5.** If the panel decides to retain the vacatur remedy, it should clarify that the scope of that vacatur does not reach the original authorizations, *see* Rio Grande Reh'g Pet. § II.D, or the Remand Order's pipeline-amendment approval. On the latter, the Commission approved the pipeline amendments, including environmentally beneficial steps such as eliminating two of three previously-approved compressor stations, after publishing and inviting public comment on an environmental assessment. JA622. On rehearing at FERC, Petitioners raised only certain targeted challenges to the pipeline amendments, none of which are germane here. JA841, JA847-854. Petitioners' appellate brief focused on the process and substance of FERC's response to the *Vecinos* remand, mentioning the pipeline amendments only once in passing, Opening Br. 41—not properly presenting a challenge to that aspect of FERC's orders. *Cf. Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983). This Court thus had no reason to find the pipeline amendments unlawful, the predicate for "set[ting] aside" the same. *See* 5 U.S.C. § 706(2); *cf. Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (scope of equitable remedy

"dictated by the extent of the violation established"). Clarifying the scope of vacatur would appropriately balance the equities where Petitioners presented no specific challenge to the amendment order, and vacatur of those amendments would cause significant disruption. Langbauer Decl. ¶¶ 23-25.

## II.    The Panel's New NEPA Supplementation Test Breaks With Precedent And Will Cause Government-Wide Disruption.

The panel's new NEPA supplementation trigger breaks from Supreme Court and circuit precedent. *See* Rio Grande Reh'g Pet. § I.A-B; Texas LNG Reh'g Pet. § I. Rio Bravo joins those arguments and adds additional points.

**1.** Although the seriousness of the panel's error and its implications for FERC's project reviews are alone sufficient reason for rehearing, the question's exceptional importance is underscored by its government-wide consequences. NEPA and its implementing regulations allow agencies discretion to tailor their processes to their specific circumstances and statutory authorities. *See* 40 C.F.R. § 1507.1. But one common thread is an agency's ability to analyze "new" environmental information when deciding whether formal supplementation is warranted, without inviting public comment on those deliberations.

For example, the Army Corps of Engineers and Forest Service analyze new information through so-called "supplemental information reports," which, like FERC's expanded analysis here, are generally prepared without public comment. *See* 33 C.F.R. § 230.13(d) (district commanders **may** publish supplemental

information documents); Forest Service Handbook § 1909.15-18.1 (2023) (officials review whether new information requires supplementation and "[d]ocument the results").  Indeed, in *Marsh* itself, the Supreme Court upheld a Corps decision not to prepare a formal supplemental environmental impact statement, where the agency had issued a supplemental information report without public comment.  490 U.S. at 379-85.  Other agencies use similar procedures, such as the Bureau of Land Management's "determinations of NEPA adequacy," *see* 516 U.S. Dep't of the Interior, Departmental Manual 11.6, or the Federal Aviation Administration's "written re-evaluations," *see* FAA Order 1050.1F § 9-2(a).

Agencies use these documents to decide whether the trigger for NEPA supplementation is met.  *See Marsh*, 490 U.S. at 374.  But, like FERC here, agencies do not necessarily or even regularly invite public comment on those documents.  By holding that formal supplementation and public comment are required whenever new information "*might* result" in significant environmental effects (A-15), the panel's decision effectively forecloses these long-established procedures, in favor of a rule requiring serial reopening of NEPA reviews and public comment periods, even where agencies conclude information will not yield any new significant environmental or human health impacts.

**2.**  Much of the opinion's reasoning appears to have been motivated by the panel's understanding that FERC's "new environmental justice analysis"

supposedly caused the agency to "arrive[] at different conclusions" on remand.  A-14.  That conclusion misperceives the Commission's analysis.

In its original environmental review, FERC acknowledged that project facilities would be located almost exclusively in areas that qualify as environmental justice communities.  Its environmental justice discussion incorporated extensive analysis of impacts spanning the entire suite of natural and human environments, including air quality, visual impacts, noise, fishing, tourism, socioeconomics, traffic, wetlands, and safety.  JA267-68.  On that basis, FERC concluded that the projects' impacts "would not have disproportionate adverse effects on minority and low-income residents" because they "would apply to everyone and would not be focused on or targeted to any particular demographic group."  JA267.

On remand, the Commission expanded the geographic scope of its environmental justice analysis of the same potential environmental and human health effects.  FERC concluded that none of those effects would be significant, except for potentially significant cumulative visual impacts that the Commission had already discussed in the original environmental impact statement.  Remand Order P 207, JA93.  The Remand Order used different language to describe essentially the same picture of environmental and human health impacts: because the projects are located in environmental justice areas, "the impacts on environmental justice populations from the projects would be disproportionately high and adverse because

14

they would be predominately borne by the environmental justice communities identified." *Id.*

These two passages do not reveal a "fundamental[]" change in position. A-14. The new air-modeling data showed lower emissions and **<u>fewer</u>** potential impacts, and FERC did not conclude that environmental justice communities would bear any greater environmental or human health impacts than originally understood. Intervenor Br. 10; *see also* Arg. 1:00:30-1:01:20. FERC did alter its **<u>description</u>** of the effects, shifting from an observation that "everyone" in an area dominated by environmental justice communities would feel them equally, to an acknowledgement that project-related impacts could be understood as "disproportionate" in the sense that most residents in the project area are members of environmental justice communities. That is not a fundamentally "different conclusion," just a different way of describing the same on-the-ground reality. *See* Intervenor Br. 10; Arg. 54:55.

**3.** Finally, the panel erred in concluding that "environmental justice analyses and impacts can be sufficiently meaningful to require a supplement" even absent any "significant impacts to the physical environment" or human health. A-16-17. "[E]nvironmental justice impacts" are **<u>defined in terms of</u>** "human health or environmental effects." *See* Exec. Order 12,898 § 1-101, 59 Fed. Reg. 7629, 7629 (Feb. 11, 1994). Thus, an environmental justice analysis appropriately focuses on whether minority or low-income populations will experience disproportionately

high or adverse environmental or human health effects. *Id.* A wide range of environmental and human health considerations can appropriately fall within NEPA. But environmental justice analysis—and the trigger for potential NEPA supplementation—cannot be decoupled from underlying effects on the environment or human health. This understanding aligns with *Marsh*'s instruction that supplementation is required only where new information indicates that an action will affect "the quality **of the human environment** in a significant manner" not already considered. *Marsh*, 490 U.S. at 374 (emphasis added). To the extent the panel understood "environmental justice impacts" differently, it departed from longstanding precedent and injected confusion into Circuit law.

## III.    The Panel Should Vacate its Connected-Action Holding, Which Is Moot, Wrong, and Opens Unnecessary Circuit Splits.

1. The panel held that the Commission erred by failing to consider Rio Grande's carbon-capture proposal as a "connected action" under 40 C.F.R. § 1501.9(e)(1)(ii). *See* A-20-23. Rio Grande has now withdrawn that proposal, Notice of Effectiveness of Withdrawal, *Rio Grande LNG, LLC*, FERC Dkt. CP22-17 (Sept. 10, 2024) (Accession No. 20240910-3042), "mooting" the issue, A-23. When an issue becomes moot after this Court's opinion but before issuance of the mandate, the proper approach is to vacate the relevant portion of the opinion. *See, e.g.*, *Sierra Club v. FERC*, No. 20-1512, 2023 WL 5537562 (D.C. Cir. Aug. 25, 2023); *cf. Clarke v. United States*, 915 F.2d 699, 706 (D.C. Cir. 1990) (en banc).

16

**2.** Vacating the "connected action" portion of the opinion is appropriate because the panel's discussion created inter- and intra-circuit splits. The panel's new bidirectional independence test, under which two projects will be found to have "substantial independent utility" only when both are independently useful, splits with the Second Circuit and prior Circuit precedent. *Compare* A-22, *with Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 836 F.2d 760, 763 (2d Cir. 1988), *and Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987) ("proper question is whether one project will serve a significant purpose even if a second related project is not built"); *see also* Intervenor Br. 36-38. The rule also lacks grounding in regulatory text, which treats two actions as "connected" only when "they" (plural) cannot or will not proceed without other actions. 40 C.F.R. § 1501.9(e)(1)(i)-(ii) (2020). This Court should reserve the bidirectional independence question for a future case where the issue is live, rather than creating a circuit split on a statute with nationwide application, on an issue that is unnecessary to decide this case. *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1237 (D.C. Cir. 1996).

**3.** Because the connected-action issue arose in the context of the terminal and potential carbon-capture system, the panel did not have occasion to grapple with the significant practical problems that a "bidirectional independence" standard will cause when applied to linear infrastructure networks such as pipelines, electric

17

transmission lines, or highways.  For those systems, improvement or expansion of one part of a network necessarily builds on, and creates synergies with, existing infrastructure and future improvements.  *See Coalition*, 826 F.2d at 69 ("it is inherent in the very concept of a highway network that each segment will facilitate movement in many others; if such mutual benefits compelled aggregation, no project could be said to enjoy independent utility").  The panel's test risks vastly expanding the kinds of projects that may now be deemed "connected actions," with negative effects on agency reviews and project scheduling.  If two or more projects must be addressed in a single NEPA document, earlier projects cannot move forward until review of all later projects concludes.  And in-process NEPA reviews may be disrupted or sent back to the drawing board, by the need to wrap in new proposals as they are developed and proposed.

## <u>CONCLUSION</u>

The Court should grant panel rehearing or rehearing en banc.  Alternatively, the panel should revise its opinion as described above.

Date: October 21, 2024                    Respectfully submitted,

                                          */s/ Jeremy C. Marwell*

                                          Jeremy C. Marwell
                                          Matthew X. Etchemendy
                                          James T. Dawson
                                          VINSON & ELKINS LLP
                                          2200 Pennsylvania Avenue, NW
                                          Suite 500 West
                                          Washington, DC 20037
                                          Phone: 202.639.6507
                                          Email: jmarwell@velaw.com
                                          Email: metchemendy@velaw.com
                                          Email: jamesdawson@velaw.com

                                          James D. Seegers
                                          VINSON & ELKINS LLP
                                          834 Texas Ave.
                                          Suite 4700
                                          Houston, TX 77002
                                          Phone: 713.758.2939
                                          Email: jseegers@velaw.com

*Counsel for Respondent-Intervenor Rio Bravo Pipeline Company, LLC*

## **CERTIFICATE OF COMPLIANCE**

1.      This petition complies with the type-volume limitation of Federal Rules of Appellate Procedure 35(b)(2) and 40(b) and D.C. Circuit Rule 35(b) because it contains 3,898 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

2.      This petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.


Date:  October 21, 2024          */s/ Jeremy C. Marwell*
                                 Jeremy C. Marwell
                                 VINSON & ELKINS LLP
                                 2200 Pennsylvania Avenue, NW
                                 Suite 500 West
                                 Washington, DC 20037
                                 Phone: 202.639.6507
                                 Email: jmarwell@velaw.com

                                 *Counsel for Respondent-Intervenor*
                                 *Rio Bravo Pipeline Company, LLC*

**ORAL ARGUMENT HELD ON MAY 17, 2024**
**DECISION ISSUED ON AUGUST 6, 2024**

No. 23-1174 (consolidated with 23-1221)

───────────────────────────────────

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

───────────────────────────────────

CITY OF PORT ISABEL, et al.,

*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*,

RIO BRAVO PIPELINE COMPANY, LLC
and RIO GRANDE LNG, LLC,

*Respondent-Intervenors*.

──────────────────────

On Petitions for Review of Orders of the Federal Energy Regulatory Commission,
183 FERC ¶ 61,046 (Apr. 21, 2023) and 185 FERC ¶ 61,080 (Oct. 27, 2023)

──────────────────────

**ADDENDUM TO PETITION FOR PANEL REHEARING**
**OR REHEARING EN BANC OF RESPONDENT-INTERVENOR**
**RIO BRAVO PIPELINE COMPANY, LLC**

## TABLE OF CONTENTS FOR ADDENDUM

| Exhibit | Page | Description |
|---------|------|-------------|
| A | A-1 | Panel's Opinion (August 6, 2024) |
| B | A-35 | Certificate as to Parties, Rulings, and Related Cases |
| C | A-39 | Corporate Disclosure Statement |
| D | A-43 | Declaration of Quinn Langbauer |

# Exhibit A

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 17, 2024        Decided August 6, 2024

No. 23-1174

CITY OF PORT ISABEL, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

RIO BRAVO PIPELINE COMPANY, LLC AND RIO GRANDE LNG,
LLC,
INTERVENORS

———

Consolidated with 23-1221

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Nathan Matthews* argued the cause for petitioners. With him on the joint briefs were *Lisa M. Diaz*, *Tom Gosselin*, and *Gilberto Hinojosa*. *Eric E. Huber* entered an appearance.

**A-01**

*Robert M. Kennedy*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor. *Jason Perkins*, Attorney, entered an appearance.

*Varu Chilakamarri* argued the cause for intervenors Rio Bravo Pipeline Company, LLC and Rio Grande LNG, LLC in support of respondent. With her on the joint briefs were *Jeremy C. Marwell*, *Matthew X. Etchemendy*, *David L. Wochner*, and *John Longstreth*. *James Dawson*, *Timothy J. Furdyna*, *James D. Seegers*, and *Paul M. Teague* entered appearances.

**A-02**

No. 23-1175

CITY OF PORT ISABEL AND SIERRA CLUB,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

TEXAS LNG BROWNSVILLE, LLC,
INTERVENOR

Consolidated with 23-1222

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

*Nathan Matthews* argued the cause for petitioners. With him on the joint briefs were *Lisa M. Diaz*, *Tom Gosselin*, and *Gilberto Hinojosa*.

*Robert M. Kennedy*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General

**A-03**

4

Counsel, *Robert H. Solomon*, Solicitor, and *Jason Perkins*, Attorney.

*Michael R. Pincus* argued the cause for intervenor Texas LNG Brownsville, LLC in support of respondent.  With him on the brief were *Paul Korman* and *Mosby Perrow.*

Before: SRINIVASAN, *Chief Judge*, CHILDS and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARCIA.

GARCIA, *Circuit Judge*:  In 2021, petitioners challenged the Federal Energy Regulatory Commission's authorization of two liquefied natural gas export terminals in Cameron County, Texas, and a pipeline that would carry natural gas to one of those terminals.  In related decisions, we granted the petitions for review in part and remanded without vacatur.  *Vecinos para el Bienestar de la Comunidad Costera v. FERC* ("*Vecinos I*"), 6 F.4th 1321, 1325 (D.C. Cir. 2021); *Vecinos para el Bienestar de la Comunidad Costera v. FERC* ("*Vecinos II*"), No. 20-1045, 2021 WL 3716769 (D.C. Cir. Aug. 3, 2021) (unpublished opinion).  On remand, the Commission issued orders reauthorizing the projects.

Petitioners now challenge the reauthorization orders.  They argue that the Commission failed to comply with certain National Environmental Policy Act and Natural Gas Act requirements.  Once again, we agree in part.  The Commission erroneously declined to issue supplemental environmental impact statements addressing its updated environmental justice analysis for each project and its consideration of a carbon capture and sequestration system for one of the terminals.  It also failed to explain why it declined to consider air quality data from a nearby air monitor.  We deny the petitions in all

5

other respects.  Given the nature and severity of the flaws in the Commission's second effort to properly assess the projects, we vacate the reauthorization orders and remand to the Commission for further consideration.

## I

## A

Under Section 3 of the Natural Gas Act ("NGA"), the Commission exercises authority delegated from the Department of Energy "to approve or deny an application for the siting, construction, expansion, or operation of" facilities used to export liquefied natural gas ("LNG").  15 U.S.C. § 717b(e)(1); *see EarthReports, Inc. v. FERC*, 828 F.3d 949, 952–53 (D.C. Cir. 2016).  The Commission "shall" approve such an application unless it finds that the project "will not be consistent with the public interest."  15 U.S.C. § 717b(a); *see EarthReports*, 828 F.3d at 953.

Under Section 7 of the NGA, the Commission reviews applications for the construction and operation of pipelines that transport natural gas in interstate commerce.  15 U.S.C. § 717f(c); *Allegheny Def. Project v. FERC*, 964 F.3d 1, 4 (D.C. Cir. 2020).  The Commission "shall" authorize such a pipeline if it "is or will be required by the present or future public convenience and necessity."  15 U.S.C. § 717f(e); *see Allegheny Def. Project*, 964 F.3d at 4.

"Before authorizing the construction and operation of a proposed LNG facility or pipeline, the Commission must conduct an environmental review under" the National Environmental Policy Act ("NEPA").  *Vecinos I*, 6 F.4th at 1325.  If, as here, the Commission determines that approval of the facility constitutes a "major Federal action[] significantly affecting the quality of the human environment," the

6

Commission must prepare an Environmental Impact Statement ("EIS").  42 U.S.C. § 4332(2)(C); *see id.* § 4336(b)(1).  Among other things, the EIS must address the "reasonably foreseeable environmental effects" of the proposed action as well as "a reasonable range of alternatives . . . that are technically and economically feasible, and meet the purpose and need of the proposal."  *Id.* § 4332(2)(C)(i), (iii).  The EIS "forces the [Commission] to take a 'hard look' at the environmental consequences of its actions" and "ensures that [those] consequences, and the [Commission's] consideration of them, are disclosed to the public."  *Sierra Club v. FERC* ("*Sabal Trail*"), 867 F.3d 1357, 1367 (D.C. Cir. 2017).

**B**

This case concerns two proposed natural gas projects.  On March 30, 2016, Texas LNG Brownsville LLC ("Texas LNG") filed a Section 3 application for authorization to construct and operate an LNG export terminal on the northern shore of the Brownsville Shipping Channel in Cameron County, Texas.  On May 5, 2016, Rio Grande LNG, LLC ("Rio Grande") filed a Section 3 application for authorization to construct and operate its own LNG export terminal at a different site on the same shore.  Rio Bravo Pipeline Company, LLC ("Rio Bravo") simultaneously filed a related Section 7 application for authorization to construct and operate a new interstate pipeline system to deliver natural gas from existing grid interconnects in Nueces County, Texas, to the Rio Grande terminal.  The Rio Grande terminal and Rio Bravo pipeline together form the Rio Grande project.[1]

---

[1] Rio Grande and Rio Bravo are both wholly owned subsidiaries of NextDecade LNG, LLC, a U.S. energy project development and management company.

7

After publishing a final EIS for each project, on November 22, 2019, the Commission issued orders authorizing the projects. *See* Order Granting Authorizations Under Sections 3 and 7 of the Natural Gas Act, *Rio Grande LNG, LLC & Rio Bravo Pipeline Co.*, 169 FERC ¶ 61,131 (Nov. 22, 2019); Order Granting Authorization Under Section 3 of the Natural Gas Act, *Texas LNG Brownsville LLC*, 169 FERC ¶ 61,130 (Nov. 22, 2019) (collectively, the "2019 Approval Orders" or "authorization orders").

Petitioners—environmental groups, residents, and the nearby city of Port Isabel—intervened in the Commission's proceedings and sought rehearing of the authorization orders. They argued that the Commission's analyses of the projects' ozone emissions and impacts on climate change and environmental justice communities were deficient under NEPA and the Administrative Procedure Act ("APA"). They also claimed that the Commission failed to justify its determinations of public interest and convenience under the NGA. Regarding the Rio Grande project, petitioners further argued that the Commission violated NEPA by failing to adequately analyze alternative project designs.

After the Commission denied their rehearing requests, petitioners sought review in our court. On August 3, 2021, we addressed petitioners' challenges to the authorization orders in two companion decisions. *Vecinos I*, 6 F.4th 1321; *Vecinos II*, 2021 WL 3716769.

In *Vecinos I*, we held that the Commission failed to adequately justify its decision to examine environmental justice impacts within only a two-mile radius of the projects, when some environmental impacts of the projects would extend beyond that area. *See* 6 F.4th at 1330–31. Thus, we instructed the Commission to either better explain its reasoning

8

or analyze the projects' impacts within a different radius. *Id.* at 1331. We also directed the Commission to respond to petitioners' argument that 40 C.F.R. § 1502.21(c) (2020)[2] required it to use the social cost of carbon protocol or some other generally accepted methodology to assess whether the climate impact of the projects' greenhouse gas ("GHG") emissions would be significant or not. *See id.* at 1328–30. Given the deficiencies in the Commission's environmental analyses, we further directed the Commission to reconsider its NGA public interest determinations for the projects. *Id.* at 1331 (citing 15 U.S.C. §§ 717b(a), 717f(e)). Ultimately, we remanded without vacatur because we found it likely that the Commission could remedy the deficiencies while reaching the same result. *Id.* at 1332.

In *Vecinos II*, we "denied in all respects" the other challenges petitioners raised to the authorization orders. 2021 WL 3716769, at *1.

In November 2021, in response to our remand, Rio Grande filed on a separate docket a proposal to add a carbon capture and sequestration ("CCS") system to its terminal design. The system would employ processes to remove carbon dioxide emissions during natural gas liquefaction and then transport those emissions by pipeline to an EPA- and state-authorized underground injection well for sequestration. Rio Grande projected that the system would capture at least 90% of the

---

[2] The Council on Environmental Quality regulations cited here and elsewhere in the opinion have since been amended, but those amendments did not take effect until after the Commission entered the challenged orders. *See* National Environmental Policy Act Implementing Regulations Revisions Phase 2, 89 Fed. Reg. 35,442 (May 1, 2024) (effective July 1, 2024). Thus, we cite and apply the regulations in effect at the time of the orders. *See Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1181 n.2 (D.C. Cir. 2023).

9

carbon dioxide produced at the terminal.  The company asked the Commission to consider the CCS proposal at the same time it considered reauthorization of the existing project. Commission staff initially anticipated issuing an environmental assessment of the CCS system in May 2023 but suspended those plans after Rio Grande failed to provide "complete and timely responses" to several data requests by the agency.  Notice Suspending Environmental Review Schedule of the Proposed Carbon Capture and Sequestration System Amendment, 88 Fed. Reg. 24,407 (Apr. 20, 2023).

On April 21, 2023, the Commission issued orders reauthorizing the projects.  *See* Order on Remand and Amending Section 7 Certificate ("No. 23-1174 Remand Order"), *Rio Grande LNG, LLC & Rio Bravo Pipeline Co.*, 183 FERC ¶ 61,046 (Apr. 21, 2023); Order on Remand ("No. 23-1175 Remand Order"), *Texas LNG Brownsville LLC*, 183 FERC ¶ 61,047 (Apr. 21, 2023) (collectively, the "Remand Orders").  Petitioners filed timely requests for rehearing, but after the Commission failed to respond within thirty days, the requests were deemed denied by operation of law.

On July 10, 2023, petitioners asked this court to review the Remand Orders.  *City of Port Isabel v. FERC*, No. 23-1174 (D.C. Cir.) (Rio Grande project); *City of Port Isabel v. FERC*, No. 23-1175 (D.C. Cir.) (Texas project).  We granted Rio Grande, Rio Bravo, and Texas LNG leave to intervene.  On October 27, 2023, while the petitions were pending, the Commission issued orders addressing the rehearing requests and sustaining the reauthorizations.  *See* Order Addressing Arguments Raised on Rehearing ("No. 23-1174 Rehearing Order"), *Rio Grande LNG, LLC & Rio Bravo Pipeline Co.*, 185 FERC ¶ 61,080 (Oct. 27, 2023); Order Addressing Arguments Raised on Rehearing ("No. 23-1175 Rehearing Order"), *Texas LNG Brownsville LLC*, 185 FERC ¶ 61,079 (Oct. 27, 2023).

10

**II**

We review petitioners' claims under the familiar "arbitrary and capricious" standard. *Nevada v. U.S. Dep't of Energy*, 457 F.3d 78, 87 (D.C. Cir. 2006); *Vecinos I*, 6 F.4th at 1331. "Our role is not to flyspeck an agency's environmental analysis, looking for any deficiency no matter how minor, but instead simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Birckhead v. FERC*, 925 F.3d 510, 515 (D.C. Cir. 2019) (per curiam) (citations and quotation marks omitted). We therefore ask whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation and quotation marks omitted).

Petitioners challenge several aspects of the Commission's orders. We consider each in turn.

**A**

We begin with the Commission's environmental justice analysis. "In conducting NEPA reviews of proposed natural gas projects, the Commission follows Executive Order 12[,]898, which directs federal agencies to identify and address 'disproportionately high and adverse human health or environmental effects' of their actions on minority and low-income populations (i.e., environmental justice communities)." No. 23-1174 Remand Order ¶ 103 (quoting Executive Order 12,898, 59 Fed. Reg. 7,629 (Feb. 11, 1994)); *see Sabal Trail*, 867 F.3d at 1368. The Commission's methodology considers: "(1) whether environmental justice communities . . . exist in the project area; (2) whether impacts on environmental justice

11

communities are disproportionately high and adverse; and (3) possible mitigation measures."  No. 23-1174 Remand Order ¶ 104.

In *Vecinos I*, we held that the Commission's environmental justice analysis of the projects was arbitrary. The Commission did not adequately explain why, despite its "determination that environmental effects from the project would extend well beyond two miles from the project sites," it nonetheless "chose to analyze the projects' impacts only on communities . . . within two miles of the project sites."  6 F.4th at 1330, 1331.  We remanded for the Commission to either provide such an explanation "or else analyze the projects' impacts on communities within a different radius of each project site." *Id*.  We also required the Commission to "explain whether its finding that 'all project-affiliated populations are minority or low-income populations,' is still justified, and, if so, whether its conclusion that the projects 'would not have disproportionate adverse effects on minority and low-income residents in the area' still holds." *Id.* (quoting the 2019 Approval Orders).

On remand, the Commission generated a new and significantly expanded environmental justice analysis for each project.  It first issued several information requests to the developers, seeking updated demographic information for census block groups within fifty kilometers (thirty-one miles) of the project and updated models for emissions within that same geographic scope.  "Commission staff" then "conducted a new environmental justice analysis."  No. 23-1174 Remand Order ¶ 102; No. 23-1175 Remand Order ¶ 26.  The Commission did not prepare its analysis in the form of a supplemental environmental impact statement ("supplemental EIS").  Doing so would have required the agency to publish a draft supplemental EIS, provide a forty-five-day period for

12

public comment on that draft, and allow interested parties to intervene—procedural steps the Commission skipped here. *See* 40 C.F.R. §§ 1502.9(d)(3), 1506.11(d) (2020); 18 C.F.R. § 380.10(a)(1)(i).

Petitioners argue that the Commission's choice not to issue a supplemental EIS for its environmental justice analysis was arbitrary and capricious and prejudiced their ability to comment meaningfully on the Commission's new environmental justice analysis. We agree.

**1**

NEPA regulations require a supplemental EIS when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(ii) (2020). This requirement applies to new circumstances or information that "will 'affect the quality of the human environment' in a significant manner or to a significant extent not already considered," *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989) (quoting 42 U.S.C. § 4332(2)(C)) (cleaned up), or that "provides a seriously different picture of the environmental landscape," *Stand Up for California! v. Dep't of Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021) (quoting *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1060 (D.C. Cir. 2017)) (emphasis omitted).

Here, the pertinent "new information" includes the updated demographic and environmental data submitted by the developers, as well as the Commission's entirely new analysis and interpretation of that data, which are substantially different from the previously conducted environmental justice analysis in the final EIS. *See* No. 23-1174 Remand Order ¶¶ 102–206; No. 23-1175 Remand Order ¶¶ 26–82; *see also* No. 23-1175 J.A. 126 (Chairman Phillips's concurrence describing that the

13

Commission "conducted a full review of the projects' impacts on environmental justice communities" in response to remand). Contrary to the Commission's view, the scope and nature of that new information and analysis "provide[] a seriously different picture of the environmental landscape" and require a supplemental EIS. *Stand Up*, 994 F.3d at 629 (emphasis and quotation omitted).

To begin, the previous environmental justice analysis in the final EIS analyzed the projects' impacts on communities within a two-mile radius of the projects, which included four to five census blocks. *See* No. 23-1174 J.A 266; No. 23-1175 J.A. 237. On remand, the Commission analyzed the projects' impacts on communities within a fifty-kilometer (or thirty-one-mile) radius, which covered over 373 census block groups of environmental justice communities. No. 23-1174 Remand Order ¶¶ 204–05 (286 block groups impacted by Rio Grande terminal and eighty-seven impacted by Rio Bravo pipeline); No. 23-1175 Remand Order ¶ 82 (279 block groups impacted by Texas project). The new analysis expanded the discussion from a mere five pages to forty-six pages for the Rio Grande project, with a similar increase for the Texas project. *Compare* No. 23-1174 J.A. 263–68 (Rio Grande project's five-page final EIS analysis), *and* No. 23-1175 J.A. 236–39, 273–74 (Texas project's five-page final EIS analysis), *with* No. 23-1174 Remand Order ¶¶ 102–206 (Rio Grande's forty-six-page new analysis), *and* No. 23-1175 Remand Order ¶¶ 26–82 (Texas project's twenty-six-page new analysis). In those pages, the new analysis acknowledges, for example, that "potential impacts on the identified environmental justice communities may relate to wetlands, recreational and subsistence fishing, tourism, socioeconomics, road and marine traffic, noise, safety, air quality, and visual resources," No. 23-1174 Remand Order ¶ 110; No. 23-1175 Remand Order ¶ 35, and proceeds to analyze those categories of impacts and more through the

14

environmental justice lens. That new analysis also relied on updated cumulative air emissions data. *See* No. 23-1174 Remand Order ¶ 137; No. 23-1175 Remand Order ¶ 76.

The Commission's new environmental justice analysis also arrived at different conclusions. Most fundamentally, prior to remand, the Commission found that the projects would not have any "disproportionate adverse effects" on environmental justice communities. No. 23-1174 J.A. 267–68; No. 23-1175 J.A. 239. Yet in its updated analysis, the Commission concluded that "the impacts on environmental justice populations from the project would be disproportionately high and adverse because they would be predominately borne by the environmental justice communities identified and, specifically, communities in the areas near the [projects] may experience significant visual impacts, as well as significant cumulative visual impacts." No. 23-1175 Remand Order ¶ 83; No. 23-1174 Remand Order ¶ 207. Moreover, the Commission ordered additional mitigation measures, beyond what it originally ordered, to address certain potential air quality impacts at public recreational areas close to the project sites. *See* No. 23-1174 Remand Order ¶¶ 140–41; No. 23-1175 Remand Order ¶¶ 68–69.

The combination of these factors persuades us that a supplemental EIS was required. This case is meaningfully different from those in which we have not disturbed agencies' decisions not to issue a supplemental EIS, such as where the "new" information was only updated information about an issue that the agency had already considered adequately and to a similar extent, *see Friends of Cap. Crescent Trail*, 877 F.3d at 1060–61; *Stand Up*, 994 F.3d at 629; *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004); *Vecinos II*, 2021 WL 3716769, at *2, and cases in which the agency was presented with new information from an outside

15

party and did not trust the validity of that information at all, *see Friends of the River v. FERC*, 720 F.2d 93, 109 (D.C. Cir. 1983); *Marsh*, 490 U.S. at 374. Here, the Commission not only trusted the validity of the new demographic and emissions data but used that data to "conduct[] a new environmental justice analysis" for a significantly expanded geographic scope and arrived at new conclusions. No. 23-1174 Remand Order ¶ 102; No. 23-1175 Remand Order ¶ 26.

For its part, the Commission stated that it "was not required to prepare a supplemental EIS because the issues addressed on remand did not result in any new significance determinations," insofar as Commission staff "concluded that there would be no significant impact on air quality from the project." No. 23-1175 Rehearing Order ¶ 31; No. 23-1174 Rehearing Order ¶ 42 (similar).

That explanation is inadequate for two related reasons. First, neither the regulations nor case law condition the requirement to issue a supplemental EIS on a new determination that a particular environmental impact is significant. As stated above, our cases describe the requirement as triggered by a "seriously different picture of the environmental landscape," *Stand Up*, 994 F.3d at 629 (emphasis and quotation omitted), not solely whether the agency makes a new significance finding. Indeed, NEPA requires an EIS if any significant impacts "*might* result" from the proposed action, not only when it definitively concludes that a significant impact *will* result. *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002) (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983)) (emphasis added). The same logic applies to the issuance of a supplemental EIS, and that logic contradicts the Commission's bright-line approach.

16

Second, the unavoidable implication of the Commission's argument is that environmental justice analyses—even new and dramatically expanded ones—are not important enough to require a supplemental EIS unless they also disclose significant impacts to the physical environment. *See* No. 23-1174 Rehearing Order ¶¶ 42–43; No. 23-1175 Rehearing Order ¶¶ 31–32. But environmental justice analyses and impacts can be sufficiently meaningful to require a supplement on their own.

The requirement for a supplemental EIS itself states that there must be "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(ii) (2020). Effects on environmental justice communities are certainly "impacts" that are "relevant to environmental concerns": NEPA regulations define relevant "impacts" to mean "changes to the human environment from the proposed action" including "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" effects. 40 C.F.R. § 1508.1(g) (2022); *see id.* § 1508.1(m).[3]

In fact, CEQ and EPA guidance—on which the Commission relies—reinforces the notion that effects on

_____

[3] Indeed, the new regulations effective July 1, 2024, explicitly add "disproportionate and adverse effects on communities with environmental justice concerns" to this list of relevant effects, 40 C.F.R. § 1508.1(i)(4), and the CEQ explained that the change was designed to "provide[] further specificity" and "not [to] expand the scope of the definition of 'effects,'" National Environmental Policy Act Implementing Regulations Revisions Phase 2, 89 Fed. Reg. at 35,539.

17

environmental justice communities can be independently significant. *See, e.g.*, CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act*, at 10 (Dec. 10, 1997), https://perma.cc/773N-3WXX ("Agency consideration of impacts on low-income populations, minority populations, or Indian tribes may lead to the identification of disproportionately high and adverse human health *or* environmental effects that are significant and that otherwise would be overlooked." (emphasis added)); EPA, *Promising Practices for EJ Methodologies in NEPA Reviews*, at 33 (2016), https://perma.cc/ZQ8H-YA4H ("The impacts of a proposed action on minority populations and low-income populations should inform the determination of whether impacts are significant.").

Therefore, at least where, as here, the Commission issued an entirely new and significantly expanded environmental justice analysis that reached new conclusions, we hold that the Commission needed to issue a supplemental EIS. Its failure to do so was arbitrary and capricious.[4]

---

[4] Petitioners separately argue that a supplemental EIS is always required to remedy a deficient EIS, regardless of whether the new information meets the standard articulated in 40 C.F.R. § 1502.9(d)(1)(ii)—that is, regardless of whether there are "significant new circumstances or information relevant to environmental concerns." *See* No. 23-1174 Petitioners' Brief 25. The only case petitioners cite for that argument is *Idaho Sporting Congress Inc. v. Alexander*, 222 F.3d 562 (9th Cir. 2000), but even there, the Ninth Circuit found that the new information requiring a supplemental EIS was "significant," *id*. at 567, and explained that the rule is that "once an agency determines that new information is significant, it must prepare a supplemental EA or EIS," *id.* at 566. Accordingly, we reject petitioners' argument and instead assess,

18

**2**

The Commission attempts to save itself from remand by arguing that even if it were required to issue a supplemental EIS, its failure to do so was harmless.  Our court has recognized the APA's "'rule of prejudicial error' . . . in the NEPA context when the agency has undertaken the required analysis but 'failed to comply precisely with NEPA procedures,'" *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 300 (D.C. Cir. 2022) (quoting *Nevada*, 457 F.3d at 90), and we will not remand if it would be "utterly pointless," *NRDC v. U.S. Nuclear Regul. Comm'n*, 879 F.3d 1202, 1212 (D.C. Cir. 2018).  We decline to apply that rule here because the Commission's error prejudiced petitioners' and the public's ability to comment on the Commission's environmental justice analysis.

The Commission did solicit public comment as to some of the data underlying its environmental justice analysis, but it did not permit comment on all the relevant data.  Even though the Commission opened a fifteen-day window to receive public comments on the developers' responses (including Rio Grande's cumulative air emissions data), it did not solicit any public comment on the final cumulative air emissions model upon which the Commission eventually relied in its analysis.  *See* No. 23-1174 Remand Order ¶¶ 82–85 (summarizing comment process); *id.* ¶ 137 (explaining reliance on new model); No. 23-1175 Remand Order ¶¶ 10–12, 76 (similar).  That final model, which contained substantially different results from the prior model, was submitted to the Commission on January 6, 2023, after the public comment period closed on

---

consistent with the regulation and our precedent, whether there are "significant new circumstances or information relevant to environmental concerns" requiring issuance of a supplemental EIS.

19

November 4, 2022. *Compare* No. 23-1175 J.A. 457 (April 29, 2022 analysis showing five NAAQS exceedances for the Texas project), *with* No. 23-1175 J.A. 504–05 (January 6, 2023 analysis predicting zero NAAQS exceedances for the Texas project). Indeed, petitioners point out discrepancies in the final model that they would have investigated further and submitted comments on had they been given the chance. *See* No. 23-1174 Petitioners' Brief 35; No. 23-1175 Petitioners' Brief 29–30. The fact that petitioners challenge the validity and interpretation of the underlying data differentiates this case from *Oglala Sioux*, where we did not remand because the parties did "not dispute the reasonableness or accuracy" of the agency's findings. 45 F.4th at 301.

More importantly, the Commission did not permit any public comment on its *analysis*. Because the comment period was limited to the developers' responses, the public was not able to comment on the Commission's analysis of those responses. *See* No. 23-1175 J.A. 498–505 (Texas LNG's developer response with data but no explanation). But NEPA's purpose is to allow the public to see and comment on the agency's interpretation of data, not just the underlying data itself. *See Friends of the River*, 720 F.2d at 106–07 (explaining that a supplemental EIS should "present evidence and discussion relevant to [the agency's] environmental decisionmaking in one comprehensive document").

In sum, the Commission's error is prejudicial because it deprived petitioners and the public of an adequate "springboard for public comment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). The Commission provided only a fifteen-day comment period on the developer responses, while the typical NEPA process would have afforded a forty-five-day comment period on a draft supplemental EIS—which would have included not just the developer responses but the

20

later-submitted air modeling data and the Commission's proposed analysis—and required FERC to "address comments" in the final version. *See* 40 C.F.R. §§ 1502.9(b)–(d), 1506.11(d) (2020). The Commission responds by arguing that parties could still file letters on the Commission's docket after the comment period ended or on rehearing. But filing letters on the docket (with no guarantee that the Commission will consider them) is no substitute for commenting on a draft supplemental EIS because NEPA requires the public to be able to comment "at a meaningful time." *Marsh*, 490 U.S. at 371. We therefore hold that the Commission's failure to issue a supplemental EIS for its environmental justice analysis was arbitrary and capricious and prejudicial.

**B**

Next, petitioners argue that, before reauthorizing the Rio Grande terminal on remand, the Commission needed to consider the company's CCS proposal as part of its environmental review of the terminal. Petitioners advance two grounds for this argument: (1) the CCS system is a "connected action" under 40 C.F.R. § 1501.9(e)(1)(ii) (2020); and (2) inclusion of the CCS system qualifies as an alternative to the terminal as initially proposed. Both are correct.

**1**

NEPA regulations state that, in addition to assessing the project under review, an EIS "shall consider . . . connected actions." 40 C.F.R. § 1501.9(e)(1) (2020). As relevant here, petitioners claim that the CCS proposal is an action "connected" to the Rio Grande terminal because it "will not proceed unless" the terminal is constructed "previously or simultaneously." *Id.* § 1501.9(e)(1)(ii).

21

To assess whether actions are connected, and thus must be considered together, we consider whether they have "substantial independent utility" and whether they overlap temporally. *City of Bos. Delegation v. FERC*, 897 F.3d 241, 252 (D.C. Cir. 2018) (quotation omitted). Here, both factors support finding the actions connected.

At the outset, the parties disagree on the test for substantial independent utility. The Commission and Rio Grande insist that two projects are not connected whenever *one* of the projects has utility independent of the other. In their view, because the terminal is useful separate and apart from the CCS system, the projects are not connected actions. Petitioners, by contrast, contend that projects have substantial independent utility in the relevant sense only if *both* projects are independently useful. For three reasons, petitioners have the better argument.

First, the relevant regulation states that "[a]ctions are connected if they . . . [c]annot or will not proceed unless other actions are taken previously or simultaneously." 40 C.F.R. § 1501.9(e)(1)(ii) (2020). Read plainly, the regulation suggests that if any one action cannot or will not proceed without the other(s), those actions are connected.

Second, the Commission's view would undermine the undisputed purpose of the regulation: to stop an agency from impermissibly segmenting "connected . . . federal actions into separate projects and thereby fail[ing] to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). That concern would obviously be implicated if projects could escape consolidated review whenever one of them could proceed without the other. For example, imagine that an applicant proposed an initial project to build an LNG

22

terminal with four liquefaction trains.  Suppose the applicant then proposes to add—as a distinct project—a fifth liquefaction train to the terminal (and perhaps a sixth, seventh, and so on).  Assume the initial project could stand on its own, but the other liquefaction-train projects could proceed only if the initial project were completed.  Under the Commission's reading of the regulation, those formally distinct projects—though clearly parts of the same functional development—would be deemed unconnected for NEPA purposes, allowing the Commission to segment the projects' environmental reviews and avoid addressing their collective environmental impact.  That result would defy the commonsense policy behind the connected-action regulation.

Third, our previous decisions have already gestured toward the more stringent test.  Although we have not directly addressed the Commission's argument, in cases where we have found substantial independent utility satisfied, we have noted that each project could proceed without the other(s).  *See Food & Water Watch v. FERC*, 28 F.4th 277, 291 (D.C. Cir. 2022) ("The Commission found that each project would have gone forward absent the other."); *City of Bos. Delegation*, 897 F.3d at 252 ("[T]he projects do not depend on the other[s] for access to the natural gas market." (second alteration in original)); *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1326 (D.C. Cir. 2015) ("[T]he Commission in this case made clear that the Allegheny Storage Project and the Cove Point LNG terminal are unrelated, and that neither depends on the other for its justification.").

Accordingly, we hold that projects have substantial independent utility for purposes of the connected-action inquiry only when both projects are independently useful.  Applied here, that factor favors connectedness because, as neither the Commission nor Rio Grande disputes, the proposed

23

CCS system is entirely dependent on the Rio Grande terminal for its utility.

The temporal-overlap factor also supports finding that the CCS system is a connected action. This factor generally asks whether the projects are "either under construction" or "pending before the Commission for environmental review and approval" at the same time. *Del. Riverkeeper*, 753 F.3d at 1308. Here, the Commission emphasizes that it completed its initial environmental analysis of the Rio Grande terminal and approved that project in November 2019, two years before the company filed its CCS proposal. But that is not the whole story. Rio Grande submitted its CCS proposal specifically in response to our 2021 remand—which required the Commission to revisit aspects of its environmental analysis and its ultimate approval of the project—such that both approval requests were pending before the Commission at the same time. Indeed, Rio Grande implored the Commission to consider the CCS proposal as part of the reauthorization process precisely because it viewed the two actions as related and thought that the CCS proposal's ability to capture most of the terminal's GHG emissions would make reauthorization more likely. *See* No. 23-1174 J.A. 715.

The Commission's view that the Rio Grande terminal and the proposed CCS system are not connected actions is both arbitrary and contrary to law. On remand, the Commission must consider the actions together in its environmental analysis before deciding whether to reauthorize the terminal.

**2**

Even if Rio Grande decides on remand that it does not wish to proceed with the CCS proposal (thereby mooting the connected-action issue), the Commission must, at the very

24

least, analyze the proposal as an alternative via a supplemental EIS before reauthorizing the Rio Grande terminal.

NEPA regulations require an agency to "[e]valuate reasonable alternatives to the proposed action." 40 C.F.R. § 1502.14(a) (2020). As we have already discussed, those regulations also require an agency to prepare a supplemental EIS "if a major Federal action remains to occur" and "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Id.* § 1502.9(d)(1)(ii) (2020). Here, petitioners correctly argue that Rio Grande's determination that CCS is a reasonable and feasible alternative to the terminal as proposed constitutes significant new information under the regulations.

The feasibility of CCS as an alternative "provides a seriously different picture of the environmental landscape," *Stand Up*, 994 F.3d at 629 (emphasis and quotation omitted), and "will affect the quality of the human environment . . . to a significant extent not already considered," *Marsh*, 490 U.S. at 374 (alteration and quotation omitted). In its application to the Commission, Rio Grande represented that its proposed CCS system would "capture and sequester at least 90%" of the carbon dioxide produced by the terminal. No. 23-1174 J.A. 714. It also estimated that the system would reduce conventional air pollution (*e.g.*, sulfur dioxide emissions) by 94.8% and fine particulate matter emissions by 49.2%. *See* No. 23-1174 J.A. 683. Indeed, the Commission agreed at oral argument that had the CCS system been proposed at the same time as the terminal, the Commission would have been required, as part of its EIS, to consider inclusion of the system as a reasonable alternative. *See* Oral Argument Tr. 36:22–37:6.

25

The Commission offers two procedural arguments to justify its decision to not analyze the CCS proposal as part of the terminal reauthorization.  Both are meritless.

The Commission asserts that *res judicata* precludes petitioners' claim because we already rejected in *Vecinos II* petitioners' challenges to the adequacy of the Commission's original analysis of alternatives.  *See* 2021 WL 3716769, at *3.  But that doctrine "does not preclude claims based on facts not yet in existence at the time of the original action."  *Drake v. FAA*, 291 F.3d 59, 66 (D.C. Cir. 2002).  Here, the feasibility of CCS for the terminal first came to light *after* our remand, when Rio Grande submitted its proposal to the Commission.  *See* No. 23-1174 Respondent's Brief 17.  Only at that point did petitioners have the concrete basis to argue that CCS should have been considered as a viable alternative that would satisfy the terminal's purpose while limiting its adverse environmental impacts.

The Commission also contends that consideration of CCS as an alternative is outside the scope of our remand in *Vecinos I*.  True, the scope of our remand would normally dictate which issues the Commission was required to address.  *See Canadian Ass'n of Petrol. Producers v. FERC*, 254 F.3d 289, 298 (D.C. Cir. 2001).  But in the unusual circumstances of this case, we cannot credit the Commission's reliance on the scope of our remand in *Vecinos I*.  The CCS proposal was not before us or the Commission when we decided that case.  Instead, as noted above, Rio Grande placed the proposal before the Commission specifically in response to our remand, which required the Commission to reassess its ultimate decision to approve the project.  On those unique facts, the Commission should have considered the CCS alternative as part of the terminal reauthorization process.  *See also Marsh*, 490 U.S. at 371–72 (indicating the obligation to consider new information

26

exists so long as the agency retains "a meaningful opportunity" to weigh project benefits against environmental harms).

### C

Next, we turn to petitioners' arguments that various aspects of the Commission's new environmental justice and air pollution analyses are arbitrary and capricious. Because we remand for the Commission to issue a supplemental EIS for its environmental justice analysis, we need not address several of those arguments. In particular, petitioners argue that the Commission's choice of a fifty-kilometer radius was arbitrary; that it erred by using the NAAQS to analyze whether air quality impacts were "disproportionate and adverse"; and that it failed to make a concrete conclusion about whether air quality impacts were disproportionate and adverse. Given our remand, we decline to address these challenges to the extant analysis.

There are, however, two challenges to the Commission's updated air pollution analysis that are fit for resolution now.

### 1

Petitioners argue that the Commission erred by relying on Rio Grande's air pollution analysis, which used air quality data only from the Brownsville monitor, and instead should have also considered data from the Isla Blanca monitor, which is located closer to the projects than the Brownsville monitor. This error matters, petitioners say, because the Isla Blanca data showed potential NAAQS exceedances for fine particulate matter ($PM_{2.5}$), while the Brownsville monitor did not. We agree that the Commission's explanation for rejecting the Isla Blanca data is arbitrary and capricious.

The Commission provided two reasons for declining to examine data from the Isla Blanca monitor. First, the Commission said that "the Isla Blanca monitor was

27

appropriately excluded from the air quality analysis because it appears that the monitor did not have three years of data . . . as contemplated by EPA and the Texas Commission on Environmental Quality" at the "time the analysis was completed."  No. 23-1175 Rehearing Order ¶ 17 & n.40; *see* No. 23-1174 Rehearing Order ¶ 27.  But at the time Rio Grande completed its analysis using the Brownsville data in January 2023, the Isla Blanca monitor did have more than three years of data.  As the Commission itself noted, the Isla Blanca monitor began collecting "valid design values" on October 7, 2019, which means it had collected about three years and three months of data by January 2023.  No. 23-1174 Rehearing Order ¶ 27; No. 23-1175 Rehearing Order ¶ 17.

On appeal, Rio Grande attempted to bolster the Commission's conclusion by explaining that in January 2023 the Isla Blanca monitor did not have three years of *validated and published* data.  *See* No. 23-1174 Respondent-Intervenor Rio Grande Brief 20.  But because that explanation is not what the Commission said in its orders, nor is it an explanation that can be "reasonably . . . discerned" from what the Commission did say, we give it no weight.  *Bowman Transp. Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *see SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

Second, the Commission said the Brownsville monitor was "closer in proximity to environmental justice communities than the Isla Blanca monitor."  No. 23-1174 Rehearing Order ¶ 27; *see* No. 23-1175 Rehearing Order ¶ 17.  Even if the Brownsville monitor is closer to more environmental justice communities, there are also such communities near the Isla Blanca monitor.  The Commission provided no explanation in its Remand Orders or even at oral argument why it could not have considered data from both monitors to assess the air pollution impacts on environmental justice communities,

28

especially considering that the Isla Blanca monitor displayed potential NAAQS exceedances. *See* Oral Argument Tr. 24:25–25:3 (Commission stating it could have considered both monitors' data).

The Commission's explanations for rejecting use of the Isla Blanca monitor are arbitrary and capricious. On remand, the Commission must either include that data in its analysis or provide a new, reasoned explanation for declining to do so.

**2**

Second, petitioners challenge the Commission's updated ozone analysis as arbitrary and capricious for failing to expressly consider the effect on ozone of emissions from the mobile ships that will export natural gas in connection with the projects. In *Vecinos II*, we upheld the Commission's ozone analysis even though the EIS's model did not account for mobile ship emissions because the Commission considered such emissions in its 2020 Rehearing Order. *See* 2021 WL 3716769, at *4.

The Commission was not required on remand to conduct a new ozone analysis, but because the Commission chose to do so, we now review its new analysis. *See Canadian Ass'n of Petrol. Producers*, 254 F.3d at 298.

The Commission's updated ozone analysis was not arbitrary and capricious. The cumulative emissions model the Commission relied on appears to account for "background concentrations from mobile ship emissions." No. 23-1175 Remand Order ¶ 76; No. 23-1174 Remand Order ¶ 137. But even if the Commission's cumulative model did not include mobile ship emissions, such an error would not be prejudicial. The mobile ship emissions are otherwise in the record and showed a substantial drop in ozone precursor (NOx) emissions

29

compared to the emissions analyzed in the 2020 rehearing order. *Compare* No. 23-1174 J.A. 785 (Rio Grande's updated NOx total ship emissions is 84.9 tons per year), *with* No. 23-1174 J.A. 549 & n.175 (Rio Grande's NOx total ship emissions in 2020 rehearing order was 928.7 ton per year). Overall cumulative ozone emissions also decreased, as expected, due to the design change from six to five liquefaction trains and cancellation of the Annova terminal.[5] *See Vecinos II*, 2021 WL 3716769, at *4 n.4 (acknowledging these changes "would cause less ozone to be produced than the original design would have"). Because petitioners do not cast doubt on that data and provide no reason why either mobile ship emissions or cumulative ozone emissions would increase beyond the levels previously authorized by the Commission, we hold that the Commission's updated ozone analysis was not prejudicially deficient even if it did not account for mobile ship emissions. *See PDK Labs., Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.").

**D**

Next, petitioners contend that the Commission failed to satisfy our remand directive regarding its analysis of GHG emissions.

In *Vecinos I*, we instructed the Commission to "explain whether 40 C.F.R. § 1502.21(c) [(2020)] calls for it to apply

---

[5] The project originally included a third LNG terminal to be developed by Annova, LLC, which was also authorized by the Commission and appealed to this Court in *Vecinos I*. Prior to oral argument in that case, "Annova, LLC informed the Commission that it was abandoning its project," and we dismissed that petition as moot. 6 F.4th at 1327.

30

the social cost of carbon protocol or some other analytical framework" to evaluate the impact of each project's contribution to climate change and "if not, why not." 6 F.4th at 1329–30. Section 1502.21(c)(4) states that "[i]f the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are unreasonable or the means to obtain it are not known, the agency shall include within the environmental impact statement . . . [its] evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. § 1502.21(c)(4) (2020).

Given the scope of our remand on this issue, we need not (and do not) opine on the overall adequacy of the Commission's explanation for why it declined to use the social cost of carbon protocol to assess the significance of the projects' GHG emissions. For purposes of this appeal, it suffices that the Commission adequately explained why Section 1502.21(c)(4) does not compel use of the protocol for that task.

The social cost of carbon is a method of quantifying in dollars the climate change impacts of greenhouse gas emissions. *See Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 111 (D.C. Cir. 2022). Consistent with its position in prior proceedings, the Commission explained in the Remand Orders that "there are no criteria to identify what monetized values are significant for NEPA purposes, and [the Commission is] currently unable to identify any such appropriate criteria." No. 23-1174 Remand Order ¶ 93; No. 23-1175 Remand Order ¶ 20 (same); *see also Ctr. for Biological Diversity*, 67 F.4th at 1184; *EarthReports*, 828 F.3d at 956. As a result, the Commission explained, the social cost of carbon "does not enable the Commission to determine credibly whether the

31

reasonably foreseeable GHG emissions associated with a
project are significant or not significant in terms of their impact
on global climate change." No. 23-1174 Remand Order ¶ 93;
No. 23-1175 Remand Order ¶ 20 (same). Thus, any attempt to
determine GHG emissions' significance using the social cost
of carbon protocol would not turn on the application of
"theoretical approaches or research methods generally
accepted in the scientific community." 40 C.F.R.
§ 1502.21(c)(4) (2020); *see* No. 23-1174 Remand Order ¶ 92;
No. 23-1175 Remand Order ¶ 20.

Petitioners argue that, because the Commission
consistently exercises its policy judgment to determine the
severity and significance of project impacts on other aspects of
the environment (such as wetlands, recreation, wildlife, and
habitats), it can do the same for GHG emissions. But given the
narrow issue before us, that argument is beside the point. The
question on remand regarding the social cost of carbon protocol
was whether Section 1502.21(c)(4) requires the Commission to
make a significance determination using the protocol, not
whether, as a general matter, the protocol may be used to make
such a determination. As explained above, the Commission
adequately explained why the answer is no.

Petitioners' other counterarguments fare no better. They
identify examples of other agencies incorporating the social
cost of carbon protocol into their NEPA analyses. *See* No. 23-
1174 Petitioners' Brief 54 n.10 (citing environmental impact
statements issued by the Maritime Administration, the Bureau
of Land Management, and the Bureau of Ocean Energy
Management); No. 23-1175 Petitioners' Brief 48 n.8 (same).
But in none of those examples did the agency use the protocol
to determine GHG emissions' significance. At most, those
agencies disclosed the social cost of the relevant emissions for
informational purposes, which is exactly what the Commission

32

did for each of the projects here. *See* No. 23-1174 Remand Order ¶¶ 98–99; No. 23-1175 Remand Order ¶ 24.

Apart from the social cost of carbon, petitioners insist that the Commission failed to heed our instruction on remand to also consider whether Section 1502.21(c)(4) required the application of "some other analytical framework" to determine GHG significance. *See Vecinos I*, 6 F.4th at 1329–30. Specifically, petitioners argue that the Commission "simply could have made an ad-hoc determination of significance" like it did in *Northern Natural Gas Co.*, 174 FERC ¶ 61,189 (Mar. 22, 2021). No. 23-1174 Petitioners' Brief 58; No. 23-1175 Petitioners' Brief 52 (same). There, the Commission found that a project's operations would increase national GHG emissions by only 0.000006%. *N. Nat.*, 174 FERC ¶ 61,189, ¶ 34. The Commission then concluded that "[h]owever [its] approach to the significance analysis evolves, the reasonably foreseeable GHG emissions associated with th[e] project would not be considered significant." *Id.* ¶ 33. Petitioners argue that the converse is true here and that the Commission could have applied *Northern Natural*'s logic to conclude that the projects' GHG emissions were significant. They also assert that other regulations beyond Section 1502.21(c) require the Commission to "evaluate the significance of greenhouse gas emissions *somehow*." No. 23-1174 Petitioners' Brief 57 (citing 18 C.F.R. § 380.7(a), (d) and 40 C.F.R. § 1502.16(a)(1) (2020)); No. 23-1175 Petitioners' Brief 52 (same). But petitioners never made any of these specific arguments to the Commission on rehearing. Because they offer no reasonable ground for failing to do so, we lack jurisdiction to consider the arguments on appeal. 15 U.S.C. § 717r(b).

Finally, petitioners advance related arguments that the Commission failed to explain the role GHG emissions played in the public interest determinations under NGA Sections 3 and

33

7.   We considered and dispensed with those arguments in *Vecinos II*.  2021 WL 3716769, at *1 (denying the petitions "in all respects other than those ruled upon in the contemporaneously issued published opinion").  In *Vecinos I*, we remanded the Commission's NGA determinations only insofar as the Commission relied on a GHG emissions analysis that did not grapple with the requirements of 40 C.F.R. § 1502.21(c)(4) (2020).  *See* 6 F.4th at 1331.  Because, on remand, the Commission adequately explained why Section 1502.21(c) does not alter its GHG analysis, we see no reason to question the resulting NGA determinations on GHG grounds.

## III

The deficiencies discussed above warrant vacating the reauthorization orders for the projects.  Although we do not take this step lightly, the circumstances here require it.

"Vacatur 'is the normal remedy' when we are faced with unsustainable agency action."  *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 117 (D.C. Cir. 2020) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)).  We typically assess the decision to vacate based on two factors: "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences" of vacatur.  *Allied-Signal v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993).

"When an agency bypasses a fundamental procedural step," the first factor asks "not whether the ultimate action could be justified, but whether the agency could, with further explanation, justify its decision to skip that procedural step." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021).  Here, the answer is no.

34

For both projects, the Commission failed to issue a supplemental EIS to account for its updated environmental justice analysis. And for the Rio Grande terminal, the Commission further failed to consider the company's CCS proposal as part of its environmental review as either a connected action or a project alternative. For the reasons detailed above, we do not see how the Commission could justify its decision to skip those fundamental procedural steps.

We appreciate the significant disruption vacatur may cause the projects. But that does not outweigh the seriousness of the Commission's procedural defects. *Cf. Env't Def. Fund v. FERC*, 2 F.4th 953, 976 (D.C. Cir. 2021) (noting that "the second *Allied-Signal* factor is weighty only insofar as the agency may be able to rehabilitate its rationale" (quotation omitted)). In any event, even for the likely more substantial task on remand—consideration of the CCS proposal—Rio Grande itself stated to the Commission that an assessment could be done "expeditiously." No. 23-1174 J.A. 715.

In addition, although we did not vacate the orders in our prior remand, we have explained that this fact can actually support vacatur where, as here, the agency "has yet again come up with insufficient support" for its action. *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1343 (D.C. Cir. 2023) (quotation omitted).

We therefore grant the petitions for review in part, deny them in part, vacate both reauthorizations, and remand to the Commission for further proceedings consistent with this opinion.

*So ordered*.

# Exhibit B

ORAL ARGUMENT HELD ON MAY 17, 2024
DECISION ISSUED ON AUGUST 6, 2024

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CITY OF PORT ISABEL, et al.,

*Petitioners*,

*v.*

FEDERAL ENERGY
REGULATORY COMMISSION,

*Respondent*,

RIO BRAVO
PIPELINE COMPANY, LLC, et al.,

*Respondent-Intervenors*.

No. 23-1174 (consolidated
with No. 23-1221)

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1), Respondent-Intervenor Rio Bravo Pipeline Company, LLC ("Rio Bravo") submits this certificate as to parties, rulings, and related cases.

**1.    Parties and *Amici*.**  All parties, intervenors, and *amici* appearing in this Court are listed in Petitioners' opening brief.

*Circuit Rule 26.1 Disclosures for Rio Bravo.*  Rio Bravo filed a Corporate Disclosure Statement on August 9, 2023 and an updated Corporate Disclosure Statement on October 21, 2024.

2.    **Ruling Under Review.**  References to the rulings at issue appear in the Respondent's answer brief.

3.    **Related Cases.**  In 2020, several of the Petitioners here filed a petition for review challenging the Commission's orders granting authorizations to Rio Bravo and Rio Grande LNG, LLC under Sections 3 and 7 of the Natural Gas Act. *See Rio Grande LNG, LLC*, 169 FERC ¶ 61,131 (2019), *on reh'g*, 170 FERC ¶ 61,046 (2020).  That petition for review was docketed in this Court as case 20-1045.  The Court subsequently ordered that argument in case 20-1045 be held on the same day as the argument in cases 20-1093 and 20-1094, which were appeals concerning orders issued by the Commission related to two different projects—the Annova LNG project and the Texas LNG project, respectively.

On August 3, 2021, this Court entered an opinion and a per curiam judgment that dismissed the petition for review in case 20-1093 as moot, and denied in part while granting in part the petitions for review in cases 20-1045 and 20-1094.  The FERC orders under review in cases 20-1045 and 20-1094 were remanded to the Commission without vacatur for further proceedings.  *See* 6 F.4th 1321 (opinion);

2021 WL 3716769 (Aug. 3, 2021) (per curiam).  On remand from case 20-1045, the Commission issued the orders that Petitioners challenge in these appeals.

Although it does not appear to meet the definition of a "related case" in this Court's Rule 28(a)(1)(C), Rio Bravo notes for completeness that, in 2020, several of the Petitioners here filed a petition for review challenging the Commission's approval of certain changes to the design of the Rio Grande LNG project.  This Court docketed that petition for review as case 20-1491.  In August 2021, this Court granted the Petitioners' motion to voluntarily dismiss case 20-1491.

At this time, counsel is unaware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

A-37

Date: October 21, 2024                    Respectfully submitted,

                                          */s/ Jeremy C. Marwell*

                                          Jeremy C. Marwell
                                          Matthew X. Etchemendy
                                          James T. Dawson
                                          VINSON & ELKINS LLP
                                          2200 Pennsylvania Avenue, NW
                                          Suite 500 West
                                          Washington, DC 20037
                                          Phone:  202.639.6507
                                          Email: jmarwell@velaw.com
                                          Email: metchemendy@velaw.com
                                          Email: jamesdawson@velaw.com

                                          James D. Seegers
                                          VINSON & ELKINS LLP
                                          834 Texas Ave.
                                          Suite 4700
                                          Houston, TX 77002
                                          Phone: 713.758.2939
                                          Email: jseegers@velaw.com

*Counsel for Respondent-Intervenor Rio Bravo Pipeline Company, LLC*

A-38

# Exhibit C

ORAL ARGUMENT HELD ON MAY 17, 2024
DECISION ISSUED ON AUGUST 6, 2024

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CITY OF PORT ISABEL, et al.,

*Petitioners*,

*v.*

FEDERAL ENERGY
REGULATORY COMMISSION,

*Respondent*,

RIO BRAVO
PIPELINE COMPANY, LLC, et al.,

*Respondent-Intervenors.*

No. 23-1174 (consolidated
with No. 23-1221)

**AMENDED CORPORATE DISCLOSURE STATEMENT
OF RIO BRAVO PIPELINE COMPANY, LLC**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Rio Bravo Pipeline Company, LLC ("Rio Bravo"), a Texas limited liability company, through undersigned counsel, certifies as follows:

Rio Bravo is a wholly-owned subsidiary of Rio Bravo Holdings, LLC.

**Rio Bravo Holdings, LLC**, a Delaware limited liability company, is a wholly-owned subsidiary of Rio Bravo InvestCo, LLC.

**A-39**

**Rio Bravo InvestCo, LLC**, a Delaware limited liability company, is a wholly-owned subsidiary of WPC Parent, LLC.

**WPC Parent, LLC** is a Delaware limited liability company in which the following entities have ownership interests: WhiteWater Whistler Holdings, LLC; Enbridge Holdings (Multiply), LLC; and MPLX Delaware Basin LLC.

**WhiteWater Whistler Holdings, LLC**, a Delaware limited liability company, is a wholly owned subsidiary of ISQ Whistler Holdings (Parent), LLC. To our knowledge, no publicly held corporation has a 10% or greater ownership interest in ISQ Whistler Holdings (Parent), LLC.

**Enbridge Holdings (Multiply), LLC**, a Delaware limited liability company, is a wholly-owned subsidiary of Spectra Energy Transmission II, LLC.

**Spectra Energy Transmission II, LLC**, a Delaware limited liability company, is a wholly-owned direct subsidiary of Spectra Energy Partners, LP.

**Spectra Energy Partners, LP** ("Spectra Partners") is a Delaware limited partnership in which the following entities have ownership interests: Spectra Energy Partners (DE) GP, LP; Spectra Energy Southeast Supply Header, LLC; and Spectra Energy Transmission, LLC. Spectra Energy Partners (DE) GP, LP, a Delaware limited partnership, is owned by Spectra Energy Transmission, LLC and by Spectra Energy Partners GP, LLC. Spectra Energy Partners GP, LLC**,** a Delaware limited liability company, is a wholly-owned direct subsidiary of Spectra Energy

**A-40**

Transmission, LLC.  Spectra Energy Southeast Supply Header, LLC, a Delaware limited liability company, is a wholly-owned direct subsidiary of Spectra Energy Transmission, LLC.

**Spectra Energy Transmission, LLC**, a Delaware limited liability company, is a wholly-owned direct subsidiary of Spectra Energy Capital, LLC.

**Spectra Energy Capital, LLC**, a Delaware limited liability company, is a wholly-owned direct subsidiary of Spectra Energy, LLC.

**Spectra Energy, LLC**, a Delaware limited liability company, is a wholly-owned direct subsidiary of Enbridge (U.S.) Inc.

**Enbridge (U.S.) Inc.**, a Delaware corporation, is a wholly-owned direct subsidiary of Enbridge US Holdings Inc.

**Enbridge US Holdings Inc.**, a Canadian Federally Chartered corporation, is a wholly-owned direct subsidiary of Enbridge Inc.

**Enbridge Inc.** (TSX: ENB and NYSE: ENB), a Canadian Federally Chartered corporation, is a publicly held corporation that has no parent companies. To our knowledge, no publicly held corporation has a 10% or greater ownership interest in Enbridge Inc.

**MPLX Delaware Basin LLC**, a Delaware limited liability company, is a wholly owned-direct subsidiary of MPLX Operations LLC.

**MPLX Operations LLC**, a Delaware limited liability company, is a wholly-owned direct subsidiary of MPLX LP.

**MPLX LP** (NYSE: MPLX), a Delaware limited partnership, is a publicly held limited partnership, in which Marathon Petroleum Corporation has a 10% or greater ownership interest. To our knowledge, no other publicly held corporation has a 10% or greater ownership interest in MPLX LP.

Date: October 21, 2024                    Respectfully submitted,

                                          */s/ Jeremy C. Marwell*

                                          Jeremy C. Marwell
                                          VINSON & ELKINS LLP
                                          2200 Pennsylvania Avenue, NW
                                          Suite 500 West
                                          Washington, DC 20037
                                          Phone: 202.639.6507
                                          Email: jmarwell@velaw.com

                                          *Counsel for Rio Bravo Pipeline*
                                          *Company, LLC*

4

**A-42**

# Exhibit D

**ORAL ARGUMENT HELD ON MAY 17, 2024**
**DECISION ISSUED ON AUGUST 6, 2024**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| CITY OF PORT ISABEL, et al., <br><br> *Petitioners*, <br><br> *v.* <br><br> FEDERAL ENERGY REGULATORY COMMISSION, <br><br> *Respondent*, <br><br> RIO BRAVO PIPELINE COMPANY, LLC, et al., <br><br> *Respondent-Intervenors.* | No. 23-1174 (consolidated with No. 23-1221) |

**DECLARATION OF QUINN LANGBAUER**

I, Quinn Langbauer, hereby depose and state that I am over the age of 18 and am in all respects competent and qualified to make this declaration. All facts stated are within my personal knowledge and are true and correct.

1.      I am currently the Vice-President of Engineering and Project Director for the Rio Bravo Pipeline Project (the "Pipeline Project"), to be constructed and operated by the Rio Bravo Pipeline Company, LLC ("Rio Bravo"). Rio Bravo is indirectly owned by a joint venture among affiliates of WhiteWater Midstream (as

1

**A-43**

operator), MPLX LP, and Enbridge Inc.  I have worked at WhiteWater Midstream since December 2016, and I have served in my current role since late 2023.

2.    In my current position, I am responsible for overseeing all construction, engineering, environmental, and land functions for the Pipeline Project.  Among other things, I am responsible for ensuring that all construction and engineering is accomplished safely, effectively, on schedule, and in accordance with applicable regulations, permits, and contracts.  I am also familiar with, and involved in, the process of securing the necessary financing to support construction of the Pipeline Project.  I am knowledgeable regarding the progress made on the planning and design of the Pipeline Project to date, ongoing work to advance development and financing of the project, the current construction schedule, and the potential effects that a judicial vacatur of the Federal Energy Regulatory Commission ("FERC") orders challenged in this case would have with respect to Rio Bravo's plans to complete construction of the Pipeline Project.

I.    **The Pipeline Project**

3.    The Rio Bravo Pipeline will connect existing natural gas infrastructure in Kleberg and Jim Wells Counties, Texas, to the Rio Grande LNG, LLC ("Rio Grande") liquefied natural gas terminal (the "LNG Terminal") in Cameron County, Texas.  Construction of the Pipeline Project is scheduled to begin in May 2025 and last approximately one year, with a planned in-service date of August 2026 for the

initial pipeline facilities.  When fully completed and operational, the Pipeline Project will provide the LNG Terminal with up to 4.5 billion standard cubic feet per day of natural gas transportation capacity.

4.     The Pipeline Project will consist of an approximately 2.4-mile header system, approximately 136 miles of dual mainline pipelines, one compressor station, six receipt meter stations, and one delivery station.  The Pipeline Project will traverse Jim Wells, Kleberg, Kenedy, Willacy, and Cameron Counties, Texas.  The map on the following page shows the Pipeline Project's route, as most recently approved by FERC.

**A-45**

EXHIBIT A
FERC APPROVED PIPELINE ROUTE



DETAILS:

**RIO BRAVO PIPELINE COMPANY, LLC**

**FERC APPROVED
PIPELINE ROUTE
DOCKET NO. CP23-519-000**

| PREPARED BY: LD | CHECKED BY: QL |
|---|---|
| ISSUE DATE: 10/16/2024 | REVISION: A |

DISCLAIMER: PIPELINE FACILITY LOCATIONS ARE PRELIMINARY AND SUBJECT TO CHANGE. MAP IS FOR REFERENCE ONLY.

4

**A-46**

## II.     Current Status of Authorizations and Permits for Construction of the Pipeline Project

### A.     Federal Energy Regulatory Commission

5.     In 2019, after more than three years of review, FERC authorized construction and operation of Rio Bravo's Pipeline Project and of Rio Grande's LNG Terminal. *Rio Grande LNG, LLC*, 169 FERC ¶ 61,131 (2019) ("Authorization Order"). FERC's order states that "the public convenience and necessity require approval and certification of [the Pipeline Project] . . . under section 7 of the [Natural Gas Act]," and that "the Rio Grande LNG Terminal is not inconsistent with the public interest." *Id.* PP 32, 133. The Authorization Order enumerates expected benefits of the Pipeline Project and LNG Terminal. The Authorization Order also states that the Pipeline Project will have "minimal adverse impacts on . . . landowners and surrounding communities" and concludes that the environmental impacts of the LNG Terminal and Pipeline "would be reduced to less-than-significant levels with the implementation of . . . avoidance, minimization, and mitigation measures." *Id.* PP 32, 56.

6.     In February 2020, opponents of the Pipeline Project and LNG Terminal appealed the Authorization Order to the U.S. Court of Appeals for the District of Columbia Circuit. In August 2021, the D.C. Circuit granted that petition for review in part, holding that FERC had failed to sufficiently justify its analyses of the projects' impacts on climate change and environmental justice communities.

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1325 (D.C. Cir. 2021) ("*Vecinos*").  The D.C. Circuit remanded the Authorization Order to FERC without vacatur because it was "reasonably likely that on remand the Commission [could] redress its failure of explanation."  *Id.* at 1332.

7.     In June 2020, while the appeal of the Authorization Order was pending, Rio Bravo filed an application with FERC to amend its certificate authorization (the "First Amendment Application").  Rio Bravo sought to implement certain design changes intended to improve the hydraulic efficiency of the pipeline, decrease the pipeline's above-ground footprint, and decrease overall Pipeline Project emissions.

8.     In April 2023, FERC issued an order that addressed the issues that had been remanded in the D.C. Circuit's *Vecinos* opinion and reauthorized the Pipeline Project and the LNG Terminal.  *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (2023) ("Remand Order").  As part of the same order, FERC also approved Rio Bravo's First Amendment Application.  FERC explained that, following an additional environmental review, it had concluded that approval of the First Amendment Application "would not constitute a major federal action significantly affecting the quality of the human environment."  *Id.* P 79.  FERC further stated that "the public convenience and necessity requires approval of Rio Bravo's request [to] . . . amend the [Natural Gas Act] section 7 certificate authorization issued by the Authorization Order."  *Id.* P 80.

6

9.    In July 2023, opponents of the Pipeline Project and LNG Terminal appealed the Remand Order to the U.S. Court of Appeals for the District of Columbia Circuit.  In October 2023, while that appeal was pending, the Commission issued an order addressing the arguments raised on rehearing.  *Rio Grande LNG, LLC*, 185 FERC ¶ 61,080 (2023) ("Remand Rehearing Order").  In August 2024, the D.C. Circuit held that FERC had erroneously declined to prepare a supplemental environmental impact statement before issuing the Remand Order and that FERC had failed to explain why it did not consider air-quality data from a certain air monitor.  *City of Port Isabel v. FERC*, 111 F.4th 1198, 1203 (D.C. Cir. 2024) ("*City of Port Isabel*").  The D.C. Circuit "vacat[ed] the re[mand] order[] for the projects" and remanded the matter to FERC.  *Id.* at 1218.

10.    In July 2023, while the appeal of the Remand Order remained pending, Rio Bravo submitted another amendment application to FERC (the "Second Amendment Application").  In that application, Rio Bravo sought approval for four minor route adjustments to limit impacts on ocelot habitat, address agency and landowner concerns, avoid recently constructed infrastructure, enhance safety, and reduce environmental effects.  Following yet another environmental review, FERC issued an order approving the Second Amendment Application, which stated that FERC's approval of Rio Bravo's proposed changes "would not constitute a major federal action significantly affecting the quality of the human environment."  *Rio*

*Bravo Pipeline Co., LLC*, 187 FERC ¶ 61,104, P 75 (2024) ("Second Amendment Order"). FERC again reaffirmed that the Pipeline Project, as amended, "is required by the public convenience and necessity." *Id.* P 77. No party sought administrative rehearing or appealed the Second Amendment Order.

### B.    Endangered Species Act Biological Opinion

11.    In October 2019, following years of review, the U.S. Fish and Wildlife Service issued a Biological Opinion and Incidental Take Statement for the Pipeline Project pursuant to the Endangered Species Act. The Fish & Wildlife Service subsequently issued certain amendments and an addendum to that Biological Opinion. I understand that the U.S. Court of Appeals for the Fifth Circuit denied appeals of this Biological Opinion and Incidental Take Statement. *See Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898 (5th Cir. 2021).

12.    In January 2023, Rio Bravo initiated discussions with the Fish & Wildlife Service to discuss potential minor modifications to the pipeline route. In August 2023, the Fish & Wildlife Service issued a "Not Likely To Adversely Affect" determination to FERC in connection with Rio Bravo's Second Amendment Application, specifically addressing the change of the pipeline route to reduce impacts on potential ocelot habitat. Rio Bravo is engaged in ongoing discussions with the Fish & Wildlife Service and is working to complete some additional surveys for covered species near the route of the Pipeline Project.

### C.  Authorization Under the Clean Water Act and the Rivers and Harbors Act

13.    In May 2018, Rio Grande and Rio Bravo filed a permit application with the U.S. Army Corps of Engineers (the "Corps") pursuant to Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act.  In February 2020, the Corps granted that application and issued Permit No. SWG-2015-00114.  Rio Grande and Rio Bravo subsequently asked the Corps to amend the permit in light of certain design modifications and enhancements, and the Corps approved the modified design in 2021.  The U.S. Court of Appeals for the Fifth Circuit upheld the amended Corps permit on appeal.  *See Shrimpers & Fishermen of the RGV v. U.S. Army Corps of Eng'rs*, 56 F.4th 992 (5th Cir. 2023).  Rio Bravo anticipates that it may have future discussions with the Corps regarding a minor route adjustment pursuant to Section 14 of the Rivers and Harbors Act, in connection with crossing the Arroyo Colorado.

### D.  National Historic Preservation Act

14.    In 2016, Rio Bravo began consulting with the National Park Service and Texas Historical Commission regarding potential impacts on historic resources pursuant to Section 106 of the National Historic Preservation Act.  In 2016, the Texas State Historic Preservation Officer concurred with the findings of Rio Bravo's cultural survey report.  The National Park Service concluded the consultation process in January 2020.  Rio Bravo subsequently submitted supplemental

9

information regarding the amended project, and the State Historic Preservation Officer concurred with the information provided by Rio Bravo in May 2023.

### E.  Ongoing Permitting and Authorization Work

15.   Rio Bravo remains actively engaged with federal and state agencies regarding the remaining applicable consultation processes and remaining authorizations for the Pipeline Project.  Among other things, Rio Bravo remains engaged in ongoing discussions with the Fish & Wildlife Service, and anticipates that it may have further discussions with the Corps related to a potential minor route adjustment.

16.   Prior to beginning construction, Rio Bravo will submit a Clean Air Act application for standard permits and a revised Title V operating permit application to the Texas Commission on Environmental Quality.

### III.  Pipeline Project Construction Schedule and Sequencing

17.   In addition to ongoing efforts to secure all remaining permits and complete applicable consultations, Rio Bravo has made substantial financial commitments and investments in tasks that must be completed before construction can begin, totaling more than $465 million in aggregate.  For instance, Rio Bravo has executed binding agreements for integral project-related materials, including purchasing steel to fabricate the pipe for the mainline section of the Pipeline Project, purchasing standard and heavy-wall pipe for additional sections of the pipeline, and

10

**A-52**

purchasing various valves. Rio Bravo also executed a contract with an Engineering, Procurement, and Construction contractor for the Pipeline's compressor station. The purchase orders mentioned above are binding and are subject to ongoing progress payments. Rio Bravo has contractually committed to funding the entirety of these purchase orders.

18.    In mid-2024, Rio Bravo began soliciting bids for labor contracts related to the construction of pipelines and metering and regulating station facilities, with the goal of finalizing those contracts in early 2025 to allow construction to begin by mid-2025. Rio Bravo received responses to its bid requests prior to the *City of Port Isabel* opinion, but has now paused its conversations with bidders in light of that decision.

19.    Pipeline design and development occurs in a linear fashion. Some tasks (e.g., refinement of design and specifications) must be completed before others (e.g., procurement of pipe or land acquisition) can occur. Therefore, delays at one stage of the process can have cascading effects on overall project timing.

20.    Construction of the first pipeline, compressor station, and metering and regulating station is scheduled to commence in May 2025. Pipeline construction also proceeds in a linear, sequential fashion after completion of the required pipeline design and development and land-rights acquisition: surveying and marking the right of way; building facilities needed for temporary construction access (e.g., gravel

routes to access properties from public roads, temporary bridges to protect sensitive areas); clearing activities along the pipeline route; grading the pipeline right-of-way; excavating the pipeline trench; bringing segments of pipe to the property; bending the pipe to the shape of the ground; welding the pipe segments together; placing the pipe in the trench; backfilling the trench; and re-grading and restoring the surface.

21.    Delays in beginning or undertaking initial phases of work will necessarily delay Rio Bravo's ability to begin or complete work on later tasks, such that initial delays can have cascading effects on overall project timing.  Construction of the pipeline header system is scheduled to begin in July 2025 and to be completed in approximately nine months.  Rio Bravo plans to complete construction and commissioning of the first pipeline and compressor station, and to place the initial facilities into service, by August 2026.

## IV.    Vacating Any of FERC's Authorizations for the Pipeline Project Will Harm Rio Bravo and Disserve the Public Interest.

22.    In the *City of Port Isabel* proceeding, the D.C. Circuit reviewed, and in its August 6 opinion vacated, the 2023 Remand Order and Remand Rehearing Order. If the D.C. Circuit does not modify its opinion, and if the Remand Order and Remand Rehearing Order are vacated in their entirety, Rio Bravo would face significant disruption to its ongoing design and procurement process.  The Remand Order included the Commission's action on Rio Bravo's First Amendment Application, which as explained above made certain key changes to the pipeline design.  (That

amendment application did not include any changes to the Terminal design.) If the Remand Order and the Remand Rehearing Order were vacated in their entirety, the practical result would be that Rio Bravo's FERC authorization would revert to the design and route approved in the 2019 Authorization Order, as modified in the Second Amendment Order. But the First Amendment Application involved important changes to the route and design of the Pipeline Project. For example, the First Amendment Application authorized Rio Bravo to increase the diameter of one of the pipelines from 42 inches to 48 inches and "to eliminate from the project's original design two compressor stations and two booster stations," thus "decreasing the project's aboveground footprint." Remand Order P 29. And although FERC's order granting Rio Bravo's Second Amendment Application was never challenged, the changes in that amendment (i.e., adjusting the pipeline route at four locations to minimize impacts to ocelots, and to make certain adjustments necessary to "align the . . . Pipeline Project with the currently approved design of the . . . Terminal to which it will interconnect") are predicated and build on the design changes approved in the Remand Order. Second Amendment Order P 9.

23. If Rio Bravo is reverted to the original 2019 pipeline design and route (as modified by the Second Amendment), it would face significant delay and disruption associated with the need for further proceedings to address the disconnect between the remaining FERC orders approving a pipeline design, and the design that

exists today.  For instance, the 2019 pipeline design contemplated a compressor station to be sited within the footprint of the LNG Terminal, but that compressor station was eliminated when the First Amendment Application was approved, and is no longer needed.  Given subsequent changes to the design of the Terminal, it is not physically possible for Rio Bravo to simply revert back to the 2019 design.

24.    If, however, the Court's August 6 opinion were construed more broadly to have also vacated the original 2019 Authorization Order, Rio Bravo would experience even more significant disruption, with cascading negative impacts on project schedule and timing.  Among other things, Rio Bravo would be limited in its ability to complete certain tasks on the timeframe and in the manner necessary to place the pipeline into service on schedule.  For instance, without the 2019 Authorization Order, Rio Bravo may be unable to access land along the right-of-way to complete certain species or other environmental surveys that are required to occur during specific time periods (e.g., seasonal windows) before construction can begin. In addition, without the 2019 Authorization Order, Rio Bravo could lack authority to accept delivery of certain materials on or along the pipeline right-of-way; instead, Rio Bravo could be forced to incur additional expense to delay delivery of these materials or store them elsewhere (e.g., at the mill), at significant additional cost.

25.    Regardless of how the August 6 opinion is construed, vacating **any** of the FERC authorizations for Rio Bravo will create significant disruption.  Planning

14

and design of the Pipeline Project must continue expeditiously, and in accordance with the schedule outlined above, for the pipeline to begin construction in May 2025 and be completed by the August 2026 in-service date. Vacatur will interrupt ongoing work of obtaining financing, finalizing remaining permits and authorizations, securing contracts, and procuring materials, with cascading, non-linear effects on timing and cost. Those effects would cause significant financial, practical, and reputational harms, with Rio Bravo potentially incurring contractual damages associated with delay and—if delays extend past the current in-service date—lost revenue. Vacating any of FERC's orders, even temporarily, would cause Rio Bravo to incur substantial unrecoverable costs.

26.    As of October 2024, Rio Bravo has incurred expenses of approximately $265 million in connection with permitting, developing, environmental mitigation, and right-of-way acquisition for the Pipeline Project.  In aggregate, Rio Bravo's expenditures and obligations exceed $465 million.

27.    The Pipeline Project has specific and unusual design specifications, and Rio Bravo has procured and designed materials that are particular to this project, in reliance on the FERC orders.

28.    In addition to its contracts with construction vendors, Rio Bravo also has contractual obligations to Rio Grande, including an obligation to begin delivering gas at dates that are keyed to the in-service date for the LNG Terminal.

15

A-57

Vacating any of the FERC orders could imperil Rio Bravo's ability to begin providing service at the date contemplated by that contract. If Rio Bravo misses the August 2026 in-service date, it could jeopardize the project and result in Rio Bravo losing or deferring substantial revenue.

29.   Before the Court's August 6 opinion, Rio Bravo had planned to proceed with up to $1 billion in project debt financing in October 2024. Those plans are now put on hold. If any of FERC's orders are vacated, Rio Bravo will not be able to access debt markets or secure reasonable financing and risk terms for the Project.

30.   If vacatur of FERC authorizations for Rio Bravo delays the in-service date for the Pipeline Project and interferes with the commissioning or entry into service of the LNG Terminal, it would cause broader harms to the public interest. The Pipeline Project in particular will yield significant expected benefits, including increased tax revenues, job creation, and economic benefits to communities along the pipeline route. Rio Bravo estimates that total spending in connection with the Pipeline Project will support more than 3,500 jobs. Moreover, Rio Bravo anticipates paying more than $750 million in property taxes to Jim Wells, Kleberg, Kenedy, Willacy, and Cameron Counties over the 40-year life of the Pipeline Project. In addition, the Pipeline Project, together with the LNG Terminal, will provide domestic natural gas producers with access to critically important export markets and improve the country's balance of trade.

\* \* \*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed at Austin, Texas on October 21, 2024.

Quinn Langbauer

17

**A-59**

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that on October 21, 2024, I electronically filed the foregoing petition, together with its addendum, with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.


Date:  October 21, 2024          */s/ Jeremy C. Marwell*
                                 Jeremy C. Marwell
                                 VINSON & ELKINS LLP
                                 2200 Pennsylvania Avenue, NW
                                 Suite 500 West
                                 Washington, DC 20037
                                 Phone: 202.639.6507
                                 Email: jmarwell@velaw.com

                                 *Counsel for Respondent-Intervenor*
                                 *Rio Bravo Pipeline Company, LLC*