

January 23, 2025

*Via ECF*

Clifton Cislak
Clerk of Court
U.S. Court of Appeals for the D.C. Circuit
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue N.W.
Washington, D.C. 20001

**Orrick, Herrington & Sutcliffe LLP**
2100 Pennsylvania Avenue NW
Washington, DC 20037-3202

+1 202 339 8400

**orrick.com**

**Robert Loeb**

E  rloeb@orrick.com
D  +1 202 339 8475
F  +1 202 339 8500

Re: *City of Port Isabel v. FERC*, Nos. 23-1174, 23-1221
Rule 28(j) Letter

Dear Mr. Cislak:

Intervenor Rio Grande LNG, LLC files this letter under F.R.A.P. 28(j), to submit Executive Order Ending Illegal Discrimination and Restoring Merit-Based Opportunity (Jan. 21, 2025) ("January 21 EO"), and Executive Order Unleashing American Energy (Jan. 20, 2025) ("January 20 EO"), as supplemental authority.

Section 3 of the January 21 EO revokes Executive Order 12,898, the purported authority cited by the panel for vacating the Rio Grande project's authorization and requiring FERC to conduct a more thorough environmental-justice analysis. *See* Op. 10-11; Rio Grande PFREB. 13-15. This Court has already held that Council on Environmental Quality regulations implementing the requirements of Executive Order 12,898 are themselves unenforceable. *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 909 (D.C. Cir. 2024); *see* Joint Reply ISO PFREB 8-10. Following the January 21 EO, it is now clear that all of the claimed errors cited by the panel here as the basis for vacatur are based on authorities that are now without force. As a result, they cannot be a proper basis for vacating FERC's authorization of the Rio Grande project and requiring a supplemental EIS based on purported deficiencies in an environmental justice analysis. In addition, under Section 6 of the January 20 EO, agencies are not permitted to apply additional requirements beyond those provided for directly in the statute. Other nonstatutory requirements, such as environmental justice review, are "eliminated" from consideration.

This Court should therefore withdraw the panel decision and deny the petition for review. At a minimum, the Court should vacate the panel opinion and order supplemental briefing on the effect of these recent developments.



>Respectfully,
>
>/s/ Robert M. Loeb
>Robert M. Loeb

cc: Counsel of Record (via ECF)

# EXHIBIT A

Presidential Actions

# ENDING ILLEGAL DISCRIMINATION AND RESTORING MERIT-BASED OPPORTUNITY

January 21, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Purpose.  Longstanding Federal civil-rights laws protect individual Americans from discrimination based on race, color, religion, sex, or national origin.  These civil-rights protections serve as a bedrock supporting equality of opportunity for all Americans.  As President, I have a solemn duty to ensure that these laws are enforced for the benefit of all Americans.

Yet today, roughly 60 years after the passage of the Civil Rights Act of 1964, critical and influential institutions of American society, including the Federal Government, major corporations, financial institutions, the medical industry, large commercial airlines, law enforcement agencies, and institutions of higher education have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called "diversity, equity, and inclusion" (DEI) or "diversity, equity, inclusion, and accessibility" (DEIA) that can violate the civil-rights laws of this Nation.

Illegal DEI and DEIA policies not only violate the text and spirit of our longstanding Federal civil-rights laws, they also undermine our national unity, as they deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system.  Hardworking Americans who deserve a shot at the American Dream should not be stigmatized, demeaned, or shut out of opportunities because of their race or sex.

These illegal DEI and DEIA policies also threaten the safety of American men, women, and children across the Nation by diminishing the importance of individual merit, aptitude, hard work, and determination when selecting people for jobs and services in key sectors of American society, including all levels of government, and the medical, aviation, and law-enforcement communities.  Yet in case after tragic case, the American people have witnessed first-hand the disastrous consequences of illegal, pernicious discrimination that has prioritized how people were born instead of what they were capable of doing.

The Federal Government is charged with enforcing our civil-rights laws.  The purpose of this order is to ensure that it does so by ending illegal preferences and discrimination.

Sec. 2.  Policy.  It is the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work.  I therefore order all executive departments and agencies (agencies) to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements.  I further order all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities.

Sec. 3.  Terminating Illegal Discrimination in the Federal Government.  (a)  The following executive actions are hereby revoked:
(i)    Executive Order 12898 of February 11, 1994 (Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations);
(ii)   Executive Order 13583 of August 18, 2011 (Establishing a Coordinated Government-wide Initiative to Promote Diversity and Inclusion in the Federal Workforce);
(iii)  Executive Order 13672 of July 21, 2014 (Further Amendments to Executive Order 11478, Equal Employment Opportunity in the Federal Government, and Executive Order 11246, Equal Employment Opportunity); and
(iv)   The Presidential Memorandum of October 5, 2016 (Promoting Diversity and Inclusion in the National Security Workforce).
(b)  The Federal contracting process shall be streamlined to enhance speed and efficiency, reduce costs, and require Federal contractors and subcontractors to comply with our civil-rights laws.  Accordingly:
(i)    Executive Order 11246 of September 24, 1965 (Equal Employment Opportunity), is hereby revoked.  For 90 days from the date of this order, Federal contractors may continue to comply with the regulatory scheme in effect on January 20, 2025.
(ii)   The Office of Federal Contract Compliance Programs within the Department of Labor shall immediately cease:
(A)  Promoting "diversity";
(B)  Holding Federal contractors and subcontractors responsible for taking "affirmative action"; and
(C)  Allowing or encouraging Federal contractors and subcontractors to engage in workforce balancing based on race, color, sex, sexual preference, religion, or national origin.
(iii)  In accordance with Executive Order 13279 of December 12, 2002 (Equal Protection of the Laws for Faith-Based and Community Organizations), the employment, procurement, and contracting practices of Federal contractors and subcontractors shall not consider race, color, sex, sexual preference, religion, or national origin in ways that violate the Nation's civil rights laws.

(iv)   The head of each agency shall include in every contract or grant award:
(A)  A term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and
(B)  A term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws.
(c)  The Director of the Office of Management and Budget (OMB), with the assistance of the Attorney General as requested, shall:
(i)    Review and revise, as appropriate, all Government-wide processes, directives, and guidance;
(ii)   Excise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures to streamline those procedures, improve speed and efficiency, lower costs, and comply with civil-rights laws; and
(iii)  Terminate all "diversity," "equity," "equitable decision-making," "equitable deployment of financial and technical assistance," "advancing equity," and like mandates, requirements, programs, or activities, as appropriate.

Sec. 4.  Encouraging the Private Sector to End Illegal DEI Discrimination and Preferences.  (a)  The heads of all agencies, with the assistance of the Attorney General, shall take all appropriate action with respect to the operations of their agencies to advance in the private sector the policy of individual initiative, excellence, and hard work identified in section 2 of this order.
(b)  To further inform and advise me so that my Administration may formulate appropriate and effective civil-rights policy, the Attorney General, within 120 days of this order, in consultation with the heads of relevant agencies and in coordination with the Director of OMB, shall submit a report to the Assistant to the President for Domestic Policy containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI.  The report shall contain a proposed strategic enforcement plan identifying:
(i)    Key sectors of concern within each agency's jurisdiction;
(ii)   The most egregious and discriminatory DEI practitioners in each sector of concern;
(iii)  A plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated "DEI" or otherwise) that constitute illegal discrimination or preferences.  As a part of this plan, each agency shall identify up to nine potential civil compliance investigations of publicly traded corporations, large non-profit corporations or associations, foundations with assets of 500 million dollars or more, State and local bar and medical associations, and institutions of higher education with endowments over 1 billion dollars;

(iv)  Other strategies to encourage the private sector to end illegal DEI discrimination and preferences and comply with all Federal civil-rights laws;
(v)  Litigation that would be potentially appropriate for Federal lawsuits, intervention, or statements of interest; and
(vi)  Potential regulatory action and sub-regulatory guidance.

Sec. 5.  Other Actions.  Within 120 days of this order, the Attorney General and the Secretary of Education shall jointly issue guidance to all State and local educational agencies that receive Federal funds, as well as all institutions of higher education that receive Federal grants or participate in the Federal student loan assistance program under Title IV of the Higher Education Act, 20 U.S.C. 1070 et seq., regarding the measures and practices required to comply with Students for Fair Admissions, Inc. v. President and Fellows of Harvard College, 600 U.S. 181 (2023).

Sec. 6.  Severability.  If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

Sec. 7.  Scope.  (a)  This order does not apply to lawful Federal or private-sector employment and contracting preferences for veterans of the U.S. armed forces or persons protected by the Randolph-Sheppard Act, 20 U.S.C. 107 et seq.
(b)  This order does not prevent State or local governments, Federal contractors, or Federally-funded State and local educational agencies or institutions of higher education from engaging in First Amendment-protected speech.
(c)  This order does not prohibit persons teaching at a Federally funded institution of higher education as part of a larger course of academic instruction from advocating for, endorsing, or promoting the unlawful employment or contracting practices prohibited by this order.

Sec. 8.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:
(i)   the authority granted by law to an executive department, agency, or the head thereof; or
(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.
(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.
(c)  This order is not intended to and does not create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
January 21, 2025.

# EXHIBIT B

Presidential Actions

# UNLEASHING AMERICAN ENERGY EXECUTIVE ORDER
January 20, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Background.  America is blessed with an abundance of energy and natural resources that have historically powered our Nation's economic prosperity.  In recent years, burdensome and ideologically motivated regulations have impeded the development of these resources, limited the generation of reliable and affordable electricity, reduced job creation, and inflicted high energy costs upon our citizens.  These high energy costs devastate American consumers by driving up the cost of transportation, heating, utilities, farming, and manufacturing, while weakening our national security.

It is thus in the national interest to unleash America's affordable and reliable energy and natural resources.  This will restore American prosperity —- including for those men and women who have been forgotten by our economy in recent years.  It will also rebuild our Nation's economic and military security, which will deliver peace through strength.

Sec. 2.  Policy.  It is the policy of the United States:

(a)  to encourage energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf, in order to meet the needs of our citizens and solidify the United States as a global energy leader long into the future;

(b)  to establish our position as the leading producer and processor of non-fuel minerals, including rare earth minerals, which will create jobs and prosperity at home, strengthen supply chains for the United States and its allies, and reduce the global influence of malign and adversarial states;

(c)  to protect the United States's economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible in every State and territory of the Nation;

(d)  to ensure that all regulatory requirements related to energy are grounded in clearly applicable law;

(e)  to eliminate the "electric vehicle (EV) mandate" and promote true consumer choice, which is essential for economic growth and innovation, by removing regulatory barriers to motor vehicle access; by ensuring a level regulatory playing field for consumer choice in vehicles; by terminating, where appropriate, state emissions waivers that function to limit sales of gasoline-powered automobiles; and by considering the elimination of unfair subsidies and other ill-conceived government-imposed market distortions that favor EVs over other technologies and effectively

mandate their purchase by individuals, private businesses, and government entities alike by rendering other types of vehicles unaffordable;

(f)  to safeguard the American people's freedom to choose from a variety of goods and appliances, including but not limited to lightbulbs, dishwashers, washing machines, gas stoves, water heaters, toilets, and shower heads, and to promote market competition and innovation within the manufacturing and appliance industries;

(g)  to ensure that the global effects of a rule, regulation, or action shall, whenever evaluated, be reported separately from its domestic costs and benefits, in order to promote sound regulatory decision making and prioritize the interests of the American people;

(h)  to guarantee that all executive departments and agencies (agencies) provide opportunity for public comment and rigorous, peer-reviewed scientific analysis; and

(i)  to ensure that no Federal funding be employed in a manner contrary to the principles outlined in this section, unless required by law.

Sec. 3.  Immediate Review of All Agency Actions that Potentially Burden the Development of Domestic Energy Resources.  (a)  The heads of all agencies shall review all existing regulations, orders, guidance documents, policies, settlements, consent orders, and any other agency actions (collectively, agency actions) to identify those agency actions that impose an undue burden on the identification, development, or use of domestic energy resources — with particular attention to oil, natural gas, coal, hydropower, biofuels, critical mineral, and nuclear energy resources — or that are otherwise inconsistent with the policy set forth in section 2 of this order, including restrictions on consumer choice of vehicles and appliances.

(b)  Within 30 days of the date of this order, the head of each agency shall, in consultation with the director of the Office of Management and Budget (OMB) and the National Economic Council (NEC), develop and begin implementing action plans to suspend, revise, or rescind all agency actions identified as unduly burdensome under subsection (a) of this section, as expeditiously as possible and consistent with applicable law.  The head of any agency who determines that such agency does not have agency actions described in subsection (a) of this section shall submit to the Director of OMB a written statement to that effect and, absent a determination by the Director of OMB that such agency does have agency actions described in this subsection, shall have no further responsibilities under this section.

(c) Agencies shall promptly notify the Attorney General of any steps taken pursuant to subsection (a) of this section so that the Attorney General may, as appropriate:

(i)   provide notice of this Executive Order and any such actions to any court with jurisdiction over pending litigation in which such actions may be relevant; and

(ii)  request that such court stay or otherwise delay further litigation, or seek other appropriate relief consistent with this order, pending the completion of the administrative actions described in this order.

(d)  Pursuant to the policy outlined in section 2 of this order, the Attorney General shall consider whether pending litigation against illegal, dangerous, or harmful policies should be resolved through stays or other relief.

Sec. 4.  Revocation of and Revisions to Certain Presidential and Regulatory Actions.  (a)  The following are revoked and any offices established therein are abolished:

(i)     Executive Order 13990 of January 20, 2021 (Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis);

(ii)    Executive Order 13992 of January 20, 2021 (Revocation of Certain Executive Orders Concerning Federal Regulation);

(iii)   Executive Order 14008 of January 27, 2021 (Tackling the Climate Crisis at Home and Abroad);

(iv)    Executive Order 14007 of January 27, 2021 (President's Council of Advisors on Science and Technology);

(v)     Executive Order 14013 of February 4, 2021 (Rebuilding and Enhancing Programs to Resettle Refugees and Planning for the Impact of Climate Change on Migration);

(vi)    Executive Order 14027 of May 7, 2021 (Establishment of the Climate Change Support Office);

(vii)   Executive Order 14030 of May 20, 2021 (Climate-Related Financial Risk);

(viii)  Executive Order 14037 of August 5, 2021 (Strengthening American Leadership in Clean Cars and Trucks);

(ix)    Executive Order 14057 of December 8, 2021 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability);

(x)     Executive Order 14072 of April 22, 2022 (Strengthening the Nation's Forests, Communities, and Local Economies);

(xi)    Executive Order 14082 of September 12, 2022 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022); and

(xii)   Executive Order 14096 of April 21, 2023 (Revitalizing Our Nation's Commitment to Environmental Justice for All).

(b)  All activities, programs, and operations associated with the American Climate Corps, including actions taken by any agency shall be terminated immediately.  Within one day of the date of this order, the Secretary of the Interior shall submit a letter to all parties to the "American Climate Corps Memorandum of Understanding" dated December 2023 to terminate the memorandum, and the head of each party to the memorandum shall agree to the termination in writing.

(c)  Any assets, funds, or resources allocated to an entity or program abolished by subsection (a) of this section shall be redirected or disposed of in accordance with applicable law.

(d)  The head of any agency that has taken action respecting offices and programs in subsection (a) shall take all necessary steps to ensure that all such actions are terminated or, if necessary, appropriate, or required by law, that such activities are transitioned to other agencies or entities.

(e) Any contract or agreement between the United States and any third party on behalf of the entities or programs abolished in subsection (a) of this section, or in

furtherance of them, shall be terminated for convenience, or otherwise, as quickly as permissible under the law.

Sec. 5.  Unleashing Energy Dominance through Efficient Permitting.  (a)  Executive Order 11991 of May 24, 1977 (Relating to protection and enhancement of environmental quality) is hereby revoked.

(b)  To expedite and simplify the permitting process, within 30 days of the date of this order, the Chairman of the Council on Environmental Quality (CEQ) shall provide guidance on implementing the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 *et seq.*, and propose rescinding CEQ's NEPA regulations found at 40 CFR 1500 *et seq.*

(c)  Following the provision of the guidance, the Chairman of CEQ shall convene a working group to coordinate the revision of agency-level implementing regulations for consistency. The guidance in subsection (b) and any resulting implementing regulations must expedite permitting approvals and meet deadlines established in the Fiscal Responsibility Act of 2023 (Public Law 118-5).  Consistent with applicable law, all agencies must prioritize efficiency and certainty over any other objectives, including those of activist groups, that do not align with the policy goals set forth in section 2 of this order or that could otherwise add delays and ambiguity to the permitting process.

(d)  The Secretaries of Defense, Interior, Agriculture, Commerce, Housing and Urban Development, Transportation, Energy, Homeland Security, the Administrator of the Environmental Protection Agency (EPA), the Chairman of CEQ, and the heads of any other relevant agencies shall undertake all available efforts to eliminate all delays within their respective permitting processes, including through, but not limited to, the use of general permitting and permit by rule.  For any project an agency head deems essential for the Nation's economy or national security, agencies shall use all possible authorities, including emergency authorities, to expedite the adjudication of Federal permits.  Agencies shall work closely with project sponsors to realize the ultimate construction or development of permitted projects.

(e)  The Director of the NEC and the Director of the Office of Legislative Affairs shall jointly prepare recommendations to Congress, which shall:

(i)   facilitate the permitting and construction of interstate energy transportation and other critical energy infrastructure, including, but not limited to, pipelines, particularly in regions of the Nation that have lacked such development in recent years; and

(ii)  provide greater certainty in the Federal permitting process, including, but not limited to, streamlining the judicial review of the application of NEPA.

Sec. 6.  Prioritizing Accuracy in Environmental Analyses.  (a)  In all Federal permitting adjudications or regulatory processes, all agencies shall adhere to only the relevant legislated requirements for environmental considerations and any considerations beyond these requirements are eliminated.  In fulfilling all such requirements, agencies shall strictly use the most robust methodologies of assessment at their disposal and shall not use methodologies that are arbitrary or ideologically motivated.

(b)  The Interagency Working Group on the Social Cost of Greenhouse Gases (IWG), which was established pursuant to Executive Order 13990, is hereby disbanded, and any guidance, instruction, recommendation, or document issued by the IWG is withdrawn as no longer representative of governmental policy including:

(i)    the Presidential Memorandum of January 27, 2021 (Restoring Trust in Government Through Scientific Integrity and Evidence-Based Policymaking);

(ii)   the Report of the Greenhouse Gas Monitoring and Measurement Interagency Working Group of November 2023 (National Strategy to Advance an Integrated U.S. Greenhouse Gas Measurement, Monitoring, and Information System);

(iii)  the Technical Support Document of February 2021 (Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990); and

(iv)   estimates of the social cost of greenhouse gases, including the estimates for the social cost of carbon, the social cost of methane, or the social cost of nitrous oxide based, in whole or in part, on the IWG's work or guidance.

(c)  The calculation of the "social cost of carbon" is marked by logical deficiencies, a poor basis in empirical science, politicization, and the absence of a foundation in legislation.  Its abuse arbitrarily slows regulatory decisions and, by rendering the United States economy internationally uncompetitive, encourages a greater human impact on the environment by affording less efficient foreign energy producers a greater share of the global energy and natural resource market.  Consequently, within 60 days of the date of this order, the Administrator of the EPA shall issue guidance to address these harmful and detrimental inadequacies, including consideration of eliminating the "social cost of carbon" calculation from any Federal permitting or regulatory decision.

(d)  Prior to the guidance issued pursuant to subsection (c) of this section, agencies shall ensure estimates to assess the value of changes in greenhouse gas emissions resulting from agency actions, including with respect to the consideration of domestic versus international effects and evaluating appropriate discount rates, are, to the extent permitted by law, consistent with the guidance contained in OMB Circular A-4 of September 17, 2003 (Regulatory Analysis).

(e)  Furthermore, the head of each agency shall, as appropriate and consistent with applicable law, initiate a process to make such changes to any rule, regulation, policy or action as may be necessary to ensure consistency with the Regulatory Analysis.

(f)  Within 30 days of the date of this order, the Administrator of the EPA, in collaboration with the heads of any other relevant agencies, shall submit joint recommendations to the Director of OMB on the legality and continuing applicability of the Administrator's findings, "Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act," Final Rule, 74 FR 66496 (December 15, 2009).

Sec. 7.  Terminating the Green New Deal.  (a)  All agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58), including but not limited to funds for electric vehicle charging stations made

available through the National Electric Vehicle Infrastructure Formula Program and the Charging and Fueling Infrastructure Discretionary Grant Program, and shall review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order.  Within 90 days of the date of this order, all agency heads shall submit a report to the Director of the NEC and Director of OMB that details the findings of this review, including recommendations to enhance their alignment with the policy set forth in section 2.  No funds identified in this subsection (a) shall be disbursed by a given agency until the Director of OMB and Assistant to the President for Economic Policy have determined that such disbursements are consistent with any review recommendations they have chosen to adopt.

(b)  When procuring goods and services, making decisions about leases, and making other arrangements that result in disbursements of Federal funds, agencies shall prioritize cost-effectiveness, American workers and businesses, and the sensible use of taxpayer money, to the greatest extent.  The Director of OMB shall finalize and circulate guidelines to further implement this subsection.

(c)  All agencies shall assess whether enforcement discretion of authorities and regulations can be utilized to advance the policy outlined in section 2 of this order.  Within 30 days of the date of this order, each agency shall submit a report to the Director of OMB identifying any such instances.

Sec. 8.  Protecting America's National Security.(a) The Secretary of Energy is directed restart reviews of applications for approvals of liquified natural gas export projects as expeditiously as possible, consistent with applicable law.  In assessing the "Public Interest" to be advanced by any particular application, the Secretary of Energy shall consider the economic and employment impacts to the United States and the impact to the security of allies and partners that would result from granting the application.

(b)  With respect to any proposed deepwater port for the export of liquefied natural gas (project) for which a favorable record of decision (ROD) has previously been issued pursuant to the Deepwater Port Act of 1974 (DWPA), 33 U.S.C. 1501 *et seq.*, the Administrator of the Maritime Administration (MARAD) shall, within 30 days of the date of this order and consistent with applicable law, determine whether any refinements to the project proposed subsequent to the ROD are likely to result in adverse environmental consequences that substantially differ from those associated with the originally-evaluated project so as to present a seriously different picture of the foreseeable adverse environmental consequences (seriously different consequences).  In making this determination, MARAD shall qualitatively assess any difference in adverse environmental consequences between the project with and without the proposed refinements, including any potential consequences not addressed in the final Environmental Impact Statement (EIS), which shall be considered adequate under NEPA notwithstanding any revisions to NEPA that may have been enacted following the final EIS.  MARAD shall submit this determination, together with a detailed justification, to the Secretary of Transportation and to the President.

(c)  Pursuant to subsection (b) of this section, if MARAD determines that such refinements are not likely to result in seriously different consequences, it shall include in that determination a description of the refinements to supplement and update the ROD, if necessary and then no later than 30 additional days, he shall issue a DWPA license.

(d)  If MARAD determines, with concurrence from the Secretary of Transportation, that such proposed refinements are likely to result in seriously different consequences, it shall, within 60 days after submitting such determination, issue an Environmental Assessment (EA) examining such consequences and, with respect to all other environmental consequences not changed due to project refinements, shall reaffirm the conclusions of the final EIS.  Within 30 days after issuing the EA, MARAD shall issue an addendum to the ROD, if necessary, and shall, within 30 additional days, issue a DWPA license consistent with the ROD.

Sec. 9.  Restoring America's Mineral Dominance.  (a)  The Secretary of the Interior, Secretary of Agriculture, Administrator of the EPA, Chairman of CEQ, and the heads of any other relevant agencies, as appropriate, shall identify all agency actions that impose undue burdens on the domestic mining and processing of non-fuel minerals and undertake steps to revise or rescind such actions.

(b)  The Secretaries of the Interior and Agriculture shall reassess any public lands withdrawals for potential revision.

(c)  The Secretary of the Interior shall instruct the Director of the U.S. Geological Survey to consider updating the Survey's list of critical minerals, including for the potential of including uranium.

(d)  The Secretary of the Interior shall prioritize efforts to accelerate the ongoing, detailed geologic mapping of the United States, with a focus on locating previously unknown deposits of critical minerals.

(e)  The Secretary of Energy shall ensure that critical mineral projects, including the processing of critical minerals, receive consideration for Federal support, contingent on the availability of appropriated funds.

(f)  The United States Trade Representative shall assess whether exploitative practices and state-assisted mineral projects abroad are unlawful or unduly burden or restrict United States commerce.

(g)  The Secretary of Commerce shall assess the national security implications of the Nation's mineral reliance and the potential for trade action.

(h)  The Secretary of Homeland Security shall assess the quantity and inflow of minerals that are likely the product of forced labor into the United States and whether such inflows pose a threat to national security and, within 90 days of the date of this order, shall provide this assessment to the Director of the NEC.

(i)  The Secretary of Defense shall consider the needs of the United States in supplying and maintaining the National Defense Stockpile, review the legal authorities and obligations in managing the National Defense Stockpile, and take all appropriate steps to ensure that the National Defense Stockpile will provide a robust supply of critical minerals in event of future shortfall.

(j)  Within 60 days of the date of this order, the Secretary of State, Secretary of Commerce, Secretary of Labor, the United States Trade Representative, and the heads of any other relevant agencies, shall submit a report to the Assistant to the President for Economic Policy that includes policy recommendations to enhance the competitiveness of American mining and refining companies in other mineral-wealthy nations.

(k)  The Secretary of State shall consider opportunities to advance the mining and processing of minerals within the United States through the Quadrilateral Security Dialogue.

Sec. 10.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of OMB relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,

    January 20, 2025.